```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN
                   SOUTHERN DIVISION
```

**UNITED STATES OF AMERICA,**

                 Plaintiff,

                                    **HONORABLE DENISE PAGE HOOD**

     v.

                                      **No. 21-20264**

**YLLI DIDANI,**

                 Defendant.

_____/

**EVIDENTIARY HEARING RE: CELLPHONES**

**Monday, April 24, 2023**

Appearances:

On behalf of Plaintiff         On behalf of Defendant

Mark Bilkovic
Timothy P. McDonald           Wade Fink
U.S. Attorney's Office       Wade Fink Law, P.C.
211 W. Fort Street, #2300   550 W. Merrill Street, #100
Detroit, Michigan  48226    Birmingham, Michigan  48009
(313) 226-9100              (248) 712-1054
mark.bilkovic@usdoj.gov     wade@wadefinklaw.com

                               Brian Kaplan
                               Brian Kaplan P.C.
                               11 Park Place, #1005
                               New York, New York  10007
                               (212) 269-2363
                               brian@bkaplanlaw.com

                       -   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*Detroit, Michigan*
*(313)234-2604 · sheri_ward@mied.uscourts.gov*

*Transcript produced using machine shorthand and CAT software.*

*Evidentiary Hearing Re: Motion to Suppress Cellphones*
*Monday, April 24, 2023*

## I  N  D  E  X

<u>Government's Witnesses</u>                          <u>Page</u>  <u>Vol.</u>

**Joshua Bianchi**

    Direct Examination By Mr. Bilkovic:        7    1

    Voir Dire Examination By Mr. Fink:        47    1

    Direct Exam (Cont'd) By Mr. Bilkovic:     53    1

    Cross-Examination By Mr. Fink:            65    1

    Redirect Examination by Mr. Bilkovic:    175    1

**Matthew Parisi**

    Direct Examination By Mr. McDonald:      189    1

    Cross Examination By Mr. Fink:           222    1

    Redirect Examination By Mr. McDonald:    249    1

    Recross Examination By Mr. Fink:         254    1

**Daniel Nugent**

    Direct Examination By Mr. McDonald:      260    1

    Cross Examination By Mr. Fink:           275    1

Certification of Court Reporters:            299

-   -   -

*Evidentiary Hearing Re: Motion to Suppress Cellphones*
*Monday, April 24, 2023*


# E X H I B I T S

Government's Exhibits

| Number | | Id'd | Rcvd | Vol. |
|---|---|---|---|---|
| 1 | ............................... | 44 | 54 | 1 |
| 2 | ............................... | 45 | 54 | 1 |
| 3 | ............................... | 46 | 54 | 1 |
| 4 | ............................... | 46 | 54 | 1 |
| 5 | ............................... | 53 | 54 | 1 |
| 6 | ............................... | 60 | 220 | 1 |
| 7 | ............................... | 176 | 179 | 1 |
| 8 | ............................... | 176 | 179 | 1 |
| 9 | ............................... | 176 | 179 | 1 |
| 11 | ............................... | 272 | 273 | 1 |

Defendant's Exhibits

Number

| 1 | ............................. | 160 | 161 | 1 |
|---|---|---|---|---|

- - -

*21-20264; U.S.A. v. Ylli Didani*

*Evidentiary Hearing Re: Motion to Suppress Cellphones*
*Monday, April 24, 2023*

Page 4

1      Detroit, Michigan

2      Monday, April 24, 2023

3      10:10 a.m.

4      -   -   -

5      (Call to Order of the Court.)

6          **LAW CLERK:**  Calling Case Number 21-20264,

7   *United States of America v. Ylli Didani.*

8          Appearances, please.

9          **MR. BILKOVIC:**  Good morning, Your Honor.

10   Mr. Bilkovic and Timothy McDonald on behalf of the

11   United States.

12          **THE COURT:**  Good morning to you.

13          **MR. FINK:**  Good morning, Your Honor.  Wade Fink and

14   Brian Kaplan at counsel table alongside our client,

15   Ylli Didani, who is present.

16          **THE COURT:**  Okay.  Good morning to all of you as

17   well.  Everyone may be seated.

18      We're here on a number of matters:  The Defendant's Motion

19   to Dismiss Counts 1 and 3 and the Defendant's Motion to

20   Suppress Cellphone Evidence, and the Defendant's Motion to

21   Dismiss Count 2, and the Government's Motion for Pretrial

22   Determination as to Jurisdiction.

23      It's my understanding that we have witnesses and so we're

24   going to proceed with the witnesses on the motion to suppress

25   the cellphone evidence; is that correct?

*21-20264; U.S.A. v. Ylli Didani*

*Evidentiary Hearing Re: Motion to Suppress Cellphones*
*Monday, April 24, 2023*

*Page 5*

1      **MR. BILKOVIC:**  That's correct, Your Honor.

2      **THE COURT:**  Okay.

3      **MR. FINK:**  Yes, Your Honor, that's correct.  We

4  thought it expedient to do the hearing with regard to

5  suppression first with our witnesses.

6      **THE COURT:**  Okay.  All right.  Very good.  Do you

7  have your witnesses ready?

8      **MR. BILKOVIC:**  Yes, Your Honor.

9      **THE COURT:**  Okay.  Do you want to make any

10 preliminary statements?

11     **MR. FINK:**  The only thing I would ask for, Judge, is

12 one of the witnesses in the courtroom I believe may testify

13 later at this hearing so I'd ask that for Special Agent

14 Bianchi's testimony that Special Agent Leach be sequestered.

15     **THE COURT:**  Do you have any objection to that?

16     **MR. BILKOVIC:**  Your Honor, I don't know that he would

17 be testifying at this hearing.  He was not involved in this

18 case until 2017, which is well after these statements take

19 place.  He might be a witness in the future but not for

20 anything that's going to be discussed today so I don't see any

21 reason to have him excused.

22     **THE COURT:**  Do you need him at counsel table?

23     **MR. BILKOVIC:**  Pardon me?

24     **THE COURT:**  Do you need him at counsel table?

25     **MR. BILKOVIC:**  No, I do not need him at counsel

*21-20264; U.S.A. v. Ylli Didani*

*Evidentiary Hearing Re: Motion to Suppress Cellphones*
*Monday, April 24, 2023*

*Page 6*

1  table.

2          **THE COURT:**  Okay.  Then he's excused.  Your objection

3  is noted and preserved for the record.  Is he in the courtroom

4  now?

5          **AUDIENCE MEMBER:**  Yes, Your Honor.

6          **THE COURT:**  Okay.  Thank you.

7          **MR. FINK:**  Thank you, Your Honor.

8          **THE COURT:**  Do you want to make any preliminary

9  statements relative to the motion?

10          **MR. FINK:**  The defense doesn't.  Thank you for

11  asking, Judge.

12          **MR. BILKOVIC:**  No, Your Honor.

13          **THE COURT:**  All right.  Very well.  Call your first

14  witness.

15          **MR. BILKOVIC:**  The government would call Agent

16  Josh Bianchi.

17          **THE COURT:**  Step all the way up here to the edge of

18  the jury box to be sworn in, okay?

19          **THE WITNESS:**  Yes, ma'am.

20          **THE COURT:**  That's fine right there.  I'll be

21  satisfied if you just answer, okay?

22                          -   -   -

23                      **JOSHUA BIANCHI,**

24          being first duly sworn to tell the truth, was

25          examined and testified upon their oath

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 7*

1           as follows:

2                **THE COURT:**  Okay.  Is that satisfactory to you?

3                **MR. FINK:**  Judge, I'm sorry, I was speaking with my

4      client.  Raising his hand -- his left hand, is that what --

5                **THE COURT:**  No.  I don't even require him to raise

6      any hand.

7                **MR. FINK:**  Absolutely no objection to that.

8                **THE COURT:**  It appears that he has his right arm in a

9      sling; is that correct?

10               **THE WITNESS:**  Yes, Your Honor.

11               **THE COURT:**  Okay.  You may be seated.

12          State your full name and spell your last name for the

13     record.

14               **THE WITNESS:**  Joshua Bianchi, B-i-a-n-c-h-i.

15               **THE COURT:**  Okay.  Very good.

16               **MR. BILKOVIC:**  May I proceed, Your Honor?

17               **THE COURT:**  You may.

18                             -   -   -

19                                          (10:14 a.m.)

20                       **DIRECT EXAMINATION**

21     BY MR. BILKOVIC:

22     **Q.**   Sir, how are you employed?

23     **A.**   With the United States Border Patrol.

24     **Q.**   In what capacity?

25     **A.**   As an intel agent in Marysville, Michigan.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 8*

1          **THE COURT:**  A what?

2          **THE WITNESS:**  As an intelligence agent in Marysville,

3   Michigan.

4          **THE COURT:**  Oh, okay.

5   **BY MR. BILKOVIC:**

6   **Q.**  And how long have you been working at an intelligence

7   agent?

8   **A.**  Since 2017.

9   **Q.**  And how long have you been working for United States

10  Border Patrol?

11  **A.**  Since July of 2003.

12  **Q.**  So approximately 20 years?

13  **A.**  Yes, sir.

14  **Q.**  And, other than as an intelligence agent, what are some

15  other assignments you have had with United States Border

16  Patrol?

17  **A.**  I -- I was initially assigned in Ajo, Arizona, before

18  transferring up to Detroit, and I have also been on two -- an

19  HSI task force and a DEA task force.

20          **THE COURT:**  A what now?

21          **THE WITNESS:**  HSI task force and a DEA task force.

22          **THE COURT:**  What was your last -- I'm sorry for

23  interrupting.

24          **MR. BILKOVIC:**  That's all right.

25          **THE COURT:**  You all should know that if you have any

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

Page 9

1   objections to my questions you should state them for the

2   record.  Otherwise, they are waived.  Okay?  Do you understand

3   that for the government?

4           **MR. BILKOVIC:**  Yes, Your Honor.

5           **THE COURT:**  What about defense?

6           **MR. FINK:**  I understand, Judge.  Thank you.

7           **THE COURT:**  I'm going to ask him because I just want

8   to know.  Your assignment prior to the current assignment was

9   what?

10      Prior to 2017, the last assignment you had prior to that.

11          **THE WITNESS:**  Was the -- from 2014 to 2017 I worked

12  on an HSI task force.

13          **THE COURT:**  Okay.  All right.  Go ahead.  You may ask

14  him everything.  I just wanted to know the prior one.

15  **BY MR. BILKOVIC:**

16  **Q.**   Okay.  And HSI stands for?

17  **A.**   Homeland Security Investigations.

18  **Q.**   And just I want to go through some of the organization or

19  the agencies.  So the United States Border Patrol, that is

20  basically -- falls under Department of Homeland Security, DHS?

21  **A.**   Correct.

22  **Q.**   And so does HSI?

23  **A.**   Correct.

24  **Q.**   And HSI basically is a subagency, is it fair to say, of

25  Immigration, Customs and Enforcement, otherwise known as ICE?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

Page 10

1   **A.**   Correct.

2   **Q.**   Did you participate in any other task force -- or other

3   agencies during your time with Border Patrol?

4   **A.**   Yes, sir.

5   **Q.**   What was that?

6   **A.**   DEA.

7   **Q.**   DEA?

8   **A.**   Yes, sir.  From 2017 to February of 2021, I believe.

9   **Q.**   And so that would have been during the same time that you

10   were also an intelligence analyst?

11   **A.**   Yes, sir.

12   **Q.**   And have you had any -- I'm not going to go through all of

13   it, but have you had law enforcement training?

14   **A.**   Yes, sir.

15   **Q.**   Can you just describe generally what type of training you

16   have had?

17   **A.**   I have had about approximately five months training

18   learning immigration, criminal and border search authority at

19   the Border Patrol Academy in Glynco, Georgia, in 2003.

20        I have also been cross-designated in Customs Title 19

21   training in 2006, as well as task force training in Title 19 in

22   2014.

23   **Q.**   Sir, I think you testified that you were a task force

24   officer with HSI starting in 2014?

25   **A.**   Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 11*

1  **Q.**  And you said that continued until approximately 2017?

2  **A.**  Yes, sir.

3  **Q.**  What type of task force were you involved with?

4  **THE COURT:**  Okay.  Before you get to that, do you

5  have any law enforcement experience prior to 2003?

6  **THE WITNESS:**  No, ma'am.

7  **THE COURT:**  You came straight into the Border Patrol?

8  **THE WITNESS:**  Yes, ma'am.

9  **THE COURT:**  Okay.  Go ahead, counsel.

10  **MR. BILKOVIC:**  Thank you, Your Honor.

11  BY MR. BILKOVIC:

12  **Q.**  What type of task force were you involved in when you went

13  to HSI in 2014?

14  **A.**  Initially it was a gun task force.

15  **Q.**  When you say "gun task force," what does that mean?

16  **A.**  We looked for, investigated, prosecuted cross-border-

17  related gun -- either gun smuggling or illicit activity with

18  guns.

19  **Q.**  What type of illicit activity?

20  **A.**  It could be money laundering.  It could be drugs.  It

21  could be just guns.  Criminal -- cross-border criminal

22  activity.

23  **Q.**  When you say "drug activity," are you talking drug

24  trafficking?

25  **A.**  Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 12*

**1**  **Q.**   You said initially it was a gun task force.  What did you

**2**  mean by initially?

**3**  **A.**   Towards the end of -- in 2017 it became a guns and gangs

**4**  task force.

**5**             **THE COURT:**  Guns and?

**6**             **THE WITNESS:**  Gangs.

**7**             **THE COURT:**  Okay.

**8**  BY MR. BILKOVIC:

**9**  **Q.**   Now, you had mentioned that you were cross-designated for

**10**  Title 19?

**11**  **A.**   Yes, sir.

**12**  **Q.**   And does Title 19 generally -- parts of Title 19 deal with

**13**  authority to conduct border searches?

**14**  **A.**   Yes, sir.

**15**  **Q.**   And so do you have Title 19 border search authority?

**16**  **A.**   Yes, sir.

**17**  **Q.**   So when you went to HSI in 2014, how did you get assigned

**18**  cases?  How did that come about?

**19**  **A.**   Usually one of two ways or both ways.  Either you are --

**20**  your group supervisor would assign you a case or you could

**21**  bring a case to the group from your home agency.

**22**  **Q.**   And your home agency was?

**23**  **A.**   The Detroit Border Patrol Station at the time.

**24**  **Q.**   In January of 2015, did you open an HSI investigation into

**25**  Ylli Didani?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 13*

1   A.   Yes.

2   Q.   And why was it generally that you opened that?

3   A.   It was generally opened due to information that I received

4   from the Border Patrol.

5   Q.   Information that you received from Border Patrol, was that

6   historical information?

7   A.   It was.

8   Q.   And we'll get into details of that throughout your

9   testimony, but can you generally describe the information that

10  you received?

11  A.   Yes.  In 2013 there was information -- suspicious

12  information at a marina in St. Clair Shores, Michigan, that

13  could have possibly led to drug or money smuggling back and

14  forth between Canada and the U.S.

15  Q.   And so what type of investigation was it that you had

16  opened up or what crimes were you looking into?

17  A.   Drugs and money laundering.

18  Q.   Now, you had mentioned that you -- one of the pieces of

19  information that you were provided had to do with something

20  that occurred in St. Clair Shores in 2013?

21  A.   Yes, sir.

22  Q.   Can you offer any more details about what information that

23  was?

24       MR. FINK:   Your Honor, the only objection I would

25  have is offering this for its truth.  I have no objection to

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 14*

1   offering it for why he opened the investigation or why he did

2   what he did, but I don't think it's clear from any foundation

3   if it's being offered just for that purpose.

4           **MR. BILKOVIC:**  I would agree with counsel.  It's

5   being offered right now -- basically one of the challenges here

6   ultimately is going to be that there was -- whether there was

7   reasonable suspicion on a later date to search a phone.  So I'm

8   basically getting into information that Agent Bianchi was aware

9   of and that he had at his disposal as to why he did what he

10  did.

11          **THE COURT:**  Okay.  Your objection is noted for the

12  record, and the Court will only consider it for the purpose

13  that it's presented.

14          **MR. FINK:**  Thank you, Judge.

15  **BY MR. BILKOVIC:**

16  **Q.**    So what information generally were you provided?

17  **A.**    That there were certain -- the security guard at the

18  marina called us stating that there was individuals going out

19  on jet skis taking off towards Canada, they were gone for a

20  couple hours at a time, and then returning back.

21  **Q.**    Now, you say "gave us."  What do you mean "us"?

22  **A.**    Us being the United States Border Patrol.

23  **Q.**    Now, you were not involved in that in 2013; this was

24  another Border Patrol agent that received this information?

25  **A.**    Correct.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 15*

1   **Q.**   And were there any names attached to that activity?

2   **A.**   Yes, sir.

3   **Q.**   And do you recall any of those names?

4   **A.**   Yes, sir.

5   **Q.**   What were the names that were attached?

6   **A.**   Eric Puzio.

7        **THE COURT:**   How do you spell that; do you know?

8        **THE WITNESS:**   P-u-z-i-o.

9        **THE COURT:**   Okay.

10  **BY MR. BILKOVIC:**

11  **Q.**   Were there more names than Eric Puzio?

12  **A.**   Vaughn Evasquez.

13  **Q.**   I'm not asking what the name was.  I'm just asking you

14  were there additional names.

15  **A.**   Yes.

16  **Q.**   I want to talk about Mr. Puzio.  Did you investigate or

17  look into Mr. Puzio's background further?

18  **A.**   Yes, sir.

19        **MR. BILKOVIC:**   And, Judge, I want to preference this

20  all with at some point there was an incident that took place

21  that we're here for today on July 30, 2015, so all of my

22  questions of Agent Bianchi predate information prior to that.

23  I will make it clear if there's something that was information

24  after that.  I just want to the make it clear for the record

25  that the information that he's testifying to now is all prior

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 16*

1 to July -- that he had received it all prior to July 30 of
2 2015.
3       **MR. FINK:**  No objection to that, Judge.
4       **THE COURT:**  Very well.
5       **MR. BILKOVIC:**  Thank you, Your Honor.
6 **BY MR. BILKOVIC:**
7 **Q.**  All right.  I'm sorry, I asked you did you look into
8 Mr. Puzio's background at all?
9 **A.**  Yes, sir.
10 **Q.**  And was there anything about his background that you
11 remember?
12 **A.**  Yes, sir.
13 **Q.**  Can you tell us what that is?
14 **A.**  Yes, sir.  He had a prior arrest for cocaine trafficking.
15 He had a conviction for cocaine possession and felony firearm,
16 and he had been recently just released from prison and still on
17 parole.
18 **Q.**  Do you recall approximately when he was released from
19 prison?
20      Let me back up.  Do you know when -- approximately when he
21 was discharged from parole?
22 **A.**  Yes, sir.  It was October of 2013.
23 **Q.**  And did you begin looking into Mr. Puzio further?
24 **A.**  I did.
25 **Q.**  Specifically, did you start gathering information about

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 17*

1  travel information related to Mr. Puzio?

2       **MR. FINK:**  Objection to leading, and I'm sorry, but I

3  think it's important that Agent Bianchi be the one to explain

4  his steps.  I wouldn't ordinarily object to a leading

5  background question.

6       **THE COURT:**  Okay.

7       **MR. BILKOVIC:**  I can rephrase it.

8       **THE COURT:**  Rephrase.

9  **BY MR. BILKOVIC:**

10 **Q.**   Did you gather other information with respect to

11 Mr. Puzio?

12 **A.**   Yes, sir.

13 **Q.**   What information did you gather?

14 **A.**   His travel history.  I put an alert on Mr. Puzio as well

15 in law enforcement databases so if he started to travel I would

16 be notified.

17       **THE COURT:**  If he started what?

18       **THE WITNESS:**  If he traveled, I would be notified.

19       **THE COURT:**  Anywhere?

20       **THE WITNESS:**  No, just outside of the United States.

21       **THE COURT:**  Okay.

22 **BY MR. BILKOVIC:**

23 **Q.**   So international travel you would be notified?

24 **A.**   International, yes.

25 **Q.**   Did you look at any other information with respect to

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 18*

1  Mr. Puzio?

2  **A.**   I looked at a lot of information then.

3  **Q.**   Okay.  Well, you said you put out an alert with respect to

4  travel?

5  **A.**   Yes.

6  **Q.**   Okay.  Any information relating to travel?

7  **A.**   Yes.  During that time there was multiple what appeared to

8  be suspicious travel.

9  **Q.**   When you say "at that time," at what time?

10 **A.**   Right after he had been released from parole.

11 **Q.**   So late 2013?

12 **A.**   It was actually early 2014.

13 **Q.**   Okay.  And what type of travel did you notice?

14 **A.**   He had traveled two times to St. Maarten.

15 **Q.**   What's unusual about that?

16 **A.**   One, both times he went to travel to St. Maarten the

17 reservations were made the day prior to travel; and, two, he

18 only stayed there for three days.  He flew in one day, stayed

19 one day, and then flew out the next day.

20 **Q.**   And how many times did he do that?

21 **A.**   In January and July of 2014, twice.

22 **Q.**   Any other travel?

23 **A.**   Yes, sir.  The month -- a couple months after that he

24 traveled to Columbia, where reservations were made four days

25 prior.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 19*

1  **Q.**   Anything significant about Columbia?

2  **A.**   Yes, sir.  He had a travel companion, which is the

3  defendant.

4  **Q.**   Pardon me?

5  **A.**   He had a travel companion on there, which was Mr. Didani.

6  **Q.**   And do you know when that was?

7  **A.**   I believe it was August of 2014.

8  **Q.**   And is there anything in your law enforcement experience

9  about Columbia that's of significance?

10  **A.**   Definitely.  It's a source of cocaine.

11  **Q.**   Did you look into the Columbia travel with respect to

12  Mr. Puzio then and Ylli Didani?

13  **A.**   I did.

14  **Q.**   When you are talking about Didani, you are talking about

15  the defendant here today?

16  **A.**   Yes, sir.

17  **Q.**   And do you recall any details about that travel?

18  **A.**   I did.

19  **Q.**   What were the details you recall about that?

20  **A.**   Mr. Puzio and Mr. Didani flew into Columbia.  Mr. Puzio

21  stayed.  Didani returned the same day.

22  **Q.**   Do you know how far in advance the reservations were made

23  to go to Columbia?

24  **A.**   I believe it was four days in advance.

25  **Q.**   And you said that Mr. Puzio stayed in Columbia.  Do you

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 20*

1  know how long the trip was for?

2  **A.**   I believe it was for three or four days.

3  **Q.**   Three or four days?

4  **A.**   Yes, sir.

5  **Q.**   And I want to make sure I'm clear.  You said that

6  Mr. Didani basically flew there but traveled back to the

7  United States the same day?

8  **A.**   Yes, sir.

9  **Q.**   Do you know who made the reservations for those trips or

10  did you have information as to who made the reservation for

11  those trips?

12  **A.**   For the Columbia trip, yes, sir.

13  **Q.**   Yes, the Columbia trip.  I'm sorry.

14  **A.**   Yes, sir.

15  **Q.**   And what information did you obtain with respect to that?

16  **A.**   It was an individual named Hussein Hussein.

17         **THE COURT:**  It was a?

18         **THE WITNESS:**  Individual named Hussein Hussein.

19  **BY MR. BILKOVIC:**

20  **Q.**   Do you know how to spell that or no?

21  **A.**   I don't.

22         **THE COURT:**  I've got it, but tell me this.  He did

23  what?  This gentleman did what?

24         **THE WITNESS:**  This gentleman made their flight

25  arrangements to fly to Columbia.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 21*

1    **THE COURT:**  Okay.  Where were they from?

2    **THE WITNESS:**  Detroit.

3    **THE COURT:**  Okay.

4  BY MR. BILKOVIC:

5  **Q.**  So Hussein Hussein makes the reservations for Mr. Didani

6  and Mr. Puzio?

7  **A.**  Yes, sir.

8  **Q.**  Did you have any information or attempt to determine

9  whether or not he was a travel agent?

10  **A.**  I did have information to know that he wasn't a travel

11  agent at the time.

12    **THE COURT:**  Was or was not?

13    **THE WITNESS:**  Was not.

14    **THE COURT:**  Okay.

15  BY MR. BILKOVIC:

16  **Q.**  And did you look at all into Mr. Hussein's background?

17  **A.**  I did.

18  **Q.**  And was there anything in particular that grabbed your

19  attention?

20  **A.**  Yes, sir.  There was a controlled substance arrest, and

21  the business that he was currently running was part of a

22  large-scale narcotics investigation.

23    **MR. FINK:**  Objection to lack of foundation and

24  speculation.

25    **MR. BILKOVIC:**  Judge, again, I'm offering this to

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 22*

1  show what information this agent possessed, not offering it for

2  the truth of the matter asserted.

3  　　　　**THE COURT:**  I'm going to allow it for that purpose.

4  　　　　**MR. FINK:**  Thank you, Judge.

5  **BY MR. BILKOVIC:**

6  **Q.**  And were you aware of any other -- or provided any other

7  information with respect to Mr. Hussein?

8  **A.**  Yes.  Records when Mr. Hussein was entering the border

9  showed that he was -- entered multiple times with large amounts

10  of money, cash.

11  **Q.**  Do you know when those occurred?  And, again, when I ask

12  the questions, it's the information that you received.  Did you

13  have information as to when those occurred?

14  **A.**  I do in my report.  I do not remember the date.

15  **Q.**  Do you remember the year?

16  **A.**  It would have been --

17  **Q.**  If you don't, it's okay.

18  **A.**  I don't.  I don't recall.

19  **Q.**  We'll come back to that.

20  **A.**  Okay.

21  **Q.**  Anything else about Mr. Hussein?

22  **A.**  I believe that is it.

23  **Q.**  Did you receive any information about any vehicles

24  registered in Mr. Hussein's name?

25  **A.**  Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 23*

1  **Q.**   What information did you receive?

2  **A.**   There was suspicious activity at the Detroit River, where

3  a vessel had come over.  The Coast Guard tried to stop him.

4  **Q.**   When you say "come over," come over from where?

5  **A.**   Canada.

6  **Q.**   Okay.

7  **A.**   The Coast Guard tried to stop him.  They loaded up on a

8  trailer and took off.  The vehicle -- the truck that took off

9  was registered to Mr. Hussein Hussein.

10  **Q.**   Okay.  I want to back up then a little bit and go through

11  some of this.  Do you know when that occurred?  Do you know the

12  year?

13  **A.**   I do not recall.

14  **Q.**   Would you have that detailed in your reports?

15  **A.**   Yes, sir.

16  **Q.**   Okay.

17         **MR. BILKOVIC:**   Judge, instead of going back and

18  refreshing his memory, I'm going to kind of keep a list and

19  maybe at the end do it all at once to save some time if that's

20  okay.

21         **THE COURT:**   Okay.

22  **BY MR. BILKOVIC:**

23  **Q.**   Now, you said basically the vehicle -- or it was a vessel

24  from Canada that came where?

25  **A.**   Into the United States.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 24*

1  Q.   Okay.

2  A.   Into a marina.

3  Q.   And were there efforts made to try to stop that vessel

4  before it reached the United States?

5  A.   Yes.

6  Q.   And were those successful according to the report?

7  A.   No.

8  Q.   So was the vessel eventually basically located?

9  A.   Yes.

10  Q.   And where was it located?  Was it in the water or was it

11  somewhere else?

12  A.   It was on a trailer out of the water.

13  Q.   And was the trailer attached to a vehicle?

14  A.   Yes, sir.

15  Q.   And who owned the vehicle?  Who was the vehicle registered

16  to?

17  A.   Hussein Hussein.

18  Q.   Did you look at any other travel information with respect

19  to Mr. Puzio and Mr. Didani?

20  A.   Yes, sir.

21  Q.   And was there anything else?

22  A.   Yes, sir.

23  Q.   What other information?

24  A.   About two months after the Columbia trip they both

25  traveled together to Albania.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 25*

1  Q.  Do you know approximately when that was?

2  A.  I'm sorry?

3  Q.  Do you know approximately when that was?

4  A.  October of 2014.

5  Q.  And did they come back to the United States together?

6  A.  They did not.

7  Q.  Did you look further into Mr. Didani's background?

8  A.  Yes, sir.

9  Q.  And were you able to determine whether or not he was a

10  United States citizen?

11  A.  Yes, sir.

12  Q.  And was he or was he not?

13  A.  He was not.

14  Q.  Did he have a legal status in the United States?

15  A.  Yes, he did.

16  Q.  What was that?

17  A.  A lawfully admitted permanent resident.

18  Q.  Do you know or did you determine where he was a citizen,

19  what his citizenship was?

20  A.  Yes.

21  Q.  And what was that?

22  A.  Of Albania.

23  Q.  Albania?

24  A.  Yes, sir.

25  Q.  And did you notice or did you take a look at his criminal

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 26*

1  background?

2  **A.**  Yes, sir.

3  **Q.**  And was there anything in his criminal background?

4  **A.**  Yes.

5  **Q.**  Such as?

6  **A.**  Multiple convictions of DUIs, a couple were felonies.  He

7  had a controlled substance arrest and felony firearm arrest,

8  which I believe those last two he was not convicted of.

9  **Q.**  He was found not guilty of those offenses involving the

10  weapons, involving the drugs?

11  **A.**  Correct.

12  **Q.**  Do you know approximately when that was?

13  **A.**  I do not.  I believe it was 2014, if I recall correctly.

14  It would be in my report.

15  **Q.**  Did you take a look at his travel history?

16  **A.**  I did.

17  **Q.**  Specifically talking about between January 1st of 2015 and

18  January 30th of 2015, did you notice anything with respect to

19  Mr. Didani?

20  **A.**  Yes.

21  **Q.**  And what was that?

22  **A.**  Multiple reservations in which he was not on board the

23  plane.

24  **Q.**  You talk about reservations.  What type of reservations

25  are we talking about?  Are we talking about United States

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 27*

1   travel?  International travel?  What are we talking about?

2   **A.**    Travel either into or out of the United States.

3   **Q.**    So international travel?

4   **A.**    International travel.

5   **Q.**    And do you know approximately how many reservations

6   Mr. Didani made in that period of time for international

7   travel?

8   **A.**    Yes.  In that seven-month span there was approximately

9   six reservations.

10  **Q.**    And in how many of those six reservations did you receive

11  information that Mr. Didani actually boarded the flight and got

12  on the plane?

13  **A.**    Two times he was on board.

14          **THE COURT:**  Two times he was what?

15          **THE WITNESS:**  On board.

16          **THE COURT:**  Okay.

17  **BY MR. BILKOVIC:**

18  **Q.**    The other four he was not?

19  **A.**    Correct.

20  **Q.**    Did you receive any other information about Mr. Didani?

21  **A.**    Yes, sir.

22  **Q.**    And what type of information was that?

23  **A.**    That he was a part of a previous drug investigation in

24  2008.

25  **Q.**    A previous drug investigation in 2008?

*21-20264; U.S.A. v. Ylli Didani*

1  A.    Yes, sir.

2  Q.    Who was it that did that investigation, what agency?

3  A.    It was a joint task force with HSI and FBI.

4  Q.    Were you involved in that or no?

5  A.    I was not involved in that investigation.

6  Q.    Have you had an opportunity to review reports relating to

7  that?

8  A.    Yes, sir.

9  Q.    And what information did you review?  What did you learn

10  about that?

11  A.    I learned HSI and FBI were investigating a trucking

12  company and individuals that were moving -- suspected of moving

13  marijuana or cocaine into and out of Canada as well as money

14  laundering.

15  Q.    Where was the suspected trucking company located?

16  A.    In the Detroit area.

17  Q.    And was there anything related with respect to Mr. Didani

18  to that investigation?

19  A.    Yes, sir.

20  Q.    And what was that?

21  A.    Well, there was surveillance done on Mr. Didani, and there

22  was also recorded phone calls.

23  Q.    Recorded phone calls from who?

24  A.    From a source that was part of that investigation.

25  Q.    To who?

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 29*

1   **A.**    To Mr. Didani.

2   **Q.**    When you're talking about a source, you're talking about

3   an informant?

4   **A.**    Yes, sir.

5   **Q.**    And did Mr. Didani -- did you determine whether or not

6   Mr. Didani had any ties to this trucking company?

7   **A.**    I'm sorry?

8   **Q.**    Did you determine whether or not Mr. Didani had any ties

9   to this trucking company or did you receive any information?

10  **A.**    Did I determine --

11  **Q.**    Did you receive any information with respect to Mr. Didani

12  and this trucking company that was under investigation?

13  **A.**    Yes.

14  **Q.**    And what was that?

15  **A.**    That there was multiple things that -- Didani was

16  suspected of hiring the source to drive trucks for this

17  trucking company that was moving drugs.

18  **Q.**    So if there was a claim that Mr. Didani could not have

19  been involved in any type of drug-trafficking investigation in

20  2008 because he was actually in prison during all of 2008, do

21  you believe that to be true?

22  **A.**    No, I do not.

23  **Q.**    And have you had an opportunity to look --

24              **MR. FINK:**  Objection to leading, Your Honor.

25              **THE COURT:**  It sounds like it might be leading.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 30*

1  **BY MR. BILKOVIC:**

2  **Q.**   Let me ask you this.  Did you have an opportunity to

3  review Michigan Department of Corrections information with

4  respect to Mr. Didani?

5  **A.**   Yes.

6  **Q.**   From that information, do you know when he was released

7  from prison?

8  **A.**   July 3rd of 2007.

9  **Q.**   So, based on the information that you had with respect to

10  Mr. Didani, did you do anything?  You said earlier that you set

11  an alert to be alerted about Mr. Puzio's travel?

12  **A.**   Yes, sir.

13  **Q.**   Did you do anything with respect to Mr. Didani?

14  **A.**   Yes, sir.

15  **Q.**   What was that?

16  **A.**   The same thing.  I set up an alert in our law enforcement

17  databases to be notified should Mr. Didani fly into or out of

18  the United States.

19  **Q.**   Okay.  And why did you do that?

20  **A.**   With hopes of being able to interview Mr. Didani.

21  **Q.**   What did you want to interview him about?

22  **A.**   His travel history and his travel companions.

23  **Q.**   Did there come a point in time that you received an alert

24  with respect to Mr. Didani's travel?

25  **A.**   Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 31*

1   **Q.**   When was that?

2   **A.**   In July of 2015.

3   **Q.**   What information did you receive?

4   **A.**   That Mr. Didani had made reservations to fly into the

5   United States.

6   **Q.**   And so what did you do?

7   **A.**   I waited to make sure he was going to be on board that

8   plane, and once I found out he was on board the plane, I

9   notified Chicago O'Hare where he was entering the United States

10  and talked with CBP there to set up an interview.

11  **Q.**   And at the time that you did that where were you?

12  **A.**   I was stationed in -- at HSI in Detroit.

13  **Q.**   And what day was it that Mr. Didani was supposed to come

14  into the United States?

15  **A.**   July 30th.

16  **Q.**   Of?

17  **A.**   2015.

18  **Q.**   And you said -- I think you said it was through Chicago

19  O'Hare?

20  **A.**   Yes, sir.

21  **Q.**   And so did you end up going to Chicago O'Hare?

22  **A.**   I did.

23  **Q.**   For what purpose?

24  **A.**   To pass information and help with the interview of

25  Ylli Didani.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 32*

1 **Q.**   And so at this time, even though you are United States

2 Border Patrol, you at this time are working as a TFO with HSI,

3 Homeland Security Investigations?

4 **A.**   Yes, sir.

5 **Q.**   So was this an HSI investigation you were doing?

6 **A.**   Yes, sir.

7 **Q.**   And what did you do when you got to Chicago?

8 **A.**   I met with CBP Officer Fuentes and went over the

9 information that I had already known about Mr. Didani's travel

10 and history and questions I would like to find answers to

11 concerning travel and his travel partners.

12 **Q.**   So what occurred next?

13 **A.**   We waited for Mr. Didani to get off the plane.  He was

14 escorted over by another CBP officer, and Mr. Fuentes started

15 interviewing Mr. Didani.

16 **Q.**   And was that interview done in your presence?

17 **A.**   Yes.

18 **Q.**   So basically it was you, the agent -- the CBP agent, and

19 Mr. Didani?

20 **A.**   Yes, and one more, the agent that brought Mr. Didani over.

21 **Q.**   Do you remember that individual's name?  If you don't,

22 it's okay.

23 **A.**   I don't recall.

24 **Q.**   How would you describe the interview?

25 **A.**   Very laid back.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Direct*
*Monday/April 24, 2023*

*Page 33*

1  **Q.**   I'm sorry, I didn't hear what you said.

2  **A.**   Very laid back.

3  **Q.**   Okay.

4  **A.**   Out in the open.  Mr. Didani was even joking around.

5  **Q.**   What do you mean he was joking around?

6  **A.**   He said he gets stopped every time he flies in.  And we

7  even asked why he thinks he gets stopped every time, and he

8  said because of his prior DUIs.

9  **Q.**   And so was Mr. Didani then interviewed?

10  **A.**   I'm sorry?

11  **Q.**   Mr. Didani was then interviewed?

12  **A.**   Yes.

13  **Q.**   And can you describe the interview -- or what happened

14  during the interview?

15  **A.**   Mr. Fuentes asked him what I would -- seem would be normal

16  stuff, to see his passport, where he was going, what he was

17  doing, and then asked him about his travel history and what

18  not.

19  **Q.**   And was Mr. Didani asked where he lived?

20  **A.**   Yes, sir.

21  **Q.**   What did he say?

22  **A.**   In Fraser.  Sabre Lane, I believe.

23  **Q.**   I'm sorry, what was the name of the street?

24  **A.**   Sabre Lane.

25  **Q.**   Sabre, S-a-b-r-e?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 34*

1  **A.**    Yes.

2  **Q.**    Lane?

3  **A.**    Yes.

4  **Q.**    And did you have any opinion when he made that statement

5  to you as to whether that information that he provided was true

6  or not?

7  **A.**    Yes.

8  **Q.**    What was that?

9  **A.**    I knew that wasn't true.

10  **Q.**    When you say "you knew it wasn't true," how did you know

11  that?

12  **A.**    Because I had done research prior to looking into

13  Mr. Didani, and it was a prior address, but someone else was

14  currently living at that address.

15  **Q.**    Was he asked about his travel history?

16  **A.**    He was.

17  **Q.**    And what did he explain -- what did he say about his

18  travel history?

19  **A.**    He said he traveled to lots of different places.  I

20  believe Maldives Island for vacation, Germany for vacation.  He

21  said he went to Dubai for a Drake concert.  He said he had been

22  to Istanbul I believe it was nine times where he went -- he

23  both had family and business dealings there with his coal

24  business.  He said he was part owner of a coal business with

25  his uncle in Albania.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 35*

1   **Q.**   Did you -- you said earlier there was -- you had

2   information that he had made international flight reservations

3   six times in 2015 and only boarded the plane twice?

4   **A.**   Correct.

5   **Q.**   Was he asked about that?

6   **A.**   He was.

7   **Q.**   And what did he say?

8   **A.**   He said things just kept coming up and he had to push off

9   reservations, and he would just remake the reservations again.

10   **Q.**   Did you ask him about the Columbia trip, where he flew to

11   Columbia and came back the same day?

12   **A.**   I did.

13   **Q.**   What did he say about that?

14   **A.**   He said he was not allowed admission into Columbia so he

15   was forced to return to the United States.

16   **Q.**   Did he say what he was going to Columbia for?

17   **A.**   He said a wedding.

18   **Q.**   And did he give you the name of the person who was getting

19   married?

20   **A.**   Just the first name, Paul.

21   **Q.**   I'm sorry?

22   **A.**   Just the first name.

23   **Q.**   And the first name was what?

24   **A.**   Paul.

25   **Q.**   Did you ask him what Paul's last name was?

*21-20264; U.S.A. v. Ylli Didani*

1  **A.**    Mr. Fuentes asked, and he did not know.

2  **Q.**    Mr. Didani did not know the last name of the person whose

3  wedding he was going to Columbia for?

4  **A.**    Correct.

5  **Q.**    Did he indicate -- you said that he owned -- he said he

6  was part owner of a coal-mining business.  Did he give you

7  information about any other businesses he was involved in?

8  **A.**    Yes, sir.  He said he owned a car wash in Fraser,

9  Michigan.

10 **Q.**    And did he give you the name of that car wash?

11 **A.**    Yes.  DES Detailing.

12 **Q.**    And did he give you any information with respect to

13 Mr. Puzio?

14 **A.**    Yes.  He said his friend Eric Puzio owned a trucking

15 company and owned six or seven trucks.

16 **Q.**    Now, you had indicated that you had researched his address

17 prior and you knew he did not live at Sabre Lane.  Were there

18 any other statements that he made that your prior research had

19 led you to believe that were not truthful?

20 **A.**    Yes, sir, all of those.

21 **Q.**    When you say "all of those," what statement or what

22 information did you have contrary to statements he had given

23 you?

24 **A.**    I had researched Mr. Puzio, and Mr. Puzio didn't own any

25 company or business.  He did own one truck that was not

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 37*

1  currently registered at the time.

2       I had researched his address, as we stated, and somebody

3  else was currently living there.

4       I had researched businesses that Didani might be attached

5  to, and he was not listed as any business owner in the State of

6  Michigan at the time.

7  **Q.**   So was that suspicious to you at all then?

8  **A.**   It was.

9  **Q.**   Why?

10 **A.**   Because he was obviously trying to cover up, one, his home

11 address and maybe how he was making money.

12 **Q.**   You said that he had indicated that he was a part owner of

13 a coal-mining business?

14 **A.**   Yes, sir.

15 **Q.**   Was he asked further about the coal-mining business?

16 **A.**   He was.

17 **Q.**   And did he provide any details?

18 **A.**   Mr. Fuentes asked him multiple details about his travel to

19 Istanbul, about the hotels he stayed in when he was trying to

20 sell his coal and associates he met with, any business cards,

21 and Mr. Didani couldn't produce any of those things.  He did

22 produce a photo that he pulled up on his phone and showed of a

23 business associate he met with in Turkey.

24 **Q.**   I'll get to that in a minute.  You said he was a co-owner.

25 Did you ask him about who the other owners of this coal-mining

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 38*

1   company were?

2   **A.**   Mr. Fuentes did.

3   **Q.**   And?

4   **A.**   And it was his uncle.

5   **Q.**   And did he give you his uncle's name?

6   **A.**   He did not.

7   **Q.**   Did you ask him for it or was he asked for it?

8   **A.**   Mr. Fuentes asked.

9   **Q.**   Did he not know it or did he just not want to give it, if

10  you remember?

11  **A.**   I got the impression he just didn't want to give out his

12  uncle's information.

13  **Q.**   Do you know whether or not Mr. Didani had any phones in

14  his possession?

15  **A.**   Yes, sir.

16  **Q.**   What did he have?

17  **A.**   An iPhone.

18  **Q.**   Did there come a point in time when Mr. Didani started

19  going through the iPhone?

20  **A.**   Yes, sir.

21  **Q.**   And what led to that?

22  **A.**   There was multiple times where Mr. Didani started going

23  through the iPhone.  I believe he was just trying to prove his

24  point that he was doing certain things.  So he was showing us

25  pictures of his business meeting.  He showed us pictures of him

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Direct*
*Monday/April 24, 2023*

Page 39

1  and his friends in a bar in Albania hanging out, and various

2  other photos of a Drake concert, I believe, he went to.

3  **Q.**   You said there was -- I think earlier you said, and I cut

4  you off, there was a picture that he showed you of someone?

5  **A.**   Yes, sir, in Turkey that he was selling -- or he was

6  trying to sell his coal to.

7  **Q.**   Did he know -- or did he identify that person by name?

8  **A.**   It was, I guess, a nickname of Tiku.

9  **Q.**   Tiku?

10  **A.**   I think, if I'm saying it correctly.

11  **Q.**   T-i-k-u?

12  **A.**   Yes, sir.

13  **Q.**   And he indicated this was an individual in Turkey that he

14  was trying to sell his coal to?

15  **A.**   Yes, sir.

16  **Q.**   Did you recognize the person in the photograph that he

17  showed you?

18  **A.**   I did.

19  **Q.**   And did you recognize that person based on the

20  investigation that you had done up to that point?

21  **A.**   I did.

22  **Q.**   And did you -- do you know that person's name or did you

23  know that person's name?

24  **A.**   Yes, sir.

25  **Q.**   What was that person's name?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 40*

**1**  **A.**   If I'm pronouncing his name wrong, Adriatic Sheko.

**2**  **Q.**   Would you have spellings of those in your report?

**3**  **A.**   Yes.

**4**  **Q.**   And how was it that you were familiar with Mr. Sheko?

**5**  **A.**   He was part of that 2008 -- he owned the trucking company

**6**  that was being looked into in 2008 for drug smuggling.

**7**  **Q.**   What else happened during the encounter with Mr. Didani at

**8**  the airport?

**9**  **A.**   Mr. Fuentes eventually asked if it was okay if he looked

**10**  at his phone, looked at the pictures.

**11**  **Q.**   And did Mr. Didani give him his phone?

**12**  **A.**   Yes.

**13**  **Q.**   And what did Agent Fuentes do?

**14**  **A.**   Mr. Fuentes started scrolling through his photos on his

**15**  phone.

**16**  **Q.**   Did he do that in your presence?

**17**  **A.**   He did.

**18**  **Q.**   So it wasn't downloaded; it was like a manual scrolling?

**19**  **A.**   Yes, sir.

**20**  **Q.**   And were you able to see the photographs as Agent Fuentes

**21**  was scrolling through them?

**22**  **A.**   Yes, sir.

**23**  **Q.**   And were there any photographs you saw that attracted your

**24**  attention?

**25**  **A.**   Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 41*

1  **Q.**   What types of photographs?

2  **A.**   Photos of Mr. Didani holding what appeared to be AR-style

3  rifles.  There was pistols.  There was one photo of a pistol on

4  Mr. Didani's hip.  There was a duffel bag full of large amounts

5  of what appeared to be U.S. Currency that was wrapped in

6  cellophane.  There was a lot of photos of U.S. Currency bundled

7  up.

8  **Q.**   And why did those pictures attract your attention?

9  **A.**   All those photos would indicate to me of criminal

10  activity.

11  **Q.**   What type of criminal activity?

12  **A.**   Cross-border criminal narcotics activity.

13  **Q.**   Such as?

14  **A.**   Such as smuggling of narcotics, money laundering.

15  **Q.**   Did you go through the entire phone at that time?

16  **A.**   We could not.  We did not have enough time.  There was

17  a lot of information on the phone, over 10,000 photos.

18  **Q.**   So what did you do?

19  **A.**   At the time we were trying to make it so Mr. Didani did

20  not miss his connecting flight.  We had -- I had asked a CBP

21  officer if they had the capabilities to do a phone extraction

22  and they did, and I requested that be done and they did that.

23  **Q.**   So you obtained basically a forensic extraction of

24  Mr. Didani's iPhone?

25  **A.**   Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 42*

1  **Q.**  And was the iPhone returned to Mr. Didani at that point?

2  **A.**  Yes, sir.

3  **Q.**  Did he make his flight?

4  **A.**  He did not, but that was not due to his phone.  It was due

5  to our record systems being down at the time.

6  **Q.**  I'm sorry?

7  **A.**  It was due to our record systems being down at the time.

8  **Q.**  When you say "our record systems," whose record systems?

9  **A.**  CBP.

10  **Q.**  So did that have anything to do with the investigation

11  that you were doing?

12  **A.**  No.

13  **Q.**  And did you -- you indicated that the phone was

14  downloaded.  Did you subsequently review all of the photographs

15  on that phone?

16  **A.**  Yes, sir.

17  **Q.**  And did you subsequently review -- were there any videos

18  on that phone?

19  **A.**  Yes, sir.

20  **Q.**  And did you subsequently review all of those?

21  **A.**  Yes, sir.

22  **Q.**  And when you did this, would this have been prior to

23  August of 2016?

24  **A.**  Yes, sir.

25  **Q.**  And was there anything in the phone when you reviewed the

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 43*

1 photographs and the videos?

2 **A.**   Yes, sir.

3 **Q.**   What did you see?  Just in general can you describe some

4 of the items that you saw?

5 **A.**   A lot of what appeared to be narcotics, guns, currency.

6 There was a video of somebody snorting cocaine.  There was

7 another picture of a pistol next to what appeared to be a small

8 pouch of cocaine and bundles of cash.

9 **Q.**   You may have said this already.  I'm sorry, I was writing

10 something down.  Did you say you saw additional U.S. Currency

11 photos?

12 **A.**   Yes.

13 **Q.**   Like bulk U.S. Currency?

14 **A.**   Yes.

15 **Q.**   Do you remember seeing anything else?

16 **A.**   There was -- yes.  There was a lot of information, over

17 10,000, again, photos and stuff.  There was shipping

18 containers, shipping lines, like they were researching ways to

19 ship things.

20 **Q.**   International shipping?

21 **A.**   International shipping.

22 **Q.**   When you're talking "shipping containers," what's a

23 shipping container?

24 **A.**   It is a container that's on a massive ship that goes port

25 to port and drops -- and carries exports -- imports, exports.

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 44*

1  **Q.**  So you're talking like big, huge shipping containers, not

2  like a small little box; correct?

3  **A.**  Crates, yes.

4        **MR. BILKOVIC:**  May I have one moment, Your Honor.

5        **THE COURT:**  Sure.

6        **MR. BILKOVIC:**  Your Honor, may I approach the

7  witness?

8        **THE COURT:**  Yes, you may.

9        **MR. BILKOVIC:**  Your Honor, I have tendered the

10  witness five proposed exhibits.  I was going to have him go

11  through and describe them and then give them to the Court.  I

12  apologize, I did not make extra copies for the Court.  Would

13  that be acceptable if I did it that way?

14        **THE COURT:**  Yes.  Do you have any objection to it

15  being done that way?

16        **MR. FINK:**  I don't.  I have seen them, Judge.  Thank

17  you for asking.

18        **THE COURT:**  Okay.  And are they marked?

19        **MR. BILKOVIC:**  They are marked.

20        **THE COURT:**  Okay.

21  **BY MR. BILKOVIC:**

22  **Q.**  Starting with Proposed Exhibit 1, do you recognize that?

23  **A.**  Yes, sir.

24  **Q.**  And what is that?

25  **A.**  That appears to be Mr. Didani talking with Mr. Sheko.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 45*

1  That is the picture that was shown to me while in the airport

2  interviewing Mr. Didani.

3  **Q.**   And that was a picture that Mr. Didani showed you?

4  **A.**   Yes, sir.

5  **Q.**   And could you look at Proposed Exhibit 2.

6          **THE COURT:**  And he showed it to you how?

7          **THE WITNESS:**  He just held his phone up and said this

8  was him making a business deal to try to sell coal, I believe.

9          **THE COURT:**  Okay.  All right.

10  **BY MR. BILKOVIC:**

11  **Q.**   And all of the photographs, that's how they were -- when

12  you scroll through them, is that the same way you were actually

13  looking at them on the phone?  You didn't actually have --

14  **A.**   Correct.

15  **Q.**   -- enlarged photographs like that, you were looking at

16  them on a screen?

17  **A.**   Correct.

18  **Q.**   Okay.  What about Proposed Exhibit 2?

19  **A.**   What is the question?

20  **Q.**   Do you recognize that?

21  **A.**   Yes.

22  **Q.**   And what is that?

23  **A.**   That is Mr. Didani holding up what appears to be an

24  AR-style rifle.

25          **THE COURT:**  A what?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 46*

1          **THE WITNESS:**  AR-style rifle, an automatic --

2          **THE COURT:**  Okay.

3          **THE WITNESS:**  -- assault rifle.

4    BY MR. BILKOVIC:

5    **Q.**   And is that one of the photographs that you observed when

6    he was scrolling through the phone?

7    **A.**   Yes.

8    **Q.**   Okay.  Government's Proposed Exhibit 3, what is that?

9    **A.**   That's Mr. Didani on top of a four-wheeler with a pistol

10   on his hip.

11   **Q.**   And is that one of the photographs that you saw when

12   Agent Fuentes was scrolling through the phone?

13   **A.**   Yes, sir.

14   **Q.**   And Government's Proposed Exhibit 4, what is that?

15   **A.**   Mr. Didani standing in a kitchen with a bunch of bulk

16   currency laid out in front of him.

17   **Q.**   And is that a photograph that you observed scrolling

18   through the phone?

19   **A.**   Yes, sir.

20   **Q.**   You said that there's a bunch.  Are there stacks there in

21   the photograph?

22   **A.**   Yes.

23   **Q.**   How many stacks are there?

24   **A.**   Eight stacks.

25   **Q.**   And how are they packaged or are they wrapped?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Voir Dire*
*Monday/April 24, 2023*

Page 47

1   **A.**   Four are wrapped in 5,000 bundles, it appears, and

2   three in 10,000, and then the last one doesn't have --

3                 **MR. FINK:**   Your Honor?

4                 **THE COURT:**   Yes.

5                 **MR. FINK:**   May I voir dire as to exactly how he was

6   viewing these?  Because he's describing these pictures, and I'm

7   not clear exactly how he could see that on the phone

8   necessarily.  Could I ask a few questions?

9                 **THE COURT:**   Yes.

10                 **MR. FINK:**   Thank you, Your Honor.

11                                 -   -   -

12                       **VOIR DIRE EXAMINATION**

13   BY MR. FINK:

14   **Q.**   Agent Bianchi, you mentioned that these particular

15   pictures, correct me if I'm wrong, you viewed when they were

16   showed to you by my client on his cellular phone; correct?

17   **A.**   No.

18   **Q.**   Okay.  Explain to me exactly when you saw these

19   photographs you are describing.

20   **A.**   When Mr. Fuentes was scrolling through Mr. Didani's phone

21   at the airport, that is when I saw them.

22   **Q.**   Okay.  We may be speculating a little bit, but correct me

23   if I'm wrong, he went to his photographs on his cellular

24   device, his iPhone; correct?

25   **A.**   I'm sorry?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Voir Dire*
*Monday/April 24, 2023*

*Page 48*

**Q.**   He went to his photos on his iPhone -- correct? --
Mr. Fuentes?

**A.**   I don't know if Mr. Fuentes did it or if Mr. Didani
already had it open.

**Q.**   Sure, but it was in the photos app where you're scrolling
through to see all the photos.  Is that accurate?

**A.**   Yes.

**Q.**   And there are thumbnails so you can see them all at once?

**A.**   That's not how they were.

**Q.**   How were they?

**A.**   They were opened.

**Q.**   They were opened to a large format?

**A.**   Correct.

**Q.**   And when you -- when you were scrolling, you indicated to
me -- I'm taking my finger and I'm going upwards.  Do you see
what I'm doing?

**A.**   Yes.

**Q.**   Do you see what I'm doing right now?

**A.**   I do see what you're doing.

**Q.**   That's what you indicated to the judge just a moment
ago -- correct? -- you were scrolling like this?

**A.**   No, and I wasn't doing it.

            **MR. FINK:**   Judge, I mean it was in open court that I
believe the witness was going like this on his phone.  Judge,
if you remember differently, that's how I recall it, and I

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Voir Dire*
*Monday/April 24, 2023*

Page 49

1  think that's important for the next question.

2  **BY MR. FINK:**

3  **Q.**   But, nevertheless, you don't think you were going like

4  this with your finger; is that what you're saying now?

5  **A.**   I do not, and I didn't scroll through the phone.

6  Mr. Fuentes did.

7  **Q.**   Right.  Just a moment ago, Agent Bianchi, you were asked

8  by Judge Hood about scrolling through the phone, and you made

9  an indication with your finger of how it was being scrolled

10  through.  Do you recall that or not?

11  **A.**   I do not.

12  **Q.**   Okay.  So you would concede to me that it's possible you

13  were going like this with your finger; correct?

14  **A.**   I do not remember doing that.

15  **Q.**   Okay.  Are you familiar with an iPhone?

16  **A.**   I am.

17  **Q.**   Do you have one?

18  **A.**   I do.

19  **Q.**   Okay.  When pictures are open to the large format on an

20  iPhone, you have to scroll through the picture from left to

21  right; is that correct?

22  **A.**   Correct.

23  **Q.**   Okay.  So you couldn't scroll up to see more pictures if

24  they were in a large format.  Is that accurate?

25  **A.**   I guess it depends.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Voir Dire*
*Monday/April 24, 2023*

Page 50

1   Q.   Well, I'm asking you:  Is that accurate?

2          THE COURT:  What's the last thing that you said?

3          THE WITNESS:  It depends.

4          THE COURT:  Okay.

5   BY MR. FINK:

6   Q.   Do you know of any circumstance on an iPhone where you

7   have a large picture blown up on your phone, in your pictures

8   on your iPhone that you can scroll upwards?

9   A.   Yes, sir.

10  Q.   Give me an example of that, that you know of?

11  A.   When you are in the messages app, if somebody sends you a

12  bunch of different messages and you are looking at the phone,

13  it really depends on the portrait --

14  Q.   So were you looking through his text messages --

15          THE COURT:  You cut him off so I couldn't hear his

16  whole answer.

17          MR. FINK:  I'm so sorry, Judge.  My apologies.

18  BY MR. FINK:

19  Q.   Go ahead, Agent Bianchi.

20  A.   It depends on which way you are holding the phone, sir.

21  Q.   So you mentioned messages; correct?

22  A.   Yes, sir.

23  Q.   And messages, you can scroll through the messages in an

24  upward or downward direction; right?

25  A.   Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Voir Dire*
*Monday/April 24, 2023*

Page 51

1  **Q.**   So was Mr. Fuentes going through text messages, not

2  photographs?

3  **A.**   No, sir.

4  **Q.**   He was going through photographs?

5  **A.**   Yes.

6  **Q.**   Okay.  So the messages example doesn't work.  Can you

7  think of another time in an iPhone where you would scroll in an

8  upward/downward direction to view photographs in a large

9  format?

10 **A.**   Yes, sir.

11 **Q.**   Please share that with me.

12 **A.**   When your screen lock is on.

13 **Q.**   If the screen lock is on?

14 **A.**   Yes, sir.

15 **Q.**   So is it your position that Mr. Fuentes must have had the

16 screen lock on to go up and down in pictures?

17 **A.**   I don't know.

18 **Q.**   So, to be clear, the photographs were in a large format on

19 the cellphone -- correct? -- so that you could see one photo at

20 a time; is that accurate?

21 **A.**   Yes, sir.

22 **Q.**   And that Mr. Fuentes was scrolling through them.  Is that

23 accurate?

24 **A.**   Yes, sir.

25 **Q.**   Does that mean that they were continually moving?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Voir Dire*
*Monday/April 24, 2023*

*Page 52*

1  **A.**   No.

2  **Q.**   Would he stop on certain pictures?

3  **A.**   Yes, sir.

4  **Q.**   And would he zoom in at all?

5  **A.**   I don't recall, to be honest.

6  **Q.**   How long would he stop on a picture at a given time to

7  view it?

8  **A.**   I don't know.

9  **Q.**   Seconds?  More than that?

10  **A.**   More than that, if it was substantial and he wanted to

11  make sure I was seeing it.

12  **Q.**   It's your position you could see the $5,000 bundling at

13  that time?

14  **A.**   I could see those -- yes.

15  **Q.**   And the details that you are describing to Mr. Bilkovic,

16  it's your position that you could see it that day on the phone?

17          **THE COURT:**  This is getting towards cross-examination

18  I think, don't you?

19          **MR. FINK:**  I do.  That was any last question.

20          **THE COURT:**  Okay.

21          **MR. FINK:**  To be clear whether he could see from the

22  phone.

23          **THE WITNESS:**  That there were actually $5,000

24  bundles?  Probably not.  That there were stacks of cash?  Yes.

25          **MR. FINK:**  Okay.  So the detail you were describing,

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 53*

1    that's what I was asking about.

2        Thank you, Judge, and thank you, Agent Bianchi.

3            **THE COURT:**  Okay.  We didn't see Exhibit 5.

4            **MR. BILKOVIC:**  Right.  We left off on 4; right?

5            **THE COURT:**  Yes.

6                        -   -   -

7                                              (11:05 a.m.)

8                    **DIRECT EXAMINATION CONTINUED**

9    BY MR. BILKOVIC:

10   **Q.**   Government's Proposed Exhibit 5, do you recognize that?

11   **A.**   Yes, sir.

12   **Q.**   And what is that?

13   **A.**   It appears to be a large amount of currency wrapped in

14   what appears to be cellophane inside a black duffel bag.

15   **Q.**   And, again, is that another photograph that you observed

16   when Agent Fuentes was scrolling through the phone?

17   **A.**   Yes, sir.

18           **MR. BILKOVIC:**  Your Honor, at this time for purposes

19   of this hearing the government would move to admit Government's

20   Proposed Exhibits 1 through 5.

21           **THE COURT:**  Any objection?

22           **MR. FINK:**  For purposes of the hearing, Judge, no

23   objection to the admission of exhibits.  However, I would ask

24   that the testimony about the specificity of the $5,000 band,

25   that testimony be stricken based on the voir dire.

                    *21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 54*

1        **THE COURT:**  That the what?

2        **MR. FINK:**  That the specifying of $5,000 bands, that

3   detail be stricken given the voir dire that he couldn't observe

4   that on the phone at the time.

5        **MR. BILKOVIC:**  Your Honor, the testimony is what it

6   is because there is going to be other reasons why those

7   photographs are relevant later on when he would have viewed

8   them in a different format.

9        **THE COURT:**  Okay.  I'm going to overrule the

10  objection.

11        **MR. FINK:**  Thank you, Judge.

12        **MR. BILKOVIC:**  Your Honor, may I retrieve the

13  exhibits and publish them to the Court?

14        **THE COURT:**  Yes, you may.

15        **MR. BILKOVIC:**  Thank you.

16        **THE COURT:**  I have a question.  On the extraction are

17  the photographs the same size they are on the telephone?

18        **THE WITNESS:**  No, ma'am.

19        **THE COURT:**  On the extraction they come out bigger?

20        **THE WITNESS:**  They come out like you see in front of

21  you, ma'am.

22        **THE COURT:**  They come out this size?

23        **THE WITNESS:**  Yes, ma'am.

24        **THE COURT:**  Okay.  Go ahead.

25

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 55*

1  **BY MR. BILKOVIC:**

2  **Q.**   And, just following up on what the Court asked, is that

3  because you are looking at those on a computer?

4  **A.**   Yes.

5  **Q.**   So a computer screen?

6  **A.**   Yes, sir.

7          **THE COURT:**  You have seen these photos?

8          **MR. FINK:**  I have, Judge, and no objection for

9  purposes --

10         **THE COURT:**  Do you have a copy of them?

11         **MR. FINK:**  I do not.

12         **MR. BILKOVIC:**  He has them in discovery, but I will

13 make copies today and I'll email them to Mr. Fink.

14         **MR. FINK:**  I have no doubt.  Thank you, Judge.

15         **THE COURT:**  Okay.  Thank you.

16 **BY MR. BILKOVIC:**

17 **Q.**   Now I'm going to jump ahead to 2016, August of 2016.  Were

18 you still conducting an investigation of Mr. Didani in this

19 matter?

20 **A.**   Yes, sir.

21 **Q.**   And was there still an alert on Mr. Didani for

22 international travel?

23 **A.**   Yes, sir.

24 **Q.**   And in August of 2016 did you receive any information with

25 respect to Mr. Didani?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Direct*
*Monday/April 24, 2023*

Page 56

1   A.   Yes, sir.

2   Q.   What information was that?

3   A.   That he was flying into the United States.

4   Q.   And did you receive information as to where he was flying

5   into -- into the United States?  What city?

6   A.   Yes.  Chicago again.

7           **THE COURT:**  From where, if you know?

8           **THE WITNESS:**   I -- I believe, if I recall correctly,

9   it was Rome.  I think he was going Albania to Rome to Chicago

10  to Juarez, Mexico, to Mexico City.

11  **BY MR. BILKOVIC:**

12  Q.   And one of those -- he was going to get to Mexico?  The

13  reservations were through Chicago O'Hare to Mexico?

14  A.   Yes, sir.

15  Q.   And do you know whether Mr. Didani was traveling with

16  anybody?

17  A.   What I knew at the time was there was nobody else on his

18  reservation list, but I did get alerted that Mr. Puzio was also

19  traveling to the same area out of Detroit.

20  Q.   Traveling -- when you say "the same area," where?

21  A.   Mexico City.

22  Q.   The same day?

23  A.   The same day.

24  Q.   And what day was this that Mr. Didani was coming into

25  Chicago?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

Page 57

1  **A.**    August 6th.

2  **Q.**    2016?

3  **A.**    Yes, sir.

4  **Q.**    So when you received that alert, what did you do?

5  **A.**    At the time I was on leave.  I contacted an HSI agent in

6  Chicago O'Hare and requested Mr. Didani be interviewed again.

7  **Q.**    And did you speak with anybody in Chicago?

8  **A.**    I did.

9  **Q.**    HSI agent in Chicago?

10  **A.**    Yes, sir.

11  **Q.**    Who did you speak with?

12  **A.**    Mr. Nugent.  HSI Agent -- Special Agent Nugent.

13  **Q.**    And he's here today?

14          **THE COURT:**  Special Agent?

15          **THE WITNESS:**  Nugent.

16          **THE COURT:**  Okay.

17  BY MR. BILKOVIC:

18  **Q.**    N-u-g-e-n-t?

19  **A.**    Yes, sir.

20  **Q.**    He's here today?

21  **A.**    Yes, sir.

22  **Q.**    And did you provide Agent Nugent any information?

23  **A.**    Yes, sir.

24  **Q.**    And I don't want you to go through everything you provided

25  him, but did you give him a summary of your investigation?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

Page 58

1   A.   Yes, sir.

2   Q.   And did you make any requests of him?

3   A.   Yes, that he be searched and interviewed.

4   Q.   That who be searched and interviewed?

5   A.   Mr. Didani.

6   Q.   And were you present at O'Hare on August 6, 2016?

7   A.   No, sir.

8   Q.   Did you receive information subsequently from Agent

9   Nugent?

10  A.   Yes, sir.

11  Q.   What information did you receive?

12  A.   I received two cellphones, an iPhone and a Blackberry.

13  Q.   And who were those cellphones taken from?

14  A.   Mr. Didani.

15  Q.   And did Mr. -- or did Agent Nugent provide you any details

16  about what occurred in Chicago?

17  A.   Yes, sir.

18  Q.   And what were -- if you could summarize those.

19  A.   Basically that --

20        **MR. FINK:**  Objection, Your Honor.  I mean we have

21  Mr. Nugent here to describe the interview.  I'm not sure that

22  this is the right witness for that.  I understand, as we

23  discussed previously, maybe to inform what he does next, but it

24  might be more efficient to use Mr. Nugent as to what he asked

25  him in the interview.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 59*

1    **THE COURT:**  So is that objection efficiency?

2    **MR. FINK:**  The objection is, Judge, it's hearsay, to

3    describe what Mr. Nugent told him.

4    **THE COURT:**  Do you want to respond?

5    **MR. BILKOVIC:**  It is hearsay.  The reason I'm

6    offering it, if there is going to be later challenges or

7    challenges that there was not later reasonable suspicion to

8    search that phone or probable cause to search that phone it's

9    important for Agent Bianchi to testify what information he had.

10   **THE COURT:**  Okay.  Your objection is noted and

11   preserved for the record and overruled.  I'm going to allow it

12   for that purpose only, not for the truth of the matter

13   asserted.

14   **MR. BILKOVIC:**  Thank you, Your Honor.

15   **MR. FINK:**  Thank you, Your Honor.

16   **BY MR. BILKOVIC:**

17   **Q.**  And did you receive information when Mr. Didani was

18   interviewed?

19   **A.**  I'm sorry?

20   **Q.**  Did you receive information whether or not Mr. Didani was

21   interviewed?

22   **A.**  Yes.

23   **Q.**  I'm not going to go through that with you right now, but

24   did you receive -- you indicated the iPhone and Blackberry were

25   taken from him.  Were you given information about anything else

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 60*

1  that was taken from Mr. Didani?

2  **A.**   Yes, sir.

3  **Q.**   And what was that?

4  **A.**   Illegal steroids.  HGH, I believe.

5  **Q.**   Do you know the name specifically or no?  If not, we can

6  get that --

7  **A.**   I do know it.  I just can't pronounce it.  It's Kigtropin.

8  **Q.**   Kigtropin?

9  **A.**   Kigtropin.

10  **Q.**   Do you know how to spell that or no?  It's okay if you

11  don't.

12  **A.**   No.

13  **Q.**   And so this occurred on August 6, 2016?

14  **A.**   Correct.

15  **Q.**   And did you subsequently receive anything from HSI in

16  Chicago?

17  **A.**   Yes, those two cellphones.

18        **MR. BILKOVIC:**  May I approach, Your Honor?

19        **THE COURT:**  Yes.

20  BY MR. BILKOVIC:

21  **Q.**   I'm showing you what's been marked Government's Proposed

22  Exhibit 6.  Do you recognize that?

23  **A.**   I do.

24  **Q.**   And what is that?

25  **A.**   That is our chain of custody form.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 61*

1  **Q.**   And does your signature appear on that form?

2  **A.**   It does.

3  **Q.**   And what day did you sign that form?

4  **A.**   I signed the form on August 15, 2016, or -- yes, and again

5  on August 26, 2016.

6  **Q.**   When you signed it on August 15, 2016, why were you

7  signing that form?

8  **A.**   Taking the phone into possession from another agent in my

9  office because I was on leave.

10  **Q.**   Okay.  So you were taking the phones, the iPhone and the

11  Blackberry?

12  **A.**   I'm sorry?

13  **Q.**   The iPhone and the Blackberry?

14  **A.**   Yes, sir.

15  **Q.**   So basically you took possession of those on August 15,

16  2016?

17  **A.**   Yes, sir.

18  **Q.**   And did you do any legal process with respect to those

19  phones?

20  **A.**   Yes, sir.

21  **Q.**   What did you do?

22  **A.**   I ended up getting a search warrant.

23  **Q.**   And where was that search warrant obtained?

24  **A.**   With you, sir.

25  **Q.**   What jurisdiction?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

Page 62

1    **A.**    The Eastern District of Michigan.

2    **Q.**    And was that a search warrant to search both the iPhone

3    and the Blackberry?

4    **A.**    Yes, sir.

5    **Q.**    And do you recall when you obtained that search warrant?

6    **A.**    I believe it was August 17th.

7    **Q.**    Of 2016?

8    **A.**    2016.  Two days later.

9    **Q.**    Which would have been approximately 11 days after the

10   phones came into HSI possession in Chicago?

11   **A.**    Yes, sir.

12   **Q.**    And at the time I think you said you were acting basically

13   as an HSI TFO, and this was an HSI investigation?

14   **A.**    Yes, sir.

15   **Q.**    Are you familiar -- and is HSI a branch of -- I think you

16   already testified -- ICE?

17   **A.**    Yes.

18   **Q.**    Are you familiar with what the policy was in place at the

19   time for retention of electronic devices -- ICE policy for

20   retention of electronic devices at the border?

21   **A.**    Yes.

22   **Q.**    And what was that?

23   **A.**    30 days.

24          **THE COURT:**  Okay.  Now, does that mean that you could

25   retain them for 30 days, then you had to return them to the

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

Page 63

1  owner?

2  **THE WITNESS:**  It depended on the matter, ma'am.

3  **THE COURT:**  Okay.  Well, then what does it mean, the

4  policy?

5  **THE WITNESS:**  What does the --

6  **THE COURT:**  What is the policy?

7  **THE WITNESS:**  The policy is on a border search when

8  you are given a device from CBP that you have 30 days to

9  determine what you are going to do with that device.

10  **THE COURT:**  Okay.

11  BY MR. BILKOVIC:

12  Q.  And is it fair to say that if you want to keep it for

13  longer than that there is a procedure you have to go through?

14  A.  There is.

15  Q.  In this case within those 30 days you obtained a search

16  warrant?

17  A.  I did.

18  Q.  I had asked you earlier about the year that the incidents

19  involving Mr. Hussein with money at the United States/Canadian

20  border was, and you indicated you did not recall the date.  If

21  I showed you your report, do you think that would refresh your

22  memory?

23  A.  Yes, sir.

24  **MR. BILKOVIC:**  May I approach, Your Honor?

25  **THE COURT:**  Yes.  And this is recalling the day of?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Direct*
*Monday/April 24, 2023*

*Page 64*

1    **MR. BILKOVIC:**  The day -- the time frame to when

2    Mr. Didani testified that Mr. Hussein was -- there was

3    information he received about Mr. Hussein having large amounts

4    of cash at the United States/Canadian border.

5    **BY MR. BILKOVIC:**

6    **Q.**   And do you recall the year that that took place?

7    **A.**   Yes, sir.

8    **Q.**   And when was that?

9    **A.**   2008.

10   **Q.**   And you also described the incident about the vehicle that

11   was registered to Mr. Hussein that was pulling the boat that

12   the Coast Guard attempted interdiction of, and you did not

13   recall the date on that?

14   **A.**   Correct.

15   **Q.**   If I showed you a copy of your report, would that refresh

16   your memory?

17   **A.**   Yes, sir.

18   **Q.**   I'm showing you a copy of your report dated July 29, 2015.

19   Does that refresh your memory on the date that that incident

20   occurred?

21   **A.**   Yes.

22   **Q.**   And when was that?

23   **A.**   On July of 2019.

24   **Q.**   July what?

25   **A.**   July 1st.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 65*

1          **MR. BILKOVIC:**  May I have one moment, Your Honor?

2          **THE COURT:**  Yes, you may.

3          **MR. BILKOVIC:**  Your Honor, I have no further

4    questions at this time.

5          **THE COURT:**  Okay.  Do you want to examine this

6    witness?

7          **MR. FINK:**  I do, Your Honor.

8          **THE COURT:**  Okay.  You may.

9                          -    -    -

10                                              (11:18 a.m.)

11                        **CROSS-EXAMINATION**

12   **BY MR. FINK:**

13   **Q.**   Agent Bianchi, good morning.  My name is Wade Fink.  I

14   represent Mr. Didani.  I think this is the first time we're

15   meeting.  It's nice to meet you.

16   **A.**   Nice to meet you.

17   **Q.**   Agent, in my cross-examination I'm going to -- I'll let

18   you know I'm going to be referring to certain reports and

19   documents.  To the extent you want to see them or what I'm

20   relying on or refresh your recollection, I have copies so

21   please ask me, but when I mention them, that's what I'm

22   referring to.

23       So, again, I'm going to ask you by memory, and please let

24   me know if you need to look at your report, but do you recall

25   writing a -- what you titled a "Didani, et al. Opening Report"

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 66*

1  in this case?

2  **A.**  I'd have to look at the report.

3  **MR. FINK:**  Judge, may I approach?

4  **THE COURT:**  Yes.

5  **MR. BILKOVIC:**  Wade, is the date February 9, '15?

6  **MR. FINK:**  Yes.

7  **MR. BILKOVIC:**  Thanks.

8  **THE COURT:**  You can pass it to Ms. Daley, and she can

9  pass it to me.

10  Any objection to me having it?

11  **MR. BILKOVIC:**  No, Your Honor.

12  **THE COURT:**  Okay.

13  **BY MR. FINK:**

14  **Q.**  Agent Bianchi, does looking at your report generally

15  refresh your recollection as to what I'm referring to?

16  **A.**  Yes, sir.

17  **Q.**  Okay.  Do you recall now writing a report entitled "Didani

18  Opening Report"?

19  **A.**  Yes, sir.

20  **Q.**  And this was on February 9th of 2015; correct?

21  **A.**  Yes, sir.

22  **Q.**  Okay.  And to the best of your recollection is this the

23  first mention in any of your reports of Ylli Didani?  Your

24  reports that you authored, I should specify.

25  **A.**  Of my reports?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

Page 67

1    **Q.**   Correct.

2    **A.**   I don't know that he's listed in this report, sir.

3    **Q.**   Well, on the title "Didani Opening Report"?

4    **A.**   Okay.

5    **Q.**   To the best of your knowledge, is this the first report

6    that you mentioned Ylli Didani in a report that you authored?

7    **A.**   I would say.

8    **Q.**   Okay.  And in the report you mention that the genesis of

9    this investigation is possible smuggling of marijuana between

10   the United States and Canada and possible money laundering; is

11   that correct?

12   **A.**   Yes, sir.

13   **Q.**   And it describes -- you described this on direct

14   examination.  It describes a tip that came in to HSI and you

15   about two other individuals and their activities in

16   St. Clair Shores, Michigan.  Is that generally accurate?

17   **A.**   Generally.

18   **Q.**   In this report, other than in the title, is Ylli Didani's

19   name mentioned anywhere in this report?

20   **A.**   No, sir.

21   **Q.**   So "Didani's Opening Report" has nothing to do with

22   Ylli Didani.  Is that accurate?

23   **A.**   That is correct.

24   **Q.**   Okay.  You mentioned in direct examination, and the

25   government writes in their brief as well, that you had

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 68*

1    information that you relied upon, perhaps not only this report,

2    but going forward as you described, that there was information

3    about Ylli Didani dating back to 2008.  Do you recall that?

4    **A.**    I do.

5    **Q.**    And this also -- this report also mentioned an

6    investigation about drug smuggling between Canada and the U.S.

7    and money laundering; is that correct?

8    **A.**    That is correct.

9          **MR. BILKOVIC:**  Wade, if you give me the dates, that's

10   all I need.  They should be in the bottom right.

11         **MR. FINK:**  June 2, 2008.

12         **MR. BILKOVIC:**  Thank you.

13   **BY MR. FINK:**

14   **Q.**    And this report from 2008, which you said on direct

15   examination that you relied upon in investigating Mr. Didani,

16   there is mention of a criminal informant discussing that

17   Mr. Didani was involved in some sort of criminal activity;

18   correct?

19   **A.**    I would have to see the report.

20         **MR. FINK:**  Sure.

21      Judge, may I approach?

22         **THE COURT:**  You may, and this is 6/2/2008?

23         **MR. FINK:**  Yes.  This report is dated June 2nd, 2008,

24   Your Honor.

25         **THE COURT:**  Okay.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 69*

1      **MR. FINK:**  A report on Department of Homeland

2  Security's letterhead.

3  **BY MR. FINK:**

4  **Q.**   For your recollection purposes, Agent, I would refer you

5  to Page 5, the bottom of Page 5 is the first mention of

6  Mr. Didani.  Let me know when you have adequately refreshed

7  your recollection.

8      **THE COURT:**  Is that the last page of the report?

9      **MR. FINK:**  I believe it's the second to the last,

10  Your Honor.  Let me see.

11      Page 5 of 5 is the last page, yes.

12  **BY MR. FINK:**

13  **Q.**   Have you refreshed your recollection, Agent Bianchi?

14  **A.**   As far as what?

15  **Q.**   Well, the question was:  Do you recall this 2008

16  information that you mentioned in direct information as

17  informing the basis for future investigation a confidential

18  criminal informant mentions Ylli Didani in this 2008 report; is

19  that correct?

20  **A.**   Yes, sir.

21  **Q.**   Okay.  And, without saying, do you know who that informant

22  is?

23  **A.**   No.

24  **Q.**   Did you look into the informant's background at all?

25  **A.**   No.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 70*

1 **Q.** Do you know anything about the informant's voracity, their

2 character for telling truthfulness?

3 **A.** No.

4 **Q.** So you really don't know anything about this other than

5 what's written in this report; correct?

6 **A.** Correct.

7 **Q.** You mentioned on direct examination that it was your

8 belief that in 2008 Mr. Didani was outside of prison; is that

9 correct?

10 **A.** Correct.

11 **Q.** He was not incarcerated at the time?

12 **A.** Correct.

13 **Q.** Okay. And if court records from Wayne County and Oakland

14 County show that he was in prison, would you change your

15 opinion?

16 **A.** As far as what?

17 **Q.** Whether he was incarcerated or not?

18 **A.** I don't know that I would.

19 **Q.** Are you certain that he wasn't incarcerated during that

20 time?

21 **MR. BILKOVIC:** Are we talking about a specific date

22 in 2008 or are we talking about the entire year?

23 **BY MR. FINK:**

24 **Q.** The entire year of 2008 are you certain that he wasn't

25 incarcerated?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 71

**A.**   According to the MDOC records that I looked at, he was not.

**Q.**   Okay.  Did you -- to the best of your knowledge, do you know if you produced those MDOC records to Mr. Bilkovic or myself?

**A.**   I --

**Q.**   And if you don't remember, I'm just asking if you remember producing that report to the government or myself.

**A.**   I don't recall.

**Q.**   Okay.  So, Agent Bianchi, the genesis, so to speak, of your investigation of Mr. Didani you discussed on direct exam, correct me if I'm wrong, began with your suspicions of a gentleman named Eric Puzio.  Is that accurate?

**A.**   Yes.

**Q.**   And the connections with Eric Puzio also led you to connections with a gentleman you also described, Hussein Hussein; correct?

**A.**   Yes.

**Q.**   That's what led you, together with this 2008 report that we just discussed, to write the "Didani Opening Report" in February 2015?

**A.**   Yes.

**Q.**   Were you the agent who started an investigation specifically into Ylli Didani?  Was that your proposal?

**A.**   Yes.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 72*

1  **Q.**   Okay.  And so those questions were designed to ask you

2  that.  The things that I described in 2008, Eric Puzio and

3  Hussein Hussein, were the bases for opening that investigation?

4  **A.**   There were lots of things.

5  **Q.**   Okay.  What else was there beside those three things that

6  I mentioned that you discussed on direct examination that led

7  you to write the opening report in February of 2015?

8  **A.**   His travel history that we went over.

9  **Q.**   Well, let me ask you about that.  So you wrote a report on

10  suspicious travel history for Didani and Eric Puzio.  I'm sure

11  you remember writing -- maybe not the date -- but writing that

12  report; correct?

13  **A.**   Yes, sir.

14  **Q.**   That report was written in July of 2015; do you recall

15  that?

16  **A.**   Yes, sir.

17  **Q.**   Okay.  That's six months after you opened the Didani case;

18  right?

19  **A.**   Okay.

20  **Q.**   So I'm asking you what predated your opening report

21  February of 2019.  Besides the 2008 information and the

22  connections to Eric Puzio and Hussein Hussein, is there any

23  other suspicions or evidence that you had to open an

24  investigation on Mr. Didani?

25  **A.**   No.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 73*

1  **Q.** Those three things were the basis to open the
2  investigation; correct?
3  **A.** Yes, sir.
4  **Q.** Okay. That's what I was asking --
5  **THE COURT:** What are you claiming they are again,
6  counsel?
7  **MR. FINK:** I'm sorry, Judge?
8  **THE COURT:** What are you claiming they are again?
9  **MR. FINK:** The three things?
10  **THE COURT:** Yes.
11  **MR. FINK:** The notation in the 2008 report that was
12  discussed, the connection to Eric Puzio discussed on direct
13  examination, and the connection to Hussein Hussein discussed on
14  direct examination.
15  **THE COURT:** Okay. Do you agree with that, sir?
16  **THE WITNESS:** Yes.
17  **THE COURT:** Okay.
18  BY MR. FINK:
19  **Q.** That led to -- so where we left off, Agent, is that led to
20  the February of 2015 report. Then, as I alluded to, in July,
21  specifically July 22nd of 2015, you wrote a report titled,
22  "Suspicious Travel - Didani and Puzio." Do you recall that?
23  **A.** Somewhat. I would love to see it.
24  **MR. FINK:** I'll approach with it if the judge allows
25  me.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 74*

1      **THE COURT:**  You may.

2      **MR. FINK:**  Thank you, Judge.

3  BY MR. FINK:

4  **Q.**  Now, does that generally refresh your recollection about

5  writing this report?

6  **A.**  Yes, sir.

7  **Q.**  Agent, you wrote this report about suspicious travel on

8  July 22, 2015; correct?

9  **A.**  Yes, sir.

10  **Q.**  That's about eight days before Didani -- Mr. Didani, the

11  defendant, was stopped for the first time at the Chicago

12  airport; correct?

13  **A.**  Approximately, yes, sir.

14  **Q.**  Okay.  And if you look at the first sentence of that

15  report, it's similar to the other reports, in that it describes

16  the investigation related to the smuggling of marijuana between

17  the United States and Canada and possible money laundering;

18  correct?

19  **A.**  Correct.

20  **Q.**  This report discusses at length a lot of information that

21  you had on Eric Puzio; correct?

22  **A.**  Okay.

23  **Q.**  You mentioned that Poland --

24      Well, do you agree with that?  This report discusses quite

25  a bit about Eric Puzio?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 75*

1   **A.**   Sure, yes.

2   **Q.**   Poland, the country of Poland had an open investigation

3   against Puzio, you write; correct?

4   **A.**   Yes.

5   **Q.**   There's nothing in the report to suggest that Poland had

6   an open investigation against Didani, was there?

7   **A.**   Can you restate that?

8   **Q.**   There's nothing -- no reason to believe in this report or

9   otherwise that Poland had an investigation against Ylli Didani;

10  correct?

11  **A.**   I don't know.  I would have to reread my report.

12  **Q.**   Sure, go ahead.

13  **A.**   Is there anywhere in particular you want me to read?

14  **Q.**   I'm just asking for your memory, Agent Bianchi.  Whether

15  in this report or otherwise, do you know of any active

16  investigations by Poland against Ylli Didani?

17  **A.**   I know in law enforcement databases that, yes.

18  **Q.**   That Poland had an investigation against Didani?

19  **A.**   Or at least somebody stated that, yes.

20  **Q.**   Okay.  But you didn't write it in this report; correct?

21  **A.**   I don't know.  I would have to reread my report.

22  **Q.**   Go ahead.

23  **A.**   Okay.  Go ahead.

24  **Q.**   You mentioned that Poland had an open investigation

25  against Eric Puzio; right?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 76

1  A.   It does mention that?

2  Q.   Yes.

3  A.   I did not see that unless I'm ...

4  Q.   If you look at -- on Page 1501 is the Bates stamp;

5  correct?

6  A.   Right.

7  Q.   The third paragraph, "Poland authorities have had previous

8  armed drug trafficking cases open on Eric Puzio."

9            **THE COURT:**  Walk up and point it out, please.

10           **THE WITNESS:**  Yes, I see it.

11           **THE COURT:**  You see it?

12           **THE WITNESS:**  Yes.

13           **THE COURT:**  Okay.

14           **THE WITNESS:**  It's right above the redacted.

15  **BY MR. FINK:**

16  Q.   But my question to you was:  It's related to Eric Puzio,

17  there's no investigation as to Ylli Didani; is that correct?

18  A.   That is correct.

19  Q.   You discuss Eric Puzio's brother being denied entry into

20  the United States.  Do you see that in your report?

21  A.   Yes, sir.

22  Q.   You discuss that Eric Puzio being released from prison in

23  2013, that's when his suspicious travel started.  Do you recall

24  that?

25  A.   Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 77

1   **Q.**   You said he started traveling and buying things, and that

2   raised your suspicions.  Is that accurate?

3   **A.**   Yes.

4   **Q.**   Do you know if Eric Puzio was on parole in the year of

5   2014?

6   **A.**   To the best of my recollection, he was not.

7   **Q.**   Okay.  Do you know parole conditions generally when

8   someone is on parole?

9   **A.**   No, sir.

10  **Q.**   Do you know that parole requires permission to travel?

11  **A.**   Okay.

12  **Q.**   If you don't know, it's okay --

13  **A.**   No.

14  **Q.**   -- you just say you don't know.

15       Okay.  So I would assume you don't know if he asked a

16  parole agent of any kind to travel, and you don't know the

17  answer to that?

18  **A.**   Correct.  But -- okay.

19  **Q.**   And after stating these suspicions that you had about

20  Eric Puzio in July of 2015, it's his -- it's Ylli Didani's

21  connection to Mr. Puzio that raises your suspicions about

22  him -- is that accurate? -- about Didani?

23  **A.**   Can you rephrase that?

24  **Q.**   Sure.  Your suspicions about my client, Ylli Didani, were

25  raised in this report -- your suspicions were heightened by his

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 78*

1  connection to Eric Puzio.  Is that accurate?

2  **A.**   Yes, sir.

3  **Q.**   Okay.  In fact, that's what you lay out in your report.

4  You have a lot of suspicious activity of Mr. Puzio, and

5  Didani's association and travel with him made you suspicious;

6  is that correct?

7  **A.**   Yes, sir.

8  **Q.**   So what we discussed pre-opening report in February 2015

9  and now supplementing with this report in July of 2015, we're

10  now adding to your suspicions on top of what we discussed prior

11  the association with Eric Puzio and the travel with Eric Puzio.

12  Is that a fair characterization of the building evidence

13  against Mr. Didani?

14  **A.**   I guess I'm not understanding what you're saying.

15  **Q.**   So we agree that there was three basic categories of

16  suspicion when you opened the case against Mr. Didani; right?

17  **A.**   Yes.

18  **Q.**   You recall those three we discussed?

19  **A.**   Yep.

20  **Q.**   Six months later you write another report, in July, eight

21  days before Mr. Didani's arrest -- or is stopped at the border;

22  correct?

23  **A.**   Yes.

24  **Q.**   What this report adds to your evidence or suspicions

25  against Mr. Didani, what it adds to this conversation is his

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 79*

1  connection to Eric Puzio and his travel with Eric Puzio; is

2  that correct?

3  **A.**    Yes, sir.

4  **Q.**    So we have added that on to your list of suspicions;

5  right?

6  **A.**    Yes, sir.

7  **Q.**    And that leads us to a report that you wrote seven days

8  later, on July 29th, 2015, which I suspect you'll want to see

9  if I'm going to rely on it; correct?

10  **A.**    Please.

11          **MR. FINK:**    Judge, may I?

12          **THE COURT:**    You may.

13          **MR. FINK:**    July 29, '15, 1671.

14  BY MR. FINK:

15  **Q.**    You wrote a report, Agent Bianchi, titled, "Background

16  on Hussein and Didani" that's dated July 29, 2015; is that

17  correct?

18  **A.**    Yes, sir.

19  **Q.**    And this was seven days after the report we just talked

20  about with Eric Puzio; correct?

21  **A.**    It appears, yes.

22  **Q.**    And that's one day before Didani is stopped for the first

23  time in 2015 at O'Hare Airport; correct?

24  **A.**    Yes, sir.

25  **Q.**    Once again, I refer you to the first sentence, which

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 80

1  describes the general nature of the investigation, and it again

2  says, "Possible smuggling of marijuana between the

3  United States and Canada and possible money laundering."  Is

4  that accurate?

5  **A.**    Yes, sir.

6  **Q.**    What this report adds and this information adds, correct

7  me if I'm wrong, Agent Bianchi, is that the man you discussed

8  on direct examination, Hussein Hussein, made travel

9  reservations for both Eric Puzio and my client, Didani, to go

10  to Columbia and Albania; is that correct?

11  **A.**    I believe so.

12  **Q.**    Among other things, that's one of the things that's added

13  in this report; correct?

14  **A.**    Yes.

15  **Q.**    And you had suspicions of Mr. Hussein given his prior

16  arrests and some other background information that you

17  discussed on direct examination.  Is that accurate?

18  **A.**    Yes, sir.

19  **Q.**    So you are clearly also suspicious of Mr. Hussein; right?

20  **A.**    Yes, sir.

21  **Q.**    Mr. Hussein, to be clear, while there is mention of

22  investigations and arrests, was never convicted of any crime.

23  Is that accurate?

24  **A.**    I do not know.

25  **Q.**    Did you know at the time?  And you can refer to your

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 81*

1    report if you want, but I would tell you that there's nothing

2    in there about a conviction, but I'm asking you if you knew

3    that at the time.

4    **A.**    If it says that in there, then I stand by my report.

5    **Q.**    No, I didn't mean to say that.  It doesn't say it.  I'm

6    saying do you know of any conviction that Mr. Hussein had in

7    his past at the time you wrote this report, and you can take

8    your time to look at it.

9    **A.**    I do not.

10   **Q.**    But the suspicions you did have were the arrest and also

11   you make mention of the currency he had on him at the Canadian

12   border; is that correct?

13   **A.**    Yes, sir.

14   **Q.**    I believe on direct examination you said it was a large

15   amount of currency; correct?

16   **A.**    Yes, sir.

17   **Q.**    Okay.  And you also said in your report, and feel free to

18   refresh your recollection, if necessary, do you recall saying

19   that Mr. Hussein lied about the amount of currency he had

20   coming over the Canadian border into the United States?  Do you

21   recall that?

22   **A.**    I do not recall him lying.  I recall him claiming that he

23   had a different amount than he actually had.

24   **Q.**    The suggestion, in mentioning that, Agent Bianchi, is that

25   it might be deceptive; right?

*21-20264; U.S.A. v. Ylli Didani*

1  **A.**   Correct.

2  **Q.**   And the amount that he said he had was $8,900; correct?

3  **A.**   Yes, sir.

4  **Q.**   But he really had $9901; right?

5  **A.**   Yes, sir.

6  **Q.**   $1,000 off; correct?

7  **A.**   Yes.

8  **Q.**   And he said he was coming from the casino; is that

9  accurate?

10  **A.**   I believe so.

11  **Q.**   The Windsor Casino.  Is that accurate?

12  **A.**   Yep.

13  **Q.**   We have the February report and now two July reports, and

14  what we have added to your suspicions of Ylli Didani in these

15  reports is that Mr. Hussein, and your suspicions of

16  Mr. Hussein, having booked flights for Ylli Didani, continued

17  to raise your suspicions about my client, Mr. Didani.  Is that

18  accurate?

19  **A.**   Yes.

20  **Q.**   In fact, it was after this report, so presumably with that

21  information, that's what led you to put a hit -- a travel hit

22  on Ylli Didani to notify you when he was traveling into the

23  country.  Is that accurate?

24  **A.**   I do not recall if that's when I did it.

25  **Q.**   Did you write in the report, "A silent hit has been put on

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 83*

1    Didani in order for him to be interviewed and searched

2    thoroughly upon his eventual return into the United States"?

3    **A.**    Yes.

4    **Q.**    You did write that; correct?

5    **A.**    Yes, sir.

6    **Q.**    And presumably, writing it in this report, it was with the

7    evidence that you had at the time that you felt that that was

8    justified; correct?

9    **A.**    Yes, sir.

10   **Q.**    I want to add that also in this report there is discussion

11   of -- related to Mr. Hussein, an interdiction by the U.S.

12   Coast Guard, I believe, on the Detroit River; do you recall

13   that?

14   **A.**    I do, sir.

15   **Q.**    Belle Isle Coast Guard?

16   **A.**    Yes, sir.

17   **Q.**    Mr. Didani was not found to be involved or on that boat as

18   far as you know; correct?

19   **A.**    Correct.

20   **Q.**    In fact, I think there's a couple mentions, and perhaps in

21   other reports in later years, of background information about

22   boats and possible smuggling from Canada to Michigan, but you

23   have no evidence to suggest that Mr. Didani was ever spotted on

24   any of these boats or jet skis; correct?

25   **A.**    That is correct.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 84

1   **Q.**   So the next day, July 30, 2015, is the day that Mr. Didani

2   flew into the Chicago airport; is that correct?

3   **A.**   Yes, sir.

4   **Q.**   From Albania?

5   **A.**   Yes, sir.

6   **Q.**   And you were there to meet him at the plane.  Is that

7   accurate?

8   **A.**   No.

9   **Q.**   You were not there to meet him at the plane?

10  **A.**   No, sir.

11  **Q.**   You weren't standing in the front area where people

12  deplane when Mr. Didani walked out with his 19-year-old girl

13  friend?

14  **A.**   No, sir.

15  **Q.**   Do you know if anyone was standing there to meet him at

16  the plane?

17  **A.**   I assume the Customs officer that brought him to secondary

18  where I was standing.

19  **Q.**   You didn't shake his hand and introduce yourself right at

20  the plane?

21  **A.**   I did not.

22  **Q.**   On -- just a moment.  I have got to find the right report,

23  Agent.  One second.

24           **MR. FINK:**   I'm sorry, Judge.  One moment.

25       Judge, I apologize, and thank you to the government for

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 85*

1  providing me with the document.  I only have one copy so I'm

2  going to pull it up on my computer.

3  **BY MR. FINK:**

4  **Q.**   Agent Bianchi, I'm going to approach with a July -- well,

5  it's an August 13, 2015, report written about the

6  July 30th encounter.

7           **MR. FINK:**  May I approach, Judge?

8           **THE COURT:**  You may.

9  **BY MR. FINK:**

10  **Q.**   So we were talking about July 30, 2015.  Mr. Didani is

11  detained at the border when he flies into O'Hare, Chicago

12  airport; correct?

13  **A.**   Yes.

14  **Q.**   Now, you've been employed at Border Patrol, I think you

15  said, since 2003 in various capacities?

16  **A.**   Yes, sir.

17  **Q.**   You have experience with how the computer systems work,

18  how flags happen, and what an agent does when a certain person

19  has his -- is flagged for interview?

20  **A.**   Actually, no.

21  **Q.**   Okay.  Well, do you have any understanding when you put --

22  you said you put a hit, a silent hit so that he would be

23  stopped.  Who sees that, and what happens when you put that hit

24  into the ether; do you know?

25  **A.**   Yes.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 86*

1  **Q.**   Okay.  Tell me basically, and the judge, exactly what

2  happens when there is a flag for a person traveling into the

3  United States.

4  **A.**   In my situation I would receive an email.

5  **Q.**   Okay.

6  **A.**   Stating that this person made reservations to fly into

7  yada yada yada, in this case Chicago O'Hare.

8  **Q.**   So you would receive some sort of notification on this hit

9  that Mr. Didani was coming into the United States; right?

10 **A.**   Yes, sir.

11 **Q.**   And then you would communicate with the airport at which

12 he was arriving?

13 **A.**   Yes, sir.

14 **Q.**   Okay.  So in this instance, when you got information that

15 Mr. Didani would be entering the United States on July 30 of

16 2015, you communicated that to some official at the O'Hare

17 airport; correct?

18 **A.**   Yes, sir, Customs.

19 **Q.**   Do you recall what you said or, if not, generically what

20 you would say in a situation like that?

21 **A.**   I don't.  I called and spoke to the supervisor over there

22 at Chicago O'Hare and requested -- and asked for permission if

23 it was okay if I was involved in an interview of Mr. Didani,

24 who there was an alert on to be interviewed and was flying in

25 later on that evening.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 87*

1  **Q.**   And when you make that call are you -- is that -- are you

2  asking another Customs and Border Patrol supervisor or agent

3  for that courtesy?  Is that what you're doing?

4  **A.**   Yes, sir.  It's a different agency.

5  **Q.**   But it is Customs and Border Patrol generally; right?

6  **A.**   Yes.

7  **Q.**   You are asking for their cooperation or giving them a

8  heads up that you will be coming in?

9  **A.**   Yes, sir.

10  **Q.**   So as far as you recall -- well, as far as you know, the

11  people that greeted Mr. Didani at the airplane were members of

12  Customs and Border Patrol?

13  **A.**   Yes, sir.

14  **Q.**   And they escorted him where, if you recall?

15  **A.**   To where myself and Mr. Fuentes was, which I believe to be

16  the secondary.

17  **Q.**   Okay.  Can you describe the secondary situation, what it

18  looks like.  If I'm just a stranger being walked into

19  secondary, what am I seeing?

20  **A.**   To the best of my recollection --

21  **Q.**   Yeah, of course, to the best of your recollection.

22  **A.**   There is a -- it almost looks like a podium like what you

23  are standing up against, and there is a table next to it where

24  they can put their luggage on and what not, and stuff can be

25  searched there, I would assume, and there was multiple podiums

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 88*

1    like that.

2    **Q.**   Is it like sectioned off from the public or is it in full

3    view of the public?

4    **A.**   It's international travel so it's sectioned off.

5    **Q.**   So when you enter in secondary, it's private?  Private in

6    the sense that general members of the public can't see what's

7    going on in this area?

8    **A.**   Correct.

9    **Q.**   Is that accurate?

10   **A.**   Yes.

11   **Q.**   Okay.  So inside this secondary room, to the best of your

12   recollection, is yourself, Ylli Didani and who?

13   **A.**   Mr. Fuentes, who conducted the interview, and the -- I do

14   not remember his name -- the other CBP agent that escorted

15   Mr. Didani over to us.

16   **Q.**   Okay.  So two CBP agents, you, and Mr. Didani are in the

17   secondary room.  Is that is an accurate description?

18   **A.**   And there was lots of people in the room.

19   **Q.**   Okay.  So there are other people that are going through

20   secondary; is that what you're saying?

21   **A.**   Yes, sir.

22   **Q.**   Okay.  So there are other folks that are being interviewed

23   or whatever pursuant to whatever reason they may be in

24   secondary, along with you and the folks that you described.  Is

25   that accurate?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 89*

1   **A.**   Yes, sir.

2   **Q.**   Okay.  Did Mr. Didani have -- was he traveling with

3   anyone?

4   **A.**   To my knowledge, I don't know.

5   **Q.**   Did he have any bags on his person, any carry-on luggage?

6   **A.**   Yes, sir.

7   **Q.**   Do you recall what it was?

8   **A.**   I don't.

9   **Q.**   Backpack?

10  **A.**   I don't.

11  **Q.**   Okay.  But it was a bag of some kind?

12  **A.**   I don't know.  I don't remember.

13  **Q.**   Do you remember if he had any luggage at all?

14  **A.**   I do not.

15  **Q.**   You don't remember, not that he didn't?

16  **A.**   Correct.  I do not remember.

17  **Q.**   You authored a report about this interaction that you just

18  described on August 13 of 2015; is that correct?

19  **A.**   Yes, sir.

20  **Q.**   And that report is entitled "Interview of Didani" on

21  July 30, 2015.  Accurate?

22  **A.**   Yes, sir.

23  **Q.**   Now, I want to call your attention to the first paragraph

24  of that report.  I have been asking you about that in prior

25  reports.  Do you recall me asking about the first sentence?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 90

1  **A.**  Yes, sir.

2  **Q.**  The first sentence of this report ends with "This

3  investigation concerns information regarding possible smuggling

4  of steroids, contraband, vehicles, possible counterfeit money,

5  and money laundering."  Is that accurately read?

6  **A.**  Yes, sir.

7  **Q.**  Now, a couple weeks prior, in the report we read from

8  July 29 and in the report we read July 22nd and in the report

9  that we read February 9, the first sentence makes no mention of

10  smuggling of steroids, contraband, counterfeit money, vehicles;

11  is that correct?  You can refer back, of course, if you need

12  to.

13  **A.**  The other reports do say money laundering.

14  **Q.**  They say money laundering -- correct? -- but there's no

15  mention of smuggling of steroids; correct?

16  **A.**  No steroids.

17  **Q.**  There's no mention of contraband in that first sentence in

18  those other reports; correct?

19  **A.**  I would consider --

20  **Q.**  The word "contraband."

21  **A.**  Okay.  Marijuana is contraband though.

22  **Q.**  Is the word "contraband" mentioned?

23  **A.**  No.

24  **Q.**  Is the word "vehicles" mentioned?

25  **A.**  Vehicles?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 91*

1   Q.   Correct.

2   A.   No.

3   Q.   Nor is the phrase "possible counterfeit money" mentioned

4   in those prior reports; correct?

5   A.   Correct.

6   Q.   All the way up until July 29th, the day before you

7   interviewed Didani, the investigation was about smuggling

8   marijuana from Canada to the United States and money

9   laundering; correct?

10  A.   Correct.

11  Q.   What changed that this report two weeks later is now far

12  more expansive in scope?

13  A.   That would be his cellphone.

14  Q.   So between the time --

15          **THE COURT:**  I'm sorry, that would be his what?

16          **THE WITNESS:**  His cellphone.

17          **THE COURT:**  Okay.

18  BY MR. FINK:

19  Q.   So from the time of July 29th to August 13th, 2015, the

20  contents of his cellphone changed your investigation from

21  marijuana smuggling from Canada to the United States to an

22  investigation about possible steroids, contraband, vehicles and

23  counterfeit money, in addition to the other things you had

24  already been investigating; correct?

25  A.   Correct.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 92*

1   **Q.**   What evidence on the phones, and you discussed them on --

2   we'll discuss this in more detail, but you discussed on direct

3   examination some pictures you observed and other things.  What

4   evidence of these new -- these new allegations were found on

5   the phones?

6   **A.**   New allegations -- could you rephrase?

7   **Q.**   Well, you said the phones made you change this

8   investigation to include smuggling of steroids; correct?

9   **A.**   Just to include it, yes.

10  **Q.**   Right, but what made you include that as a possible

11  investigation point?  What changed?

12  **A.**   Photos of steroids.

13  **Q.**   You saw steroids on his phone?

14  **A.**   Yes.  Well, what I thought was.

15  **Q.**   Help me explain what they look like, those pictures.

16  **A.**   I would have to see the pictures.

17  **Q.**   Do you have those pictures?

18  **A.**   On me?  No.

19  **Q.**   Do they exist?

20  **A.**   Yes.

21  **Q.**   Okay.  But you can't describe what they look like?

22  **A.**   No.

23  **Q.**   You don't remember?

24  **A.**   No.

25  **Q.**   Well, what would you think a steroid would look like?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 93*

1  A.   Vials.

2  Q.   A vial means it's steroids?

3  A.   No, not necessarily.

4  Q.   Did you see vials in these pictures?

5  A.   I did.

6  Q.   I thought you didn't remember.

7  A.   I don't.

8  Q.   Now you do remember that it was vials that you saw in

9  these pictures?

10  A.   Yes.

11  Q.   Anything else?

12  A.   No.

13  Q.   You said you added the word "vehicles" to your

14  investigation.  What about vehicles changed in your view of

15  Mr. Didani's cellphone?

16  A.   What do you mean?

17  Q.   Well, did you see a picture of a car and you thought it

18  was illegal for some reason?  What led you to the suspicion

19  that vehicles should be part of your investigation?

20  A.   Yes, pictures of multiple cars, high-end cars, and also

21  titles of other people that are not in.

22  Q.   Well, I mean what were your suspicions specifically about

23  seeing expensive cars?

24  A.   Just the way they were torn up and -- and what not, carpet

25  being ripped up out of them.  I didn't know.  Just suspicions.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 94*

1  **Q.**   So you were suspicious of photographs you saw from his

2  phone of cars that were torn up, you said, in some fashion --

3  right? -- or altered?

4  **A.**   Correct.

5  **Q.**   Okay.  Did you recall saying this on direct examination at

6  all?

7  **A.**   Saying what?

8  **Q.**   Anything about seeing these pictures.  When you were asked

9  about what you saw on his phones, you didn't mention any of

10  this; right?

11  **A.**   About the vehicles?

12  **Q.**   Right.

13  **A.**   No, I did not.

14  **Q.**   You didn't mention anything about steroids either; right?

15  **A.**   Correct.

16  **Q.**   Do you recall seeing the pictures of the alleged vials and

17  the vehicles, did you see that when Mr. Fuentes was scrolling

18  through on the phone?

19  **A.**   I don't recall.

20  **Q.**   Or did you see them after when the phone was imaged and

21  you looked at the images?

22  **A.**   I don't recall.

23  **Q.**   It could be either?

24  **A.**   It could be.

25  **Q.**   Because you looked at pictures that were extracted from

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 95*

1   the phone; correct?

2   **A.**   Yes, sir.

3   **Q.**   So it could have been that you saw these pictures later?

4   **A.**   Yes.

5   **Q.**   And maybe that's why you added it to the report?

6   **A.**   Maybe what?

7   **Q.**   Maybe that's why you expanded the scope of your

8   investigation by saying smuggling of steroids, perhaps you saw

9   these pictures afterwards?

10  **A.**   Okay.

11  **Q.**   I'm asking.  Is that possible?

12  **A.**   It is possible.

13        **THE COURT:**   And by "afterwards," you mean after the

14  scrolling through?

15        **MR. FINK:**   Yeah.  Thank you, Judge.  To be more

16  precise -- I appreciate that, Your Honor.

17  **BY MR. FINK:**

18  **Q.**   After the scrolling by Mr. Fuentes, you said in order to

19  facilitate a connecting flight that you thought it would be

20  more expedient to just image the phone.  Do you recall that?

21  **A.**   Yes.

22  **Q.**   What does it mean to image a phone?

23  **A.**   Basically we produce a copy of what's on the phone onto an

24  another media device that you can look at.

25  **Q.**   Basically just take all the data and make a copy of it so

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 96*

1  it's preserved; right?

2  **A.**   Yes, sir.

3  **Q.**   So you have an exact, mirror image of what that phone

4  looked like at that time, at that place; right?

5  **A.**   Yes, sir.

6  **Q.**   And that's what you did?

7  **A.**   Well, I didn't.

8  **Q.**   Well, to your knowledge that's what -- you asked CBP to

9  do?

10  **A.**   Yes, sir.

11  **Q.**   And presumably they did it because you looked at images

12  later after the fact; correct?

13  **A.**   Yes.

14  **Q.**   When I say "after the fact," to be more precise, after the

15  encounter at O'Hare in your office later you were able to view

16  contents of the phone?

17  **A.**   That is correct.

18  **Q.**   Okay.  Agent Bianchi, you wrote this report on August 13,

19  2015, about two weeks after the encounter -- correct? -- that's

20  in front of you?

21  **A.**   Yes.

22  **Q.**   Okay.  And this is -- we have just discussed that this is

23  also after you have had the benefit of looking at some things

24  from the image; right?

25  **A.**   For sure.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 97*

1  **Q.**   When you write reports -- and don't let me -- correct me

2  if I'm wrong.  I'm saying this because I think it's obvious,

3  but correct me if I'm wrong.  It's important to be inclusive in

4  your reports -- right? -- include things that you did; right?

5  **A.**   Okay.

6  **Q.**   Is that true in your opinion?

7  **A.**   Yes, sir.

8  **Q.**   It's important because you're closer in time to the event,

9  and you recall things better to write down in a report; right?

10  **A.**   Yes.

11  **Q.**   Nowhere in this report did you mention imaging the phone,

12  did you?

13  **A.**   No.

14         **THE COURT:**  Nowhere did he mention?

15         **MR. FINK:**   Imaging the phone, Your Honor.

16  **BY MR. FINK:**

17  **Q.**   Is that accurate?

18  **A.**   That is accurate.

19  **Q.**   Nowhere in the report do you mention looking at pictures

20  after the fact, do you?

21  **A.**   Correct.

22  **Q.**   Is that correct?

23  **A.**   Correct.

24  **Q.**   Nowhere in this report do you even mention scrolling

25  through the phone, do you?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 98

1  A.   Well, I didn't, but correct.

2  Q.   I'm not saying you didn't, but you didn't write it in your

3  report; correct?

4  A.   That is correct.

5  Q.   You didn't write anything about seeing vials of steroids;

6  correct?

7  A.   I'd have to look, but --

8  Q.   You can look.  Take your time, please.

9  A.   Okay.  If you're saying my report says that, then I agree.

10 Q.   That it doesn't say that.

11 A.   Correct.

12 Q.   And I don't want you to just take my word for it.  If you

13 want to look, please do.  It doesn't, but take your time.

14 A.   Okay.

15 Q.   It also makes no mention of vehicles being torn up; right?

16 A.   Correct.

17 Q.   Is that an oversight?

18 A.   I don't know.

19 Q.   Do you think it would have been better to have included

20 those things?

21 A.   I don't know.

22 Q.   Agent Bianchi, you mentioned during the interview that one

23 of the things that was suspicious to you was the Columbia trip.

24 Do you recall that?

25 A.   Yes, sir.

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 99*

1   **Q.**   And the reason it was suspicious to you -- well, why don't

2   you tell us.  Why was the trip to Columbia suspicious to you?

3   **A.**   Initially the trip to Columbia was suspicious because

4   Mr. Didani traveled with Mr. Puzio there and then returned the

5   same day.

6   **Q.**   So the association, number one, with Mr. Puzio; right?

7   **A.**   Yes, sir.

8   **Q.**   And the fact that he had a return trip so quickly; right?

9   **A.**   Correct.

10  **Q.**   And Mr. Didani explained to you that he was rejected at

11  the Columbian border; right?

12  **A.**   Yes, sir.

13  **Q.**   You were able to verify that; that that was true?

14  **A.**   No.

15  **Q.**   Did you ask if he was rejected at the border?

16  **A.**   Mr. Didani?

17  **Q.**   The Columbian officials.

18  **A.**   No.

19  **Q.**   Did you ever seek to verify whether that was true, that he

20  was turned away at the border?

21  **A.**   No.

22  **Q.**   So you don't know if he was lying to you?

23  **A.**   I do not know.

24  **Q.**   It could be true that he was declined at the Columbian

25  border; correct?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 100

1  **A.**   Yes.

2  **Q.**   You discussed in your interview and on direct

3  examination -- you said it arose suspicion -- well, inferred

4  that it arose suspicion, Mr. Didani's reference to his mineral

5  business.  Do you recall that on your direct examination?

6  **A.**   Yes, sir.

7  **Q.**   And one of the suspicions you had, correct me if I'm

8  wrong, was that he couldn't give you a ZIP code.  Do you

9  remember that?

10  **A.**   I do not.

11  **Q.**   Did you write in your report that one of the suspicions

12  you had was that he couldn't give you a precise location, a ZIP

13  code, for his mining business?

14  **A.**   I don't recall.

15  **Q.**   Do you want to look at your report to refresh your

16  recollection?

17  **A.**   Sure.

18  **Q.**   I'll see if I can point you to the right spot, but you

19  have my only copy so give me a moment.

20          **THE COURT:**  Do I have a copy of that report?

21          **MR. FINK:**  You don't, Judge, because somehow my most

22  important exhibit was not in my binder.

23          **THE COURT:**  Well, walk up and look at his copy.

24          **MR. FINK:**  Thank you, Judge.

25          **THE COURT:**  If you want to point out something to

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 101*

1   him.

2            **MR. FINK:**  Thank you, Judge.

3            **THE COURT:**  Do you all want this to be on the record?

4            **MR. FINK:**  No, Judge.  I'm sorry.

5            **THE COURT:**  I think probably you look for it and then

6   just don't have a discussion.

7            **MR. FINK:**  You're absolutely right, Judge.  My

8   apologies.

9        It's possible I'm referring to another report.  I'm going

10  to move on, and we'll come back to that question.

11  **BY MR. FINK:**

12  **Q.**  Agent Bianchi, there's a mention in your report of ISIS.

13  Do you recall writing that in your report?

14  **A.**  I do.

15  **Q.**  Do you know what ISIS is?

16  **A.**  A terrorist organization overseas.

17  **Q.**  And what you put in your report is that around the same

18  time that Mr. Didani was in Sanliurfa, Turkey, there was an

19  ISIS terrorist attack in that province.  Do you recall writing

20  that?

21  **A.**  I do.

22  **Q.**  Do you have any evidence to suggest that Mr. Didani is

23  involved in terrorism?

24  **A.**  Absolutely not.

25  **Q.**  Okay.  What was the purpose of including that in your

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 102*

1  report?

2  **A.**    He had photos of it on his phone.

3  **Q.**    Photos of what?

4  **A.**    What appeared to be where that bomb went off at that time.

5  **Q.**    He had photos of the city of Sanliurfa; correct?  Is that

6  what you're saying?

7  **A.**    There was a photo of him sitting on an airplane looking

8  out where smoke was coming up dated the same date and time as

9  that explosion went off.

10 **Q.**    So he was on an airplane?

11 **A.**    Correct.

12 **Q.**    You didn't write that in your report, that he was on an

13 airplane, did you?

14 **A.**    I don't know.

15 **Q.**    You wrote that -- it coincided with his time in Turkey is

16 what you wrote in your report; is that correct?  And take your

17 time to read it.  I believe it's on the last page.

18 **A.**    Okay, yes.

19 **Q.**    What was the purpose of including that in your report?

20 **A.**    I was just noting suspicious things, coincidences.

21 **Q.**    So you were suspicious that he was somehow involved in

22 that attack?

23 **A.**    No, not at the time.

24 **Q.**    You just thought you would put it in there?

25 **A.**    Yes, in case it came up again later.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 103*

1   **Q.**   Do you know anything about that attack?  Did you research

2   it at all?

3   **A.**   Just news articles.

4   **Q.**   Do you know Mr. Didani's religion?

5   **A.**   I do not.

6   **Q.**   Do you know if he's Muslim?

7   **A.**   I do not.

8   **Q.**   You know ISIS is the Islamic state; right?  Do you know

9   that?

10  **A.**   I do.

11  **Q.**   Do you know anything about Sanliurfa province in Turkey?

12  **A.**   No.

13  **Q.**   Do you know that it's a province of 2 million people?

14  **A.**   No.

15  **Q.**   Do you know that it's on the border with Syria?

16  **A.**   No.

17  **Q.**   Do you know it's the size of Massachusetts in square

18  miles?  Do you know any of that?

19  **A.**   No.

20  **Q.**   Do you know who the terrorist attack was targeting?

21  **A.**   I do not.

22  **Q.**   That it was targeting Islamic youth that were part of the

23  Socialist Party.  Do you know that?

24  **A.**   I do not.  Or I do not recall.

25  **Q.**   Do you know anything about Mr. Didani's politics?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 104*

1  **A.**   I do not.

2  **Q.**   So you don't have any suspicions that he's a terrorist;

3  correct?

4  **A.**   That is correct.

5  **Q.**   On direct examination, Agent Bianchi, you mentioned some

6  of the images, and I think we admitted into evidence Exhibits 1

7  through 5.  One of the images was an AR rifle.  Another image

8  was currency in cellophane.  Do you recall discussing that?

9  **A.**   Yes, sir.

10 **Q.**   Okay.  Did you happen to see the dates on any of those

11 pictures?

12 **A.**   I don't recall.

13 **Q.**   Okay.  Do you have them in front of you?

14 **A.**   I do not.

15          **THE COURT:**  I have them.

16 BY MR. FINK:

17 **Q.**   Are they dated at all --

18          **THE COURT:**  Do you want me to pass them to him?

19          **MR. FINK:**  Please, Judge.  Thank you.

20          **THE COURT:**  Thank you.  I think that's just the

21 photographs.

22          **MR. FINK:**  Your Honor, I have handed him Government's

23 Exhibits 1 through 5.

24 BY MR. FINK:

25 **Q.**   Are there any dates on those pictures, Agent Bianchi?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

Page 105

1    **A.**    No, sir.

2    **Q.**    Thank you.  And you don't recall seeing any dates on the

3    pictures when you were looking through the phone; correct?

4    **A.**    I don't recall at all.

5    **Q.**    Do you recall seeing dates when you looked later on the

6    image?

7    **A.**    Oh, yes.

8    **Q.**    Okay.  And what were the dates of those pictures?

9    **A.**    I do not know.

10   **Q.**    Were they close in time to the interview?

11   **A.**    I don't know.

12   **Q.**    Were they years before?

13   **A.**    I don't know.

14   **Q.**    Do you know how many photos Mr. Didani had total on his

15   phone?

16   **A.**    I don't.  I know it was thousands, but --

17   **Q.**    Do you know how many years those photos spanned?

18   **A.**    I don't.

19   **Q.**    So, in conclusion, we don't -- those five pictures we

20   admitted along with the other pictures that you have discussed

21   today, you don't know the dates -- you don't and didn't know

22   the dates those were taken; correct?

23   **A.**    I don't recall.

24   **Q.**    Did you know at the time?

25   **A.**    I may have.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

Page 106

1    Q.   But you don't know?

2    A.   I don't know.

3    Q.   Does that seem -- in your experience, 20 years in law

4    enforcement, does it seem important to know the proximity of

5    the timing of the picture that you're suspicious of?

6    A.   To what?

7    Q.   Well, if a picture is taken in 2004 that you're looking at

8    in 2015, it may be less suspicious or less concerning to you

9    than if it was taken the day before; is that correct?

10   A.   Correct.

11   Q.   And that's because if taken a long time ago it doesn't

12   necessarily indicate current wrongdoing; correct?

13   A.   Correct.

14   Q.   So it's an important thing to know; right?

15   A.   Yes.

16   Q.   Did you review -- you said that you know it was thousands

17   of pictures.  Did you review all of the pictures prior to your

18   next encounter in 2016?

19   A.   Yes, sir.

20   Q.   Did you review anything else on his phone prior to your

21   encounter in 2016?

22   A.   Yes, sir.

23   Q.   What else do you recall reviewing in the time between

24   July 2015 to August 2016, about a year?

25   A.   Messages and -- there was messages from different apps,

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 107

1  threads that were on there.

2  Q.   So you went through his text messages during this time;

3  correct?

4  A.   Some, yes.

5  Q.   And in your report dated August 13th, 2015, written about

6  the encounter from July 30 of 2015, you do not mention going

7  through text messages in that report; is that correct?

8  A.   That is correct.

9  Q.   In fact, I don't think you said it on direct exam either,

10 did you?

11 A.   I did not.

12 Q.   Okay.  What else did you view in the phone?

13 A.   I don't recall.  There was a lot of stuff.

14 Q.   But more than just that?

15 A.   Yes, sir.

16 Q.   I mean did you thoroughly go through the phone?

17 A.   Yes, sir.

18 Q.   Did you search every corner of it?

19 A.   Yes, sir.

20 Q.   All the apps?

21 A.   Everything that was available.

22 Q.   And, like we said, everything that was available was an

23 exact copy of that phone from the day it was taken; right?

24 A.   Not exactly, but most of it.

25 Q.   Well, the data as it was.  Obviously --

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 108*

1  **A.**   Correct.  Some things didn't come.  Some things didn't --

2  **Q.**   Understood.

3  **A.**   Yes.

4  **Q.**   To the best you could, an image of that phone; correct?

5  **A.**   Yes, sir.

6  **Q.**   At that point, between July 2015 and your encounter in

7  August of 2016, while you were reviewing all portions of this

8  phone you did not have a warrant; correct?

9  **A.**   A warrant?

10  **Q.**   A search warrant for that phone; is that correct?

11  **A.**   That is correct.

12  **Q.**   Okay.  You had no warrants for anything related to

13  Ylli Didani at this time; is that correct?

14  **A.**   That is correct.

15  **Q.**   So, to be clear, based on what the government will argue,

16  I'm not saying it's necessarily wrong, but just to be very

17  clear for the record, you did a warrantless search of the

18  entire phone that he had on him July 30 of 2015?

19      And there may be an exception to that.  I'm asking you

20  just to make it very clear on this question.  You did a

21  warrantless search of his phone on July 30, 2015 --

22  **A.**   Correct.

23  **Q.**   -- through August 2016.  Yes?

24  **A.**   Yes, sir.

25  **Q.**   July 2015 to August 2016 is much longer than 30 days;

*21-20264; U.S.A. v. Ylli Didani*

1  correct?

2  **A.**   Yes.

3       30 days though is from possession of his phone.

4  **Q.**   Your belief on that rule is that the 30-day period applies

5  to the physical cellphone.  Is that what you're saying?

6  **A.**   Yes, sir.

7  **Q.**   Now, this is an "if you know" question so if you know this

8  because I'm asking about other people's part of the

9  investigation.

10      If you know, other agents related to this investigation

11  would later rely on that 2015 extraction to conduct their

12  investigation in later years, in 2017, '18 and so on; correct?

13  **A.**   I don't --

14  **Q.**   If you don't know, that's an okay answer.

15  **A.**   I -- they -- I don't know.

16  **Q.**   Is that image that you took from 2015 still preserved

17  today?

18          **THE COURT:**  If you know.

19  **A.**   Yes.

20  **BY MR. FINK:**

21  **Q.**   The image of the -- when I say "image" --

22          **THE COURT:**  Image of the whole cellphone?

23          **MR. FINK:**  Yes, I'm sorry.

24  **BY MR. FINK:**

25  **Q.**   When I say "image," I don't mean a photograph.  Is the

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 110*

1  image, the copy of the entire cellphone that was taken and

2  extracted by Border Patrol in 2015, is that still preserved

3  today?

4  **A.**    It is.

5  **Q.**    On that topic I want to be clear.  You testified a moment

6  ago that you weren't the actual person to do the extraction;

7  right?

8  **A.**    Correct.

9  **Q.**    Customs and Border Patrol did the extraction?

10  **A.**    Correct.

11  **Q.**    Well, you were assigned to a task force.  I know you are

12  Custom and Border Patrol as well, but actually Custom and

13  Border Patrol agents did the extraction?

14  **A.**    Yes.

15  **Q.**    I am not trying to trick you here.  You were on a task

16  force for HSI, I understand that.  I'm just asking you:  The

17  actual physical task was done by Customs and Border Patrol

18  agents; right?

19  **A.**    Correct.

20  **Q.**    Okay.  Putting aside what you saw on the phone, whether it

21  was that day or later, physically speaking, in his luggage or

22  otherwise, did Mr. Didani have any contraband on his person?

23  **A.**    On which date?

24  **Q.**    July 30, 2015.

25  **A.**    Not that I'm aware of.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 111*

1  **Q.**  I mean if you need to refer to your report, sir, to

2  refresh your recollection, please do, but I would like

3  certainty in that answer if you recall.  Did he have any

4  contraband on him from your memory?

5  **A.**  Physical contraband?

6  **Q.**  Yeah, physical contraband.

7  **A.**  No.

8  **Q.**  And no steroids on his person; right?

9  **A.**  Correct.

10  **Q.**  No drugs on his person; correct?

11  **A.**  Correct.

12  **Q.**  No firearms; correct?

13  **A.**  Correct.

14  **Q.**  You mentioned that you recognized on the phone a gentleman

15  last name Sheko.  Do you remember that?

16  **A.**  Yes, sir.

17  **Q.**  Why did you recognize that person?

18  **A.**  Because when I was doing research on Mr. Didani, it pulled

19  up that Mr. Didani had worked for him at that trucking company

20  that was under investigation for drug smuggling.

21  **Q.**  Did Mr. Sheko have a criminal history of any kind?

22  **A.**  I do not recall.

23  **Q.**  Did he have any convictions?

24  **A.**  I do not recall.

25  **Q.**  Did he have any arrests?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 112*

**A.**   I do not recall.

**Q.**   Do you remember looking into that at the time?

**A.**   I do.

**Q.**   And you don't remember the results?

**A.**   I don't.

**Q.**   Would you have placed the results, if there were any, in your reports?  Is that your normal practice?

**A.**   Normally, yes, sir.

**Q.**   From the time that Mr. Didani exited the plane on July 30th, 2015, and I -- well, let me strike that and say this.

     I understand this is going to be an estimate so the best you can.  From the time Mr. Didani left the plane July 30, 2015, to the time you said here is your phone, you are all set to go, how long would you say that entire encounter lasted?

**A.**   Before he was actually admitted into the United States?

**Q.**   Correct.

**A.**   Hours.  Six hours.  Five or six hours.

**Q.**   So he was detained approximately five to six hours before admission; is that accurate?

**A.**   It is.

**Q.**   He was not free to leave at that time; right?

**A.**   He wasn't according to Customs.

**Q.**   Correct.

**A.**   Correct.

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 113*

1  Q.   If Mr. Didani wanted to leave secondary and go back on a

2  flight out of the country, he was not permitted to do that;

3  correct?

4  A.   I don't know.  They might let him do that.  He was trying

5  to make entry into the United States.  Customs is different

6  than what I do.  I work for the Border Patrol.

7  Q.   I understand.  Would you consider him seized though if he

8  wanted to leave at that moment?  Could he have?

9  A.   I don't know.  It would have been up to the Customs

10  officers.

11  Q.   What would have been your suggestion?

12  A.   If he wanted to leave?

13  Q.   Yeah.

14  A.   Sure.

15  Q.   He was free to go?

16  A.   I don't know.  You asked for my suggestion.

17  Q.   You put a hit out on him for -- a silent hit so you would

18  know when he came into the country; right?

19  A.   Yes, sir.

20  Q.   And the purpose of that was to detain him at the border;

21  right?

22  A.   Interview him, yes.

23  Q.   Stop him and interview him; right?

24  A.   Yes.

25  Q.   If you meet someone at the plane, you know, they are

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 114*

1  not --

2  **A.**   We do that to everybody that gets off the plane.

3          **THE COURT:**  I'm sorry, I didn't hear that.

4          **THE WITNESS:**  We do that to everybody that gets off

5  the plane.  They are questioned when they enter the

6  United States.

7  **BY MR. FINK:**

8  **Q.**   You meet everyone at the plane?

9  **A.**   Me?

10  **Q.**   I'm saying Customs and Border Patrol ordinary protocol,

11  you meet them at the door of the plane?  Not you personally but

12  law enforcement?

13  **A.**   I don't know what their protocol is, but I know they have

14  Customs, so yes.

15  **Q.**   Mr. Didani was met at the door of the plane -- right? --

16  by a CBP agent?

17  **A.**   Okay.  I don't know.

18          **MR. FINK:**  So, Judge, I'm going to go into 2016.

19  This witness has been there for two hours.  I'm just

20  offering -- I mean I have probably 45 minutes more or so.

21          **THE COURT:**  Okay.  You are offering a break?

22          **MR. FINK:**  I'm okay, but I don't want to be like -- I

23  just do have time left so --

24          **THE COURT:**  Do you want to take a break?

25          **THE WITNESS:**  Sure.

*21-20264; U.S.A. v. Ylli Didani*

1       **THE COURT:**  All right.  You may step down.  Let's

2   take ten minutes.

3       **MR. FINK:**  Thank you, Judge.

4       **THE COURT:**  You're welcome.

5       **THE WITNESS:**  Do I leave this?

6       **THE COURT:**  Whatever is there, leave it, and the

7   lawyers will take care of it.  All right?

8       (Recess from 12:21 p.m. to 12:40 p.m.)

9       **LAW CLERK:**  Court is back in session.

10      **THE COURT:**  Okay.  Does the witness want to come back

11  up, please.

12      And you're still under oath.

13      You heard me say, "You're still under oath"?

14      **THE WITNESS:**  Yes, ma'am.

15      **THE COURT:**  All right.  Very good.

16      You may proceed, counsel.

17      **MR. FINK:**  Thank you, Your Honor.

18      **THE COURT:**  And, sir, I forgot your arm is in a sling

19  so if you need a break you need to let me know.  Okay?

20      **THE WITNESS:**  Okay.  I'm fine.  Thank you.

21      **THE COURT:**  Okay.  Go ahead, counsel.

22      **MR. FINK:**  Thank you, Judge.

23  BY MR. FINK:

24  **Q.**   Where we left off, Agent Bianchi, was we were discussing

25  the July 30, 2015, encounter, and we left off with the

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 116*

1   information that you learned from an image of that phone, and I

2   was going to proceed from there.

3       So you write that report.  I believe we were talking about

4   the August 13, 2015 report.  After --

5       Oh, there's one thing the prosecutor and I spoke about

6   that I want to clarify for Judge Hood's benefit and for the

7   record's benefit.  The United States Border Patrol, correct me

8   if I'm wrong, is responsible for ground travel into the

9   country; is that correct?

10      So from Canada to the United States if you travel by car

11  you will be met by the United States Border Patrol agency.  Is

12  that accurate?

13  **A.**   That is not.

14  **Q.**   Okay.  Tell me why I'm wrong.

15  **A.**   That would be Customs.

16          **THE COURT:**  That would be Customs who would stop you

17  like at the tunnel or the bridge?

18          **THE WITNESS:**  Yes, ma'am.

19          **THE COURT:**  Okay.

20          **THE WITNESS:**  Border Patrol is in between the ports

21  of entry.

22  **BY MR. FINK:**

23  **Q.**   Understood.  So when it's --

24          **THE COURT:**  Wait a minute.  Tell me that again.  In

25  between the ports of entry?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 117*

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  So you are in between Port Huron and

3     Detroit, for instance?

4          What do you mean ports of entry?

5          THE WITNESS:  Yes, ma'am.  At ports of entry, like

6     the bridge or the tunnel or airports, where people enter the

7     United States, a port of entry is a designated point or place

8     that people can enter the United States.  Border Patrol

9     operates in between those, for people that are trying to sneak

10    into the United States or what not, not at a designated place.

11         THE COURT:  Give me an example of that.

12         THE WITNESS:  On the river.  We work a lot on the

13    river where people -- Canadians will get a boatload of people

14    and try to smuggle them into the United States by just crossing

15    the boat and dropping them off or narcotics.

16         THE COURT:  Okay.  So do you handle -- for instance,

17    you mentioned earlier people going on their jet ski over to

18    Canada.  Do you handle that?

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  Do you stop those people?  Are they

21    always suspicious?

22         THE WITNESS:  We do stop those people.  What do you

23    mean by "are they always suspicious?"

24         THE COURT:  Well, you said it was suspicious that --

25    earlier.  Almost at the beginning of your testimony you said it

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 118*

1   was suspicious that these people got on jet skis, went over to

2   Canada, and stayed a couple of hours.

3           **THE WITNESS:**  They went out towards Canada and stayed

4   a couple of hours.  It is because they have to legally report

5   that, and they did not.

6           **THE COURT:**  Oh, okay.  They have to report it before

7   they go or when they come back?

8           **THE WITNESS:**  Both.

9           **THE COURT:**  Okay.  So like in the old days people

10  would ride their boats across to a restaurant, dock at the

11  restaurant and eat, and come back.  They have to report that?

12          **THE WITNESS:**  Yes, ma'am.

13          **THE COURT:**  Okay.  Is it considered suspicious if

14  they go over there, eat and don't report it?

15          **THE WITNESS:**  Yes, ma'am.

16          **THE COURT:**  Okay.

17  BY MR. FINK:

18  Q.   And that actually clarified it for me.  So United States

19  Border Patrol is a law enforcement arm basically in between

20  points of entry.  So the Mexican/United States border is

21  probably more talked about, you know, areas where we have heard

22  build a wall or whatever, the enforcement arm would be United

23  States Border Patrol to stop illegal crossings; right?

24  A.   Yes, sir.

25  Q.   And Customs and Border Patrol would be at the points of

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 119*

1  entry, like airports, tunnels to receive people who are

2  lawfully entering -- well, are entering through a point of

3  entry.  Is that accurate?

4  **A.**   Yes, sir.

5  **Q.**   Okay.  So distinguishing between those two, when I

6  interchangeably have been using the two, what we're talking

7  about at O'Hare Chicago Airport is Customs and Border Patrol,

8  CBP?

9  **A.**   Yes, sir.

10         **MR. FINK:**  Thank you very much.  Is that adequate?

11         **THE COURT:**  Tell me again.

12         **MR. FINK:**  Of course, Judge.

13         **THE COURT:**  You are talking about Customs and Border

14  Patrol at the airport?

15         **MR. FINK:**  Correct.  So, Judge, for legal crossings

16  or for points of entry where people are encouraged to cross the

17  border into the United States, airports, tunnels, bridges,

18  points of entry that are designated for border crossings, the

19  enforcement arm or the law enforcement that handles that is the

20  Customs and Border Patrol, CBP.

21     When there is illegal crossings not at a port of entry

22  where someone may be running across the border, swimming

23  across, what have you, the folks that are responsible for

24  enforcing our border integrity at nonpoints of entry is

25  United States Border Patrol, two different agencies.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 120

1      **THE COURT:**  Okay.  All right.  Do you agree with

2   that, counsel?

3      **MR. BILKOVIC:**  The only thing is CBP is Customs and

4   Border Protection.

5      **MR. FINK:**  I can't get it right, but I agree with

6   that.  I'm going to call them CBP if that's okay with everyone.

7      **THE COURT:**  Okay.  Which were you a part of?

8      **THE WITNESS:**  Border Patrol.

9      **THE COURT:**  Not Customs and Border Protection.  Okay.

10  Got it.  Is that correct?

11     **THE WITNESS:**  Yes, ma'am.

12     **THE COURT:**  Okay.  Go ahead.

13  BY MR. FINK:

14  Q.   So you -- the department you are assigned to generally,

15  putting aside the task force designation that happened from

16  time to time in your career, your general assignment is to the

17  United States Border Patrol; is that accurate?

18  A.   That is, sir.

19  Q.   You are not employed by the Customs and Border Protection?

20  A.   Correct.

21  Q.   Okay.  Your checks are signed by the United States Border

22  Patrol, but it's the Department of Homeland Security --

23  A.   Correct.

24  Q.   -- United States Border Patrol.  Okay.  Thank you.

25     Then, to be clear, at the O'Hare Airport when you are on

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 121*

1    the HSI task force and you are asking for assistance at the

2    airport, you are asking for the assistance of CBP, Customs and

3    Border Protection?

4    **A.**    Correct.

5    **Q.**    Okay.  Understood.  So not your agency?

6    **A.**    Correct.

7         **THE COURT:**  So your agency doesn't go to the gate and

8    meet somebody that they think is illegally entering?

9         **THE WITNESS:**  Correct.  Well, illegally entering?

10        **THE COURT:**  Yeah.  I mean people do get on planes in

11   an attempt to illegally enter, for instance, at Detroit?

12        **THE WITNESS:**  Yep.

13        **THE COURT:**  Do you meet those people or does Customs

14   and Border Protection meet them?

15        **THE WITNESS:**  Customs and Border Protection meets

16   them.

17        **THE COURT:**  Even if you are the person alerting them?

18        **THE WITNESS:**  Correct.

19        **THE COURT:**  Okay.  Do you do the train tunnel?

20        **THE WITNESS:**  I do not.  That's also Customs and

21   Border Protection, ma'am.

22        **THE COURT:**  Okay.  All right.  Great.

23   **BY MR. FINK:**

24   **Q.**    So when you need this assistance, like in our case or any

25   case where you have a silent hit for someone traveling, you

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 122*

1  will summon or solicit, I should say, the assistance of Customs

2  and Border Protection?

3  **A.**   Yes, sir.

4  　　　　**MR. FINK:**  Okay.  Judge, did I make that record clear

5  for you?

6  　　　　**THE COURT:**  Got it.  Uh-huh.

7  　　　　**MR. FINK:**  Thank you.

8  **BY MR. FINK:**

9  **Q.**   Well, and I also want to clarify this.  You indicated that

10  Mr. Didani was detained for approximately five, six hours.  We

11  spoke about that a moment ago.  Do you recall that?

12  **A.**   Yes, sir.

13  **Q.**   Now, it has come to my attention that some of that time

14  involved an improper designation by NTC.  What's NTC?

15  **A.**   National Targeting Center.

16  **Q.**   And the National Targeting Center will put a notice, if

17  somebody is convicted of a crime or makes them ineligible to

18  enter the United States, there will be a flag when that person

19  tries to enter the United States; correct?

20  **A.**   Correct.

21  **Q.**   And there was an improper tag placed on Mr. Didani based

22  on what was expected to be a conviction in the Michigan courts

23  but ended up being a not guilty verdict; correct?

24  **A.**   Correct.

25  **Q.**   So that extended some of the time that he was detained in

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 123*

1 your interaction; right?

2 **A.**    Correct.

3 **Q.**    So let's exclude that time that it took to clear up the

4 NTC issue and just estimate the time that it took with -- from

5 the time CBP took them to secondary to you and you did your

6 investigation with Mr. Fuentes, can you estimate how many hours

7 that was?

8 **A.**    I'd say one to two.

9 **Q.**    So your interaction was one to two.  The balance of the

10 time, the three to four, was waiting for NTC to clear up their

11 issue?

12 **A.**    Yes.

13         **THE COURT:**  I have got a question.  When you go there

14 at the airport and he is detained for the one to two hours, is

15 he in your custody or the custody of the Customs and Border

16 Protection?

17         **THE WITNESS:**  Customs and Border Protection.

18         **THE COURT:**  Was anybody from Customs and Border

19 Protection there?  Fuentes is from Customs and Border

20 Protection?

21         **THE WITNESS:**  Yes, ma'am.

22         **THE COURT:**  Okay.  Remember, gentlemen, if you object

23 to my question, you need to raise it now.  Otherwise it's

24 waived.

25         **MR. FINK:**  I think it was an excellent question.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 124*

1          **THE COURT:**  Okay.  Thank you.

2          **MR. FINK:**  You're welcome.

3          **THE COURT:**  You can begin questioning again.

4   BY MR. FINK:

5   **Q.**   Agent Bianchi, after -- now that we have cleared up those

6   things, thank you for bearing with me.

7          After Mr. Didani was -- you concluded, the image was made

8   of his phone, that was returned to him.  After the interview

9   and his luggage was searched and all of that was completed,

10  Mr. Didani ultimately was admitted to the United States;

11  correct?

12  **A.**   Yes, sir.

13  **Q.**   Okay.  And after he was admitted to the United States, you

14  and other law enforcement conducted surveillance of him; is

15  that accurate?

16  **A.**   At a later date and time.

17  **Q.**   Sure.  In fact, you wrote a report on September 11, 2015,

18  so about a month after the report you wrote about the

19  July 30th interaction, discussing the surveillance you did of

20  Mr. Didani through the month of August 2015.  Do you recall

21  that?

22  **A.**   Yes.

23  **Q.**   I'm going to approach you with that, okay?

24  **A.**   Yes, sir.

25          **MR. FINK:**  Judge, is that okay?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 125*

1    **THE COURT:**  Yes, it is.  What's the date on it?

2    **THE WITNESS:**  The date on this report, Your Honor, is

3    September 11th, 2015, and marked as Bates stamp --

4    **MR. BILKOVIC:**  I have it.  Thank you.

5    **MR. FINK:**  Judge, I'm going to approach your

6    wonderful case manager with a copy for you.

7    **THE COURT:**  She's actually my law clerk.

8    **MR. FINK:**  Your wonderful law clerk.  My sincerest

9    apologies.

10   BY MR. FINK:

11   **Q.**  Agent Bianchi, what I have handed you if you need to refer

12   to it -- do you recognize this report?

13   **A.**  Yes, sir.

14   **Q.**  Okay.  This is a report dated September 11, 2015, and it's

15   titled "Survey of Didani during August 2015;" correct?

16   **A.**  Yes.

17   **Q.**  Okay.  And that first sentence describing the scope of the

18   investigation is similar to the last one, which includes the

19   new categories of steroids, vehicles and counterfeit money;

20   correct?

21   **A.**  Yes.

22   **Q.**  Okay.  On Page 2 of this report you make mention of the

23   post-inspection of Didani's phone.  This is what we were

24   discussing before; correct?

25   **A.**  Uhm --

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 126*

1  **Q.**   Post-inspection of Didani's phone means you are viewing

2  the copy made of his phone; right?

3  **A.**   Yes.

4  **Q.**   And you write that it included the picture of a shipping

5  label that was addressed to a redacted person, and that's also

6  on Page 2.  Do you see that?

7       Well, let me ask you, do you recall that?

8  **A.**   Yes.

9  **Q.**   Okay.  And from your recollection, and certainly I'm doing

10  my best to go in order of your own reports, but to the best of

11  your recollection, this is the first mention in any of your

12  reports of actually reviewing the phone image that was taken on

13  July 30 of 2015; right?

14  **A.**   Yes.

15  **Q.**   Okay.  And you discussed the other surveillance that was

16  done post-inspection.  For example -- I believe this is on

17  Page 2 as well.  Well, it starts at the -- it starts at the

18  bottom in a note on Page 2, and it says that "an individual

19  named Didani had a text message conversation in 2014," and then

20  there's a description of that text message conversation at the

21  top of Page 3, which is labeled 1508, if you're looking at that

22  page number.  Do you see that?

23  **A.**   Yes, sir.

24  **Q.**   What about this conversation is suspicious to you?  And

25  you can take your time to refresh your recollection if you need

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 127*

1    to.

2        Why did you include it in this report?

3    **A.**  I mean what is suspicious is the totality of everything

4    that I keep seeing.

5    **Q.**  Sure.  Explain it to me.

6    **A.**  The fact that he won't -- this person won't owe anybody

7    anymore money once the deal is done.  All these -- it seems

8    very hidden on how it's worded.

9    **Q.**  You think they are using like covert language?  Is that

10   what you're saying?

11   **A.**  Secret, yes.

12   **Q.**  To try to hide some nefarious deal; is that the

13   suggestion?

14   **A.**  I don't know.

15   **Q.**  Well, it's important because you are the person who

16   purportedly does know so I'm asking you what raised your

17   suspicions about this conversation that you chose to include in

18   this report.

19   **A.**  The secrecy and the totality of everything else leading up

20   to that.

21   **Q.**  So the express words on the page don't specify any illegal

22   activity; correct?

23   **A.**  Correct.

24   **Q.**  But the language and the use of the phrases in here give

25   you a hunch; right?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

Page 128

1    **A.**    A hunch?

2    **Q.**    Based on your law enforcement experience, you have a hunch

3    that it's something illegal?

4    **A.**    That it could be.

5    **Q.**    Could be something illegal.

6          You can take some time to look at this report because I

7    don't want to put words in your mouth, but essentially -- or I

8    don't want to tell you what it says if you don't recall, but

9    essentially you write that Didani was followed around to

10   different addresses going in and out, taking bags out of the

11   car, he went on a private plane and put on a flight suit and

12   got off the plane.  In and of itself, are any of the things

13   that are mentioned in this surveillance illegal?

14   **A.**    No.

15   **Q.**    Had you not seen Mr. Didani's phone, would you have been

16   as suspicious of these activities as you were having seen his

17   phone?

18   **A.**    Yes.

19   **Q.**    You would have been just as suspicious about someone

20   flying on a private plane in a Maverick-like flight suit?

21   **A.**    Suspicious of what?

22   **Q.**    Well, I'm asking that --

23          **THE COURT:**  You are suspicious of a lot, is that what

24   you said?

25          **THE WITNESS:**  Yes, ma'am, to all the totality leading

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 129*

1    up to this point.

2    **BY MR. FINK:**

3    **Q.**   My question really is this:  Having seen the photographs

4    and text messages and things that you viewed on Mr. Didani's

5    phone -- right? -- I'm asking you did those things heighten

6    your suspicions about these otherwise innocuous activities?

7    **A.**   Yes.

8    **Q.**   Why?  Why did the phone make these otherwise innocuous

9    activities more suspicious?

10   **A.**   Because of the images and messages that were on the phone.

11   **Q.**   So the money, the guns, and things of that nature give

12   different meaning to flying on a plane by yourself to getting

13   bags out of the trunk and the things that you mention in this

14   report.  Is that what you're saying?

15   **A.**   Yes, and his associates.

16   **Q.**   Can you explain to me why you were suspicious that he

17   was -- I'm going to go back to your first sentence.

18   Specifically what about this surveillance made you suspicious

19   that he was possibly smuggling steroids, contraband, vehicles,

20   counterfeit money and money laundering?  What about the

21   surveillance in August of 2015 made you suspicious of those

22   things?

23   **A.**   During surveillance?

24   **Q.**   Correct.

25   **A.**   We are just gathering intelligence at that point.  I

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 130*

1  cannot say indefinitely there was anything in particular for

2  what we saw.

3  **Q.**   I mean that's what I'm asking.  So you are agreeing with

4  me that your surveillance in August of 2015 wasn't really

5  raising any suspicions?

6  **A.**   Except for his associates.

7  **Q.**   Except for his association with people that you had

8  suspicions about?

9  **A.**   Correct.

10  **Q.**   And your suspicions of those people were based on their

11  prior history and historical information; right?

12  **A.**   Correct.

13  **Q.**   Okay.  But as to Didani himself, outside of those

14  associations, these activities didn't necessarily make you

15  suspicious of any of the topics in your investigation; right?

16       And, if they do -- I'm not trying to trick you.  If they

17  do, tell me what.

18  **A.**   That's not -- so if you go back to the interview, he said

19  he lived in Fraser, Sabre Lane, he never even went there.

20  **Q.**   Okay.  So one example you are giving me is in his

21  interview he told you of these destinations that he either

22  lived or frequented, but during the surveillance you didn't

23  observe him to go there?

24  **A.**   Correct.

25  **Q.**   Okay.  Was the surveillance 24/7 for the entire month?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 131*

1   **A.**   No.

2   **Q.**   Okay.  So he could have in the times that he wasn't being

3   surveilled; right?

4   **A.**   Sure.

5   **Q.**   We just don't know -- right? -- for sure.  We can't say

6   for sure that he did not go to those addresses that he gave

7   you?

8   **A.**   Correct, but we did know for sure that it was not his

9   current address.

10  **Q.**   Understood.  Anything else?

11       So you mentioned that's one thing that you found

12  suspicious about his activities.  Is there anything else from

13  this report of note to call the Court's attention to about your

14  suspicion of Didani?

15       Or at this time generally just based on your memory.  It

16  doesn't have to be just this report.

17  **A.**   No.

18  **Q.**   Okay.  At this point -- so now we're -- this report is

19  September 11, 2015.  So at this point have any warrants been

20  requested at this point?

21  **A.**   Via September of 2015?

22  **Q.**   Yeah, the date of this report.  To your knowledge any --

23  **A.**   To my knowledge, no.

24  **Q.**   Okay.  You certainly haven't been an affiant on any search

25  warrant to date?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 132*

**A.**    Correct.

**Q.**    Okay.  On -- now, this is -- I'm a little bit out of order

so just to give you a frame of reference.  You did an 8/13,

August 13, report on your interview, okay?  And I have also

given you the September 11th report about the surveillance in

August.

    Now I'm going to be discussing a report that was also

written in August.  I'm staying in the general time frame here,

but this was written August 10 of 2015, and it's entitled

"Association of Puzio and [another individual]."

        **MR. FINK:**  Judge, may I approach with this?

        **THE COURT:**  You may.

**BY MR. FINK:**

**Q.**    This August 2015 report is about an association of

Eric Puzio, and I'm not going to put the second name on the

record at the request of the government, but another

individual, detailing a relationship between these two; is that

correct?

**A.**    Yes, sir.

**Q.**    And can you kind of summarize essentially what we can

glean from this report that was taking place around the same

time as your surveillance of Didani?  And you can take your

time if you need to refresh.

**A.**    Okay.  To summarize this report?

**Q.**    Yeah, and the information that we learned from that

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

Page 133

1   report.

2   **A.**   Well, it's just an association between Puzio and another

3   individual.

4   **Q.**   Okay.  And what was your suspicion in that regard?

5   **A.**   I'd have to read the report.

6   **Q.**   This individual -- Puzio's relationship with this other

7   individual, I'm not curious necessarily the details of what you

8   discovered but how it relates to Didani.  I want to know what

9   your suspicion was.

10      We discussed your surveillance.  We discussed your

11  interview.  I'd like to know if there was anything from this

12  report that was necessarily relevant to Didani other than you

13  have some connection between Didani and Puzio?

14  **A.**   No.

15  **Q.**   So just still Eric Puzio and his relationship, not

16  necessarily involving Didani; right?

17  **A.**   To the best of my knowledge, yes, that is correct.

18  **Q.**   Fair enough.  Okay.

19      We touched on this without the benefit of a report, but

20  I'm just going to return to it very briefly.  Up there you

21  still should have your "Didani Opening Report" from

22  February 2015.  If you don't see it, tell me, and I'll bring

23  you this page.

24  **A.**   Yep.

25  **Q.**   This opening report related to Didani, we have already

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 134*

1  discussed it, but I just want to clarify because this is just

2  more information about Mr. Puzio and his connections.  Do you

3  recall there was an incident where Detroit Border Patrol

4  stopped a boat in the river?

5       Do you recall an incident involving Mr. Puzio where

6  Detroit Border Patrol stopped a boat with him on it?

7            **THE COURT:**  A boat with Mr. Puzio on it?

8         **MR. FINK:**  Correct, Judge.

9         **THE WITNESS:**  I don't recall.

10  BY MR. FINK:

11  **Q.**   Okay.

12  **A.**   But --

13  **Q.**   Okay.  I'm going to move on from that because that's

14  actually where -- Mr. Hussein.  We have already discussed that

15  so you can put that down.  I'm going to move to 2016.

16       In between the time of your surveillance in August of

17  2015, which was written in September, do you recall any major

18  events regarding the investigation into Mr. Didani from

19  September until August of the following year, in 2016, which

20  we're going to talk about in a minute, where he was met at the

21  border?  Do you remember any other substantial new information

22  coming up at that time?

23       We know you were reviewing the phone still, but is there

24  any other information that the Court should be aware of that

25  raised your suspicions beyond what we have already talked

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 135*

1  about?

2  **A.**   The date ranges again?

3  **Q.**   So this would be from your surveillance in August of 2015,

4  which you wrote a report in September of 2015, from that time,

5  that surveillance ended until you saw him again at the O'Hare

6  Airport the summer of the following year, did any major events

7  or anything take place that continued to raise your suspicions

8  of Mr. Didani that you can recall?

9  **A.**   I'd have to look at my report.  I believe there was.

10 **Q.**   Well, I mean do you know that there's other reports

11 between September and August offhand?

12 **A.**   I do not.  I do not know.

13 **Q.**   From your personal knowledge and your own recollection,

14 can you think of anything major between that time and the 2016

15 encounter that added to your evidence or suspicions, what have

16 you, against Mr. Didani?  From just your memory.

17         **THE COURT:**   I think he just wants you to answer from

18 your memory.  If you're not, then tell him what report you're

19 looking at.

20 **BY MR. FINK:**

21 **Q.**   Just your own recollection generally.  I mean this is a

22 case you lived and breathed; right?

23 **A.**   There was a time where a large amount of -- well, $23,000

24 got wired to Didani.

25 **Q.**   What are you relying on to look at that?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

Page 136

1   A.   The report dated 9/11/2015.

2   Q.   Okay.  So you're refreshing your recollection with the

3   September 11th report?

4   A.   Yes, sir.

5   Q.   Okay.  And what is the incident you are referring to?

6   A.   Where an individual conducted five transactions wiring

7   Didani a total amount of 23,000 within a month's time period.

8   Q.   You are reading from your report.  Do you recall this?

9   A.   Yes.

10  Q.   Okay.  What was suspicious about those wire transfers?

11  A.   Sending $23,000 to Didani overseas, five separate

12  transactions.

13  Q.   What's suspicious about that?

14  A.   There could be multiple things.

15  Q.   Could there be multiple legitimate things as well?

16  A.   Yes, except when the individual was contacted he said he

17  was being scammed.

18  Q.   I'm asking you these questions so explain that please.

19  A.   What's that?

20  Q.   The individual was contacted.  I'm not sure who you are

21  talking about.  I'm asking you to tell me what was suspicious

22  about these wire transfers.

23  A.   It was written in the wire.  I don't know who contacted

24  him.

25  Q.   So you don't have any personal knowledge of anything other

*21-20264; U.S.A. v. Ylli Didani*

1 than there was a wire of $23,000 in five different wires, but

2 you don't really know any details about it; right?

3 **A.**   Correct.  Well, to where it was sent and to whom.

4 **Q.**   And we're not saying the name of that person.  Is there is

5 a reason for that?  And I'll respect it if there is.  Is there

6 a reason why we're not revealing that name?

7         **THE COURT:**  Well, is it to the same person?  Don't

8 tell me the name.  Just tell me --

9         **THE WITNESS:**  Yes.

10        **THE COURT:**  Is it to the same person?

11        **THE WITNESS:**  Yes.

12        **THE COURT:**  Okay.

13        **MR. FINK:**  Okay.  And is that person --

14        **THE COURT:**  From the same person, I guess I should

15 say.

16        **THE WITNESS:**  Yes.

17 BY MR. FINK:

18 **Q.**   The wires were from a person overseas for $23,000 over

19 five wires to Mr. Didani?

20 **A.**   Yes.

21 **Q.**   Where was the bank account that it was sent into; do you

22 know?

23 **A.**   I do not.

24 **Q.**   Okay.  Was the person that was sending it suspicious to

25 you for some reason without saying their name?

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 138

1    **A.**    Yes.

2    **Q.**    The government has no problem with you revealing that name

3    as being particularly problematic so who is this person?

4    **A.**    Mr. Larson.

5    **Q.**    Don Larson?

6    **A.**    Yes.

7    **Q.**    What was suspicious about Mr. Larson?

8    **A.**    He had been sentenced to life in prison for cocaine.

9    **Q.**    Okay.  And Mr. Larson from prison was sending wire

10   transfers?  I'm having trouble understanding.

11   **A.**    No, he got released on parole early.

12   **Q.**    Okay.  He wasn't doing life.  He was sentenced up to life,

13   and he was paroled?

14   **A.**    Correct.

15   **Q.**    Okay.  And he sent wire transfers to Mr. Didani?

16   **A.**    Correct.

17   **Q.**    And why is that suspicious?

18   **A.**    Again, the totality of everything, all the cash,

19   everything that he has.  You have a person that has been

20   convicted of cocaine delivery, possession sending another

21   person that was involved in a cocaine-smuggling investigation

22   prior, sending money that is under the $10,000 lump sum to

23   another individual outside of the country.  All of this is

24   building suspicion to some nefarious activity.

25   **Q.**    Okay.  So if I'm understanding correctly, the criminal

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 139*

1  history of the payor and the criminal history of the payee of

2  these wire transfers, together with the fact that they were

3  sent in five separate transactions under 10,000 raised your

4  suspicion that there was something nefarious?

5  **A.**   As well as everything else.

6  **Q.**   What's everything else?

7  **A.**   The pictures on the phone, the travel history.

8  **Q.**   Was there a picture of -- do you know who Donald Larson

9  was?

10 **A.**   Yes.

11 **Q.**   Who is he?

12 **A.**   A person that lives in Fraser.

13 **Q.**   Okay.  And what was his connection, in your view, to

14 Mr. Didani?

15 **A.**   They appeared to be associates, friends.

16 **Q.**   Based on the wire transfer or did you have other

17 information as well?

18 **A.**   I don't recall at the time.

19 **Q.**   Okay.  You don't know?

20 **A.**   I don't know.

21 **Q.**   And Mr. Larson -- is there anything else about that

22 relationship that you want to share that raised your suspicion

23 other than the funds that you just discussed?

24 **A.**   No.  Does that answer your question?

25 **Q.**   I don't know the answer to this so I can't tell you.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 140*

1  **A.**    That was the other thing that I was thinking about.  I

2  wasn't sure what date that occurred on, but yes, that happened

3  in between --

4  **Q.**    The wire transfers?

5  **A.**    -- the wire transfers.

6  **Q.**    I'm just asking you is there anything about a man named

7  Donald Larson -- who the Court has no idea who that is other

8  than the name you gave him -- is there anything about him and

9  his prior conviction -- other than his prior convictions and

10 the money transfer that gave you suspicions about him having a

11 relationship with Mr. Didani?

12 **A.**    At this point in time during the investigation?

13 **Q.**    At this point in time, correct.

14 **A.**    I do not recall.  There are other things.  I don't know --

15 **Q.**    That may have come out later.  I understand.  Our

16 interest -- and that's why I'm directing you between this time

17 and August of 2016 when you encounter Mr. Didani again -- what

18 you knew at that time so I appreciate you being precise on

19 those answers, and if the answer is that's what you knew at the

20 time, that's an okay answer.  That's what I'm asking.

21 **A.**    Yes.

22 **Q.**    So we now have this wire transfer issue with Mr. Larson.

23 We have the Eric Puzio connection, the Mr. Hussein connection,

24 the phone search that you conducted back in August.  We have

25 the origins of the investigation, which me and you discussed at

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 141*

1  the beginning.  So that's where we're at with this case.  Is

2  that kind of -- I, of course, would leave you some details and

3  latitude, but that's a general overview of where we're at;

4  correct?

5  **A.**   Correct.

6  **Q.**   Okay.  Now, if we move forward in time, the original

7  question I had asked you, between September of 2015 to August

8  of 2016, that approximate year, was there any other suspicion

9  or evidence that came to your attention before you met with --

10  or Mr. Didani was detained at the border again, which we'll

11  talk about?  And this might not be in a report.  I'm just

12  asking your recollection.

13  **A.**   I believe that's it, from my recollection.

14  **Q.**   Okay.  So, as you sit here today, having kind of been in

15  charge of this case for a long time, to your recollection, and

16  I know there could be other reports and Mr. Bilkovic can come

17  up and ask about it, but to the best of your memory the things

18  we have talked about are the basic premise of what your

19  suspicions are against Mr. Didani prior to August of 2016?

20  **A.**   Correct.

21  **Q.**   There's nothing else you want to add at this point that

22  you can think of?

23  **A.**   Not that I can think of, no.

24  **Q.**   All right.  So August of 2016, let's talk about that.  On

25  August 6 of 2016 we have another encounter with Ylli Didani at

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 142*

1  the O'Hare Airport; is that accurate?

2  **A.**   Yes, with other people.

3  **Q.**   Of course.  I am going to reply upon your -- you wrote

4  this the same day, August 6 of 2016.

5          **MR. FINK:**  Judge, may I approach?

6          **THE COURT:**  Yes.

7          **MR. FINK:**  Just so you have it if you need to refer

8  to it.

9          **THE COURT:**  Thank you.

10  **BY MR. FINK:**

11  **Q.**   Okay.  This -- just so we're clear, if you need to refresh

12  your recollection, what you are holding, correct me if I'm

13  wrong, is an August 6, 2016, report titled "Interview of Didani

14  and Phone Seizure;" is that correct?

15  **A.**   Yes.

16  **Q.**   And it's authored by you; right?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  Prior to the stop that was made sometime on

19  August 6, 2016, you were alerted that Mr. Didani would be

20  entering the United States via Chicago O'Hare Airport; correct?

21  **A.**   Correct.

22  **Q.**   And you were made aware that he was coming from Albania;

23  is that accurate?

24  **A.**   Mr. Didani flew in from different places all the time.

25  **Q.**   Sure, I understand.  To the extent you recall.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 143

1   **A.**   Yes.

2   **Q.**   Okay.  And how are you notified of that?  I think we

3   talked about the email you send, but is it just a system or

4   what alerts you that he'll be traveling?

5   **A.**   A system email.

6   **Q.**   Okay.  So you get generated a notice that his name has

7   been used on some flight manifest, and he will be arriving on

8   this date and time; correct?

9   **A.**   Yes, sir.

10  **Q.**   Okay.  So you alert -- I'm going to do this the right way.

11  You alert Customs and Border Protection, CBP, because it's an

12  airport of Mr. Didani coming in and your desire to meet with

13  him or no?

14  **A.**   In this case, no.

15  **Q.**   All right.  So let's -- we will try to be as precise as

16  possible.  What actions did you take upon receiving that alert?

17  **A.**   I was going to be on leave or was on leave at the time so

18  I reached out to an HSI agent at the Chicago O'Hare Airport to

19  see if he could handle everything for me.

20  **Q.**   Okay.  Are HSI, Homeland Security Investigations, agents

21  typically stationed at airports in the United States?

22  **A.**   Yes.

23  **Q.**   All airports or just major airports or do you know?

24  **A.**   I do not know.

25  **Q.**   Okay.  But on this occasion at O'Hare there was an HSI

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 144*

1  agent stationed there; correct?

2  **A.**   I believe so.  I believe that's where he's stationed out

3  of, yes.

4  **Q.**   Well, do you remember how you came to find this gentleman?

5  **A.**   Yes.  My group supervisor gave me the phone number to call

6  over there.

7  **Q.**   Okay.  So you went to your group supervisor and said, hey,

8  I've got a hit and I would like to have him interviewed, what

9  do I do?  Of course, it might be paraphrasing, but something

10  like that?

11  **A.**   Yes, sir.

12  **Q.**   Okay.  And the supervisor responded with call this person,

13  this HSI agent at O'Hare; right?

14  **A.**   Yes, sir.

15  **Q.**   Do you recall that person's name?

16  **A.**   Who I spoke with?

17  **Q.**   The agent, yeah, at O'Hare.

18  **A.**   Yes, sir.

19  **Q.**   What's his name?

20  **A.**   Nugent, Special Agent Nugent.

21  **Q.**   Okay.  So you alert Special Agent Nugent, and what do you

22  tell -- do you do it by phone call?  Email?

23  **A.**   Phone.

24  **Q.**   Okay.  You call him on the phone, and what do you say, if

25  you recall?  And you can paraphrase.  I'm sure it's not --

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 145*

1  **A.**    Yeah.  Basically everything that I have seen in the

2  ongoing investigation.  It's been a while since Didani has been

3  back in the country.  I wanted to see his travel history again,

4  his passport, where he went during that period of time since

5  the last time he was interviewed and now, things like that.

6  **Q.**    Okay.

7  **A.**    And to check for contraband, of course.

8  **Q.**    Okay.  So you tell Nugent a little bit of

9  background -- right? -- about Didani or do you?

10 **A.**    Yes.  I tell him a lot --

11 **Q.**    Do you tell him what the investigation is about generally?

12 **A.**    Yes.

13 **Q.**    That he is suspected of drug smuggling, counterfeiting,

14 all of the things that are mentioned in your report?

15 **A.**    For the most part.

16 **Q.**    Give him kind of a 30,000-foot view of the case?

17 **A.**    Correct.

18 **Q.**    Okay.  And what is the specific request that you are

19 asking of him, to detain Didani or to interview him?  What is

20 like the specific request you would make?

21 **A.**    To interview him.

22 **Q.**    So you as an HSI officer say to another he's coming into

23 O'Hare, I'd like you to have him interviewed?

24 **A.**    Correct, and then use his investigative experience to do

25 what he thinks is best.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 146*

1   **Q.**   Okay.  Now, Agent Nugent -- Special Agent Nugent, as far

2   as you know, conducted an interview of Didani; correct?

3   **A.**   Correct.  As far as I know, yes.  I was not there.

4   **Q.**   Well, you summarized his interview in your report; is that

5   correct?

6   **A.**   Yes.  I copied his report into this report.

7   **Q.**   Okay.  So this report that we're looking at for purposes

8   of your recollection if you need it --

9   **A.**   Parts of it.

10  **Q.**   This would be copy and pasted from a report that Nugent

11  filled out?

12  **A.**   Parts of it.

13  **Q.**   Okay.  Did you ever talk to Nugent again or just read what

14  his report said?

15  **A.**   At what point?

16  **Q.**   After, after the interview with Didani.

17  **A.**   After the interview with Didani, yes, he contacted me and

18  told me that he detained the phones and was sending them to my

19  office.

20  **Q.**   Okay.  So, by telephone, he said we just did an interview,

21  I also took two phones from Didani; correct?

22  **A.**   Yes.

23  **Q.**   Okay.  And, forgive me, the last part was he would be

24  sending them to you; is that what he said?

25  **A.**   Yes.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 147*

1  **Q.**   So was that the extent of the actual phone conversation

2  from what you recall?

3  **A.**   Yes.

4  **Q.**   And as to the content of the interview, was that just

5  something you read from a report or did he tell you about that,

6  too?

7  **A.**   No, that was something I read.

8  **Q.**   Okay.  So he didn't tell you the content of the interview.

9  He just told you I've got two phones, they are on their way?

10 **A.**   Correct.  I was wondering if even Didani had came into the

11 country at that time.

12 **Q.**   Sure, understood.

13 **A.**   Again, I was on leave.

14 **Q.**   You were on leave, you weren't personally there, so he was

15 giving you the basics, he arrived, seized two phones, sent them

16 to you; correct?

17 **A.**   Yes, sir.

18 **Q.**   Okay.  You tell me if this is -- because you said you were

19 summarizing the report -- if this is a question for Agent

20 Nugent, that's who I'll ask it of, but only if you have

21 personal knowledge of this from your investigation.  Do you

22 recall in that review -- this is what I was going to ask you

23 before, but it was in this report -- about Mr. Didani

24 mentioning his mineral business?

25 **A.**   In the 2016 interview?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 148*

1   **Q.**   In his interview with Agent Nugent.

2   **A.**   No, I do not.

3   **Q.**   Okay.  I'll talk to Agent Nugent about his interview if

4   you're saying you don't remember that.  Okay.

5        On that same date --

6           **MR. FINK:**  Judge, may I approach?

7           **THE COURT:**  Yes, you may.

8   **BY MR. FINK:**

9   **Q.**   On that same date you -- August 6 of 2016 you wrote a

10  report titled "Details of the seizure of Didani's

11  Two Cellphones."  Do you recall that?

12  **A.**   Yes, sir.

13  **Q.**   Okay.  And this report is authored by you; correct?

14  **A.**   Correct.

15  **Q.**   And this is basically a summary of the evidence that was

16  taken off of Mr. Didani; is that accurate?

17  **A.**   That is.

18  **Q.**   Okay.  And you write in this report -- and correct me if

19  I'm reading this incorrectly.  I'll tell you where it is in a

20  moment.

21       So the big -- the last big paragraph, okay, the

22  second-to-the-last sentence that starts due "to the controlled

23  substance," do you see that?  So second-to-the-last sentence of

24  the last big paragraph.

25  **A.**   Okay.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 149*

1  **Q.**   I'm going to read from this report, and you just tell me

2  if you recall this.  "Due to the controlled substance and the

3  fact that both phones appear to be encrypted and cannot be

4  forensically examined at the Detroit SAC office, a search and

5  seizure warrant was issued on August 17th, 2016, and both

6  phones were seized on September 2nd of 2016."

7     Did I read that correctly?

8  **A.**   Yes.

9  **Q.**   I typed it so if I missed a word that's important, tell

10  me, but do you recall writing this now looking at it?

11  **A.**   Yes.

12  **Q.**   Okay.  So help me understand the process of what happened

13  in this instance to the best of your understanding.  Didani is

14  interviewed by Special Agent Nugent; correct?

15  **A.**   To the best of my knowledge, yes.

16  **Q.**   You know that from his summary; right?

17  **A.**   Yes.

18  **Q.**   And he called you after the fact to tell you he had taken

19  two cellphones from him; correct?

20  **A.**   Correct.

21  **Q.**   Okay.  And those phones were taken August 6 of 2016;

22  right?

23  **A.**   Yes.

24  **Q.**   And you write in your report that a warrant was sought on

25  August 17th of 2016; do you see that?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 150*

1  **A.**   I do.

2  **Q.**   That was 11 days later; right?

3  **A.**   Yes, sir.

4  **Q.**   Okay.  And then you write that the phones were seized on

5  September 2nd, 2016, which was actually a few weeks after the

6  warrant and after the phones were taken -- about a month after

7  the phones were taken.  Can you tell me what you mean by that,

8  both phones were seized on September 2, 2016?

9  **A.**   Yes, sir.

10  **Q.**   Please.

11  **A.**   There was an exhibit where I took possession of the

12  phones.  I believe the date was August 15.

13  **Q.**   So what you mean by that is when you took possession of

14  the cellphones; correct?

15  **A.**   Physically.

16  **Q.**   Because the phones were seized on August 6 of 2016, you

17  don't disagree with that; right?

18  **A.**   No, I -- the phones were seized when we got the search and

19  seizure warrant.

20  **Q.**   Well, let me ask you that.  The phones -- we don't have to

21  use a buzz word like seized if you don't want to.  We can

22  use -- the phones were taken from Ylli Didani's possession and

23  taken into law enforcement's possession on August 6 of 2016.

24  Is that accurate?

25  **A.**   Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 151*

1  **Q.**   You applied and received a search and seizure warrant on
2  August 17th of 2016?
3  **A.**   Yes, sir.
4  **Q.**   And you, Agent Bianchi, actually physically possessed
5  those phones on September 2nd of 2016 or at least that's what
6  you think you mean by this?
7  **A.**   I could tell you in one second.
8  **Q.**   And I assume you're going to refer to the receipt?
9  **A.**   Yes, sir.
10 **Q.**   Okay.  Go ahead.
11        **MR. FINK:**  Judge, this was something relied upon in
12 direct examination.  I have no problem with that.
13        **THE COURT:**  Okay.
14        **THE WITNESS:**  So can you repeat the question?
15 **BY MR. FINK:**
16 **Q.**   I just want to make sure that when you said both phones
17 were seized on September 2, 2016, you are just referring to you
18 taking physical possession, you are not saying that they were
19 somehow not taken until that day?
20 **A.**   Correct.
21 **Q.**   Just trying to understand what you meant.  You took them?
22 **A.**   Yes.
23 **Q.**   Okay.  Thank you.
24        Now, in 2015, July 30 of 2015, you made an image of the
25 entire phone that Ylli Didani had on him that day; right?

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 152*

1   **A.**   No, I did not, and --

2   **Q.**   I'm sorry, I'm being imprecise.

3   **A.**   Whatever they could get, they could get.

4   **Q.**   You asked Customs and Border Patrol to make an image, the

5   most inclusive they possibly could, of the phone that

6   Ylli Didani had on July 30, 2015; right?

7   **A.**   Yes, sir.

8   **Q.**   And you reviewed everything that was possible to review in

9   that phone in August and the coming months after that in 2015;

10  right?

11  **A.**   Yes, sir.

12  **Q.**   You did not have a warrant to do that; right?

13  **A.**   Correct.

14  **Q.**   This time you applied for a warrant 11 days later before

15  looking at the phone.  Is that accurate?

16  **A.**   That is correct.

17  **Q.**   And that's because the government suggested that you do

18  that; right?

19  **A.**   No.

20  **Q.**   Okay.  Why did you seek a warrant this time when the

21  previous phone that you had you believed you could just look

22  through without a warrant?

23  **A.**   It was more due to the criminal activity that we thought

24  was on the 2016 phones.

25  **Q.**   So let's break that down.  In 2015 you went through the

*21-20264; U.S.A. v. Ylli Didani*

1  image of the phone without -- you made a decision not to ask

2  for a warrant and went through it without a warrant, and you're

3  saying the difference just now, if I'm understanding you, is

4  that the criminality in 2016 was different.  Is that what

5  you're saying?

6  **A.**    No.

7  **Q.**    Okay.  Explain to me why you felt it necessary to obtain a

8  warrant in 2016 for the phones that you seized at the border

9  but not necessary to obtain a warrant in 2015 for the phone

10  that you copied at the border?

11  **A.**    There was -- first, we have border search authority so I

12  don't need a warrant.  I just need reasonable suspicion.

13  **Q.**    Okay.  Let's stop there.  You don't need a warrant in your

14  estimation.  You believe you have the border authority to do

15  it.  So why didn't you just search the phone?  Why did you get

16  a warrant on August 17, 2016?

17  **A.**    Because I wanted -- after what we had saw, we did do that.

18  After what we saw on the phone, we did a search and seizure

19  warrant.

20  **Q.**    But you didn't need one, you said; right?  You could just

21  do it at the border is your understanding.  That's what you

22  just told me, that you have the authority under the border

23  exception to review the phone without a warrant.  This time you

24  sought a warrant, and I'm asking why.

25  **A.**    This is -- suggestion is mostly because if you are doing a

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 154*

1  border search you are returning the item back to the person.

2  This was not returned back to them.

3  **Q.**    So the only difference you're making is because you had to

4  return the physical phone you think you need to get a warrant,

5  whereas if you don't have the physical phones, you don't need

6  one?

7  **A.**    Say that one more time.

8  **Q.**    If I'm understanding your distinction, you are saying the

9  reason you sought a warrant in 2016 was because you were going

10  to keep the phones, whereas in 2015 he had his phone back;

11  that's the reason you asked for a warrant in 2016?

12  **A.**    That is one of many reasons.

13  **Q.**    Give me the other many reasons.

14  **A.**    The evidence that was on the phone that showed criminal

15  activity.

16  **Q.**    So did you review the phones before you obtained the

17  warrant on August 17, 2016?

18  **A.**    Yes.  They were searched, border-searched.

19  **Q.**    Okay.  So between August 6 and August 17th using the

20  border search exception there was warrantless entry into the

21  two cellular phones that were seized before a warrant was

22  obtained 11 days later.  Is that what you just testified to?

23  **A.**    That is correct.

24  **Q.**    Okay.  So in those 11 days law enforcement -- you may have

25  been on leave, but it's your understanding that the phones were

*21-20264; U.S.A. v. Ylli Didani*

1  searched in those 11 days prior to the obtaining of a search

2  warrant?

3  **A.**    Prior -- yes.

4  **Q.**    And then once you realized that there was bad stuff or

5  criminality on that phone, you decided to apply for a warrant

6  on August 17th, 2016?

7  **A.**    With other circumstances, but yes.

8  **Q.**    Okay.  Well, you signed the search warrant affidavit so

9  I'm asking you --

10  **A.**    Yes.

11  **Q.**    -- what motivated --

12      You searched the phones without a warrant, and you just

13  told me you thought you had the authority to do that.

14  **A.**    I do.

15  **Q.**    Now you are saying again that you do.  Okay.  I'm hearing

16  you on that.

17  **A.**    Yes.

18  **Q.**    I'm asking you why then did you apply for a warrant at

19  all, and I asked you is it because the government suggested you

20  do that?

21  **A.**    Uhm, at this point there's multiple reasons.  It's what we

22  do in investigations.

23  **Q.**    Give me the multiple reasons.  Number one.

24  **A.**    We are seizing his cellphone.  We need a search and

25  seizure warrant to do that.

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 156*

1  **Q.**   But you didn't in 2015.

2  **A.**   We did not seize his phone in 2015.  We gave his phone

3  back.

4  **Q.**   So your distinguishing factor is that because you seized

5  the phones in 2016 that required a warrant; correct?  That's

6  one distinguishing factor.

7  **A.**   One distinguishing factor.

8  **Q.**   Yet you did have the phones for 11 days and reviewed them

9  without a warrant until you applied for it 11 days later; is

10  that correct?

11  **A.**   Can you state that again?

12  **Q.**   For 11 days, August 6 to August 17, 2016, you testified

13  that the phones were reviewed by law enforcement before a

14  warrant was ever applied for.  Do you recall just testifying to

15  that about five minutes ago?

16  **A.**   Yes.

17  **Q.**   Okay.  And you had physical possession of the phones in

18  this instance when you were reviewing them; correct?

19  **A.**   Only from the 15th to the 17th.  Two days.

20  **Q.**   Okay.  So the distinction that you're making between the

21  two times, the time that you didn't apply for a warrant and the

22  time you did, really don't make sense, do they?

23  **A.**   They do to me.

24  **Q.**   Okay.  Well, fair enough.  What's the next reason of the

25  many reasons why you sought a warrant this time but not in

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 157*

1   2015.

2   **A.**   The totality of everything we have been talking about.

3   **Q.**   Well, we had a totality up to 2015, and you didn't seek a

4   warrant.

5   **A.**   I don't know what --

6   **Q.**   Did you think perhaps maybe it's safer, better safe than

7   sorry?  Is that an element of the reason you sought a warrant?

8   **A.**   No, we were going to search the phone no matter what.  It

9   would have been searched whether we had a search warrant or

10  not.

11  **Q.**   So you don't really have -- can't give me an answer then

12  as to why you sought a search warrant, just --

13  **A.**   Other than what I have already stated.

14  **Q.**   Other than what?

15  **A.**   What I have already stated.

16  **Q.**   I'm not sure what you have already stated.  You said that

17  you had physical possession of the phones.  You said there was

18  many reasons so I asked you for the next reason, and I haven't

19  heard one.  So is there another reason or was that the reason?

20  **A.**   Sure.

21  **Q.**   That's the only reason, because you had physical

22  possession of the phone?

23          **MR. BILKOVIC:**   Objection.  I think that's a

24  mischaracterization of the testimony.  He indicated the

25  differences between this and 2015 is here they actually had the

1  phones where in 2015 they didn't, and here during a manual

2  search of the phone that somebody else did there was evidence

3  or indications with respect to drug trafficking.

4     **MR. FINK:**  Judge, I don't know how many times I have

5  said why.  I'm giving every opportunity.  I'm not --

6     **THE COURT:**  I'm not sure what your objection is.

7  What's your objection?

8     **MR. BILKOVIC:**  He's mischaracterizing this witness's

9  testimony.  Mr. Fink said the only reason was that you had

10  seized the phones.  That's not true.  This agent also testified

11  another reason was that they did a manual review of the phone

12  and there was evidence on there of drug trafficking.

13     **THE COURT:**  He didn't say that just now.  He said

14  that earlier.

15     **MR. BILKOVIC:**  Exactly, right, earlier.

16     **THE COURT:**  So --

17     **MR. FINK:**  And that's how cross-examine works; right,

18  Judge?

19     **THE COURT:**  I was going to say it's

20  cross-examination, but that may come under the totality of the

21  circumstances, but you may pose a new question if you'd like.

22     **MR. FINK:**  Thank you, Your Honor.

23     **THE COURT:**  That objection is overruled because I

24  don't think he mischaracterized his answer to this current

25  question.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 159*

1      **MR. FINK:**  Thank you, Your Honor.

2    **BY MR. FINK:**

3    **Q.**   Listen, this is not a trap.  I'm asking you to list the

4    reasons why, and rarely do I ask why on cross-examination.

5    **A.**   No, that's fine.

6    **Q.**   The floor is yours.  Why in 2016 did you find it necessary

7    after searching the phones manually for 11 days to apply for a

8    search warrant, whereas in 2015 you had the phone for a year to

9    view at your pleasure without a warrant?  I'm asking you for

10   the list of reasons why, one to whatever.

11   **A.**   I will start back at the beginning.

12   **Q.**   Let's do it.  Number one.

13   **A.**   And, to clarify, I only had the phone for two days.  You

14   keep saying 11 days.

15   **Q.**   All right.  Law enforcement had the phone for 11 days;

16   would you agree with me?

17   **A.**   Sure.

18   **Q.**   August 6 to August 17; correct?

19   **A.**   Correct.

20   **Q.**   And you testified that law enforcement, maybe not you, so

21   I'm using the "you" as a generic term for law enforcement, law

22   enforcement you said reviewed the contents of the phone during

23   those 11 days without a warrant.  Do you recall saying --

24   testifying to that?

25   **A.**   Correct.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 160*

1  Q.   Okay.  So, again, my question is:  In 2016 -- on

2  August 17th, 2016, you signed a sworn affidavit to Magistrate

3  Judge Grand in this courthouse, and you said for all of these

4  reasons, Judge, I need a warrant to look at these two phones,

5  yet you did not believe that to be necessary in 2015, and I'm

6  asking you, what changed?

7  A.   Just to be clear, I did not need that in 2016 either.

8  Q.   So why did you do it?

9  A.   Just documentation and the fact that we were seizing the

10 phones for evidence.

11 Q.   So, again, so I don't mischaracterize you, the only

12 difference that you are telling me now, presently, is you don't

13 believe you needed a warrant, but you did it because you had

14 physical possession of the phones as opposed to in 2015, you

15 merely had a copy.  That is your answer to my question?

16 A.   Yes.

17 Q.   Thank you.

18       MR. FINK:  Your Honor, may I approach the witness?

19       THE COURT:  You may.

20       MR. FINK:  I have just spoken to the prosecutor,

21 Judge, and I think we're going to stipulate.  I'll put a tag on

22 this in a moment as Defendant's Exhibit 1 entry into evidence.

23 This is a report by Agent Bianchi titled "Photos and Messages

24 from Didani's Cellphone."  I'd like to admit this report only

25 for purposes of showing that evidence was obtained from the

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 161*

1    phones.  This report has screen shots and some examples of some

2    of the things that were on the Blackberry and iPhone.  The

3    government doesn't have objection to admitting it for that

4    purpose, to show that evidence was indeed extracted from the

5    phones, so I propose that be admitted as Defendant's 1.

6              **THE COURT:**  Okay.  Any objection?

7              **MR. BILKOVIC:**  No, Your Honor.

8              **THE COURT:**  It's admitted.

9    **BY MR. FINK:**

10   **Q.**   We just admitted, Agent Bianchi, this document that I

11   handed to you, and this is a report dated September 28, 2017.

12   Do you see that?

13   **A.**   Yes, sir.

14   **Q.**   It's titled "Photos and Messages from Didani's

15   Cellphones"?

16   **A.**   Yes, sir.

17   **Q.**   And it's authored by you?

18   **A.**   Yes, sir.

19   **Q.**   If you just take a generic look at this, I'll let the

20   document speak for itself, but if you look at this through this

21   report that you authored, essentially these are screenshots and

22   other evidence and summaries of what was obtained from those

23   two cellphones that were seized August 6 of 2016.  Is that a

24   fair characterization?

25   **A.**   Yes, sir.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 162*

1  Q.   Thank you, Agent.

2       Agent Bianchi, you testified that you have been I think --

3  I'm going back to that confusion again -- United States Border

4  Patrol since -- in various capacities since 2003; correct?

5  A.   Yes, sir.

6  Q.   This may be a very difficult estimation to make so do your

7  best.  How many times would you say in that 20-year career you

8  have made use of the border exception to search phones without

9  a warrant?

10      And you can say it's been hundreds, thousands, whatever

11 you can estimate the best.

12 A.   Up to this point?

13 Q.   It's through today.

14 A.   I have no idea.

15 Q.   Are we talking hundreds, thousands of people?

16 A.   I could tell you up to this point.

17 Q.   Yeah.

18 A.   Zero times.

19 Q.   You had never done it before?

20 A.   Correct.

21 Q.   Since then have you?

22 A.   Yes.

23          **THE COURT:**  Well, I want to be sure I understand

24 this.  Your answer is never before this time of Mr. Didani's

25 phone had you searched the phones without a warrant?  Is that

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

Page 163

1  what you're saying?

2          **THE WITNESS:**  Correct.

3          **THE COURT:**  And so had you always had a warrant

4  before?

5          **THE WITNESS:**  No.  Usually when we get people at the

6  border there's -- either there's no phones or it's out of our

7  grasp.  This was initially when I got put on the task force of

8  the HSI investigation.

9  **BY MR. FINK:**

10 **Q.**   So in Border Patrol in any capacity -- I recognize that

11 you are not necessarily ports of entry so you wouldn't

12 ordinarily be doing this stuff.  My question is just solely

13 have you ever had a time like this one where you have been part

14 of some secondary search where you go through someone's phone?

15 **A.**   Yes.

16 **Q.**   Pre-Didani ever?

17 **A.**   Oh.

18 **Q.**   Pre your encounter in July of 2015 had you ever done that

19 before?

20 **A.**   No.

21 **Q.**   Post July of 2015 -- well, let's say post August 6, 2016,

22 how many occasions have you been a part of that?

23          **THE COURT:**  Part of what?

24          **MR. FINK:**  A part of reviewing a phone during a

25 border search manually.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi - Cross*
*Monday/April 24, 2023*

*Page 164*

1      **THE WITNESS:**  I can't recall.

2   BY MR. FINK:

3   Q.    Dozens?

4   A.    Dozens, yes.  Lots.

5   Q.    Hundreds or less than a hundred?

6   A.    I have no idea.

7   Q.    Okay.  Are they all related to this case or different

8   cases?

9   A.    Different.

10   Q.    Okay.  So the first time you ever did it was with

11   Mr. Didani in your 2015 encounter; correct?

12   A.    Yes.

13   Q.    And since you have done it -- 100 times since or so?

14   A.    I can't recall.

15   Q.    About that.  Dozens?

16   A.    Dozens.

17   Q.    Okay.  How would you characterize the evidence that was

18   obtained from the two cellphones that were seized from

19   Mr. Didani in August of 2016?  And what I mean by that is how

20   would you characterize it in terms of evidentiary value?

21   A.    I don't know.

22   Q.    Was it important to the case?  Was it unimportant to the

23   case?  What you found on those phones.

24   A.    I would say it was important.

25   Q.    Did it lead to a lot of other important findings about

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 165*

1    Mr. Didani?

2    **A.**   Yes.

3    **Q.**   Do you think you would have been able to be here today

4    without the content that was found on those phones and what it

5    led to?

6    **A.**   I don't know.

7    **Q.**   Possibly not?

8    **A.**   Possibly.

9    **Q.**   Agent, when -- this is total ignorance, I don't know the

10   answer to this, but when law enforcement is putting together

11   discovery in a federal case -- right? -- like when federal

12   prosecutors are involved and they are asking you for your

13   reports, is that a collaborative effort to like get what we

14   call discovery together?  Do you know what I mean by that

15   question?

16   **A.**   Yes, sir.

17   **Q.**   Is the answer to that yes, that it's a collaborative

18   effort?

19   **A.**   I would think so.

20   **Q.**   Does the government contact you and say, hi, Agent, we

21   have indicted this case and we need to get all of your reports

22   together?  How does that conversation go and start?

23   **A.**   They just ask for all of your case reports.

24   **Q.**   Could it be informal like phone call, email, whatever?

25   **A.**   Yes.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 166*

1  **Q.**   Okay.  And they will ask you for everything you have
2  related to a certain case?
3  **A.**   Yes, sir.
4  **Q.**   And then I imagine in the future they might follow up with
5  specific things they might need; right?
6  **A.**   Yes, sir.
7  **Q.**   Okay.  You testified, I believe at the beginning, that you
8  had familiarity with policies and procedures surrounding HSI;
9  right?
10 **A.**   Yes, sir.
11 **Q.**   And you talked about the 30-day rule.  Do you recall that
12 on direct examination?
13 **A.**   Yes, sir.
14 **Q.**   Okay.  And what rule is that that you are allowed to keep
15 a phone for 30 days without permission?  Do you know what rule
16 number that is?
17 **A.**   I do not.
18 **Q.**   Okay.  Do you know precisely what it says?
19 **A.**   I do not.
20 **Q.**   Do you know the content of the rule, what it requires?
21 **A.**   If I read it.
22 **Q.**   Okay.
23 **A.**   Are you -- I know that you are able to take electronic
24 media and hold them to be searched for up to 30 days per HSI
25 policy.

*21-20264; U.S.A. v. Ylli Didani*

*Joshua Bianchi – Cross*
*Monday/April 24, 2023*

*Page 167*

1   Q.   When this case was indicted, were you the special agent in

2   charge of this case?

3   A.   No.

4   Q.   Is that Special Agent Leach?  Who was the person in

5   charge?

6   A.   I do not know, sir.

7   Q.   When it was indicted, do you remember working with other

8   agents and the government lawyers to get together -- I started

9   to ask you about discovery.  Were you part of that process?

10  A.   A part of my discovery process, yes.

11         **MR. FINK:**  I want to approach and just ask a question

12  about a document, Judge, if he recognizes it, okay?

13      I want to show it to the government.  May I?

14         **THE COURT:**  You may.

15      One second.

16      (Discussion held off the record.)

17      (Brief recess to switch court reporters.)

18

19

20

21

22

23

24

25

 1                  LAW CLERK:  Recalling Case Number 21-20264, United

 2      States of America versus Ylli Didani.

 3                  Appearances, please, again.

 4                  MR. BILKOVIC:  Mark Bilkovic and Tim McDonald on

 5      behalf of the United States.

 6                  MR. FINK:  Good afternoon, Judge.  Wade Fink and Brian

 7      Kaplan on behalf of the Defendant, Ylli Didani, who is present

 8      and sitting at counsel table.

 9                  THE COURT:  Okay.  Thank you.  Since you're already

10      sworn, just state your name again and spell your last name

11      again.

12                  THE WITNESS:  Joshua Bianchi, B-I-A-N-C-H-I.

13                  THE COURT:  Okay.  Thank you.  You may continue.

14                  Are we ready to go?

15                  COURT REPORTER:  Yes.

16                  THE COURT:  Okay.  You may continue.

17                  MR. FINK:  Agent Bianchi, I'm almost finished, and I

18      think we're going be able to do this by stipulation.

19                  Your Honor, I have presented through Agent Bianchi,

20      but he wasn't necessarily the person who produced this to the

21      government, so I think we're just going to do this by

22      stipulation, I received in discovery two copies of Customs and

23      Border Protection policies, CBP policies, that were produced to

24      me under --

25                  May I approach the witness just to get the number,

```
 1    Judge?
 2              THE COURT:  You may.
 3              MR. FINK:  So, your Honor, the government produced to
 4    the defense in Bates label Didani-08103 through Didani-08112,
 5    and then again Didani-08191 through Didani-08102.
 6              THE COURT:  Read the second line again.  08 ...
 7              MR. FINK:  Didani-08091 through Didani-08102.  The
 8    government produced to the defense two different United States
 9    Customs and Border Protection policies that we will probably
10    discuss further in briefing or argument, but that spell a
11    different time period than the 30 days that was mentioned on
12    direct examination.  The government is agreeing to this
13    admission by stipulation.  I don't think this is the proper
14    witness to -- I'm going to ask him, but the government has
15    agreed to admit these two policies as having been produced to
16    the defense.
17              THE COURT:  Are they going to be marked as exhibits?
18              MR. FINK:  No.  They will be marked as -- the first
19    one is Defendant's 2 and the second one is Defendant's 3.
20              THE COURT:  Okay.  And is the government stipulation
21    that they're admitted?
22              MR. BILKOVIC:  Yes, your Honor.
23              MR. FINK:  Just for the purpose, Judge, to be clear
24    what I said to Mr. Bilkovic, the purpose that it was produced
25    to the defense.
```

```
 1                THE COURT:  Okay.

 2                MR. FINK:  Thank you.

 3   BY MR. FINK:

 4   Q.   Agent Bianchi, and I've been informed it may not have been

 5   you who gathered this so the answer can be "I just don't know,"

 6   but do you recognize what I put in front of you at all,

 7   Defendant's 2 and 3?

 8   A.   After reading it, I know what it is.

 9   Q.   Okay.  Can you just basically describe what they are?

10   A.   It looks like CBP's policy for Border Search of Electronic

11   Devices.

12   Q.   Are you reading the one -- what's the date of that one at

13   the top?

14   A.   August 20, 2009.

15   Q.   Pick up the other one and read the date on Defendant's 2.

16   A.   January 4, 2018.

17   Q.   That's the more recent one.  So Defendant's 2, the same

18   concept, but it's dated 2018; correct?

19   A.   Correct.

20   Q.   Okay.  Have you ever interacted with this rule in any

21   capacity?  Have you seen it before?  Do you know what it is

22   outside of just reading it?  Like have you had experience with

23   that rule?

24   A.   With the Border Search of Electronic Devices?

25   Q.   Under CBP's policies.
```

Monday, April 24, 2023

1    A.   Under CBP's policy, yes.

2    Q.   Okay.  You have.  And is it your understanding under Rule 8

3    that general CBP policy is that you may detain a phone for up

4    to five days, but get clearance for an additional five days

5    from the permission of a supervisor?  Is that your

6    understanding of the rule?

7    A.   I'm not sure.

8    Q.   That's okay.  But you've identified what they were for

9    purposes of the record, which is sufficient for me, so we can

10   move on from there.

11   A.   But don't look it up.

12   Q.   No, that's okay.  Because if you don't know, if you haven't

13   interacted with it before, I don't want you to guess.

14           All right.  I'm basically finish.  I just I wanted to

15   inquire as just, you know, back to the very first question you

16   were asked about your experience and training, Agent Bianchi.

17   As a United States Border Patrol officer, we've now clarified

18   that Border Patrol really doesn't typically interact with

19   travelers all that often, right, or do they?

20   A.   Quite frequently.

21   Q.   Okay.

22   A.   Not -- I would say we interact with more illegal travelers.

23   Q.   Well, prospective legal travelers; right?  It's not like

24   CBP officers sitting at a booth and, you know, constantly

25   seeing people come in and making random checks?  It's different

1    from that; right?

2    A.   It's different from that, yes.

3    Q.   Okay.  Because an ordinary CBP officer doing routine stops

4    may be for more varied reasons than would be for you; is that

5    accurate?

6    A.   Yes.

7    Q.   In other words, you have a reason for when you want to talk

8    to someone, and you get involved?  Is that an accurate

9    statement?

10   A.   Depending, but yes.

11   Q.   But usually you have some investigation or some purpose in

12   reaching out to CBP to interview for you; is that accurate?

13   A.   Yes.

14          MR. FINK:  One moment and I think I'm almost ...

15          (At 2:00 p.m., briefly off the record.)

16   BY MR. FINK:

17   Q.   Did you receive, Agent Bianchi, any specific training from

18   HSI or CPB about their border search policies?  We were

19   discussing the CBP rule, but have you received any trainings

20   about that or similar rules?

21   A.   Yes.

22   Q.   Can you describe that training that you've received?

23   A.   It was in 2003 at the academy.  I went through border

24   search authority training, both immigration and criminal, and

25   Title 19 training, cross-designation training.  In 2006 is when

Monday, April 24, 2023

 1    I received the training, and I -- it was required of all task

 2    force officers when I got on the HSI task force in 2014.

 3    Q.   Okay.  That training in 2003, like at the academy, for

 4    example, do they review all Homeland Security department's

 5    policies or specific to the ones that you're applying for?

 6    Because you said policies, which ones are you being trained on,

 7    particularly to what you're applying for or all departments'

 8    policies?

 9    A.   I would have to look that up, sir.  I don't recall.

10    Q.   You don't remember?

11    A.   That was 20 years ago.

12    Q.   Like are you trained on CBP policies as well as HSI

13    policies, do you know?

14    A.   I was when I got on the HSI task force.

15    Q.   Okay.  In 2003 were you trained -- is there specific United

16    States Border Patrol policies, for example, that you were

17    trained on?

18    A.   I --

19    Q.   In 2003 you were hired by United States Border Patrol;

20    right?

21    A.   Yes, sir.

22    Q.   Okay.  And that 2003 training, was that specific to the

23    United States Border Patrol?

24    A.   Yes.

25    Q.   It is specific?

Monday, April 24, 2023

1    A.   Yes, sir.  Yes.

2    Q.   So it's not necessarily to all departmental Homeland

3    Security policies and departments?

4    A.   Correct.  There's many agencies in our department of

5    Homeland Security.

6    Q.   And when you said then when you joined HSI you were trained

7    on their policies; correct?

8    A.   Yes.

9    Q.   Okay.

10   A.   Their task force.

11   Q.   Now, I want to ask very specific.  You said you don't know

12   the rule number, the 30-day rule number; correct?

13   A.   Correct.

14   Q.   Now, can you tell me anything else about the rule from your

15   recollection without looking at it, based on your training and

16   experience, what you are allowed to do with cell phones and

17   their seizure under the HSI policy?

18        Let's start with this.  How long are you allowed to

19   detain and seize cell phones?

20   A.   To my knowledge, it depends on -- each circumstance is

21   different.

22   Q.   Okay.  You have to apply for an additional time period to

23   the 30 days you mentioned on direct exam?

24   A.   Yes.

25   Q.   What has to happen before that 30 days in your experience

1    and training?

2    A.   What needs to happen for --

3    Q.   Yes.  What do you have to do within that 30 days?

4    A.   Complete your border search of that device and determine

5    which route you're going to take, whether you want to get a

6    search warrant, whether you're going to return the device to

7    the individual, what's -- depending on the investigation and

8    what's going to happen.

9              MR. FINK:  Okay.  I'm going to leave those documents

10   with you for redirect, but I'll come get them afterwards.

11   That's all I have for the time being.  It was nice to meet you.

12   Thank you, Agent.

13             THE WITNESS:  Thank you, sir.

14             MR. BILKOVIC:  Your Honor, can I redirect very

15    briefly?

16             THE COURT:  You may.

17                        REDIRECT EXAMINATION

18   BY MR. BILKOVIC:

19   Q.   Agent Bianchi, you had testified that up until this case

20   you had not done one of these searches of the cell phones.  Is

21   part of the reason for that is because you didn't do that in

22   your role with United States Border Patrol?

23   A.   That is correct.

24   Q.   So it was when you started working as a task force officer

25   with HSI?

```
 1   A.   Correct.

 2   Q.   And we discussed the CBP policies.  Mr. Fink brought them

 3   up to you.  But in this case you were being guided by --

 4   because you were HSI, you were being guided by ICE, which is

 5   over HSI?  You would be guided by ICE policies?

 6          MR. FINK:  Objection, your Honor.  I think that's a

 7   legal conclusion he's asking for, that the court is going to

 8   have to resolve what policy should have been followed.

 9          THE COURT:  I think I am going to probably decide what

10   policy should have been followed, but he can ask him what ones

11   he was guided by in this instance.

12          MR. FINK:  Okay, Judge.

13          THE WITNESS:  I was guided by HSI, sir.

14          MR. BILKOVIC:  May I approach, your Honor?

15          THE COURT:  Yes, you may.

16   BY MR. BILKOVIC:

17   Q.   I'm showing you what's been marked government's proposed

18   Exhibits 7, 8 and 9.  Mr. Fink went through one report from

19   2008 with you that mentioned Mr. Didani; correct?

20   A.   Yes, sir.

21   Q.   Those reports that you have there that I've handed you, 6,

22   7 and 8, do those also mention Mr. Didani?

23   A.   I believe so, sir.

24   Q.   Can you review them briefly, or please skim through them

25   just to make sure.
```

 1          MR. FINK:  Judge, I don't mean to be difficult, but I

 2     think the foundation to lay here is does he remember anything

 3     else from 2008.  And if he needs to refresh with these reports

 4     he can, but I don't know that he should be able to just

 5     automatically look at what's in them.  I don't think he --

 6          THE COURT:  I agree with that.  Are you going to ask

 7     him something about what's in these?

 8          MR. BILKOVIC:  I am, and maybe I can do it --

 9          THE COURT:  Ask him, and then if he doesn't remember

10     he can look at them.

11     BY MR. BILKOVIC:

12     Q.  I'll ask you this.  The one report from 2008, was that the

13     -- don't look at those right now -- was that the only report

14     that you reviewed prior to July 2015 that dealt with this

15     investigation into Mr. Didani in 2008?

16     A.  Absolutely not.

17     Q.  Were there multiple --

18          THE COURT:  I don't understand that question, because

19      you said were there other reports in 2008?

20          MR. BILKOVIC:  Yeah.

21     BY MR. BILKOVIC:

22     Q.  Mr. Fink showed you a report from 2008 that mentioned --

23          THE COURT:  Was there only one that he was shown from

24      2008?

25          MR. BILKOVIC:  That's what I thought.  I thought that

 1    Mr. Fink had only shown him one.

 2              MR. FINK:  That's accurate.  I think the June 2nd is

 3    what I showed you, Agent.  I think that's correct.

 4              THE COURT:  All right.  Okay.  Go ahead then.

 5    BY MR. BILKOVIC:

 6    Q.  Were there additional reports from 2008 that also detailed

 7    the investigation into Mr. Didani?

 8    A.  Yes.

 9    Q.  And prior to July 2015 did you review those reports?

10    A.  I did.

11    Q.  And was the information in those reports, did that also go

12    into your ultimate decisions in this case?

13    A.  Yes, it did.

14    Q.  Are three of those reports in front of you, 6, 7 and 8?

15    A.  Yes, sir.

16              MR. BILKOVIC:  Now, at this time for purposes of --

17              THE WITNESS:  7, 8 and 9.

18              MR. BILKOVIC:  I'm sorry.  7, 8 and 9.

19              Your Honor, at this time for purposes of this hearing

20    I would move to admit Government's Exhibits 7, 8 and 9 into the

21    record.

22              THE COURT:  Any objection?

23              MR. FINK:  I appreciate the government is working with

24    me on other documents, but I'm having trouble understanding why

25    this wouldn't be hearsay to admit the report itself.  I guess

```
 1    his testimony about his recollection -- I'm sorry.  I'm
 2    thinking through this objection out loud, Judge.
 3            My objection would be that it's hearsay, and it would
 4    be more proper what he remembers from this report and what he
 5    remembers reviewing, not necessarily the report itself.
 6            MR. BILKOVIC:  Judge, this is -- and just in response,
 7    I agree it's hearsay, but one of the determinations the court
 8    is going to have to make is what information he had that he
 9    relied on back in 2015 and 2016, whether he specifically
10    recalls all of that information in 2023.  And he's just
11    testified that he did read these reports prior to July of 2015,
12    and that the information contained in those reports were
13    additional reasons -- or additional information that he had
14    that guided his ultimate decisions in this case.
15            THE COURT:  I'm going to allow it for that purpose.
16    Your objection is overruled.
17            MR. FINK:  Thank you, Judge.
18            THE COURT:  Are these the reports that you wrote?
19            THE WITNESS:  These particular ones are not, ma'am.
20            THE COURT:  All right.  Go ahead.
21    BY MR. BILKOVIC:
22    Q.  And are those reports dated, just for the record?
23    A.  Yes --
24    Q.  You don't have to tell me the dates.  There are dates on
25    there in those reports?
```

1    A.   Yes, sir.

2         THE COURT:  Yeah.  I think he ought to give us the

3    dates.

4    BY MR. BILKOVIC:

5    Q.   Okay.  Start with 7.  When was that dated?

6    A.   Seven was dated 11-4 of 2008.

7    Q.   And what was 8?

8    A.   6-30 of 2008.

9    Q.   And Exhibit 9?

10   A.   8-14 of 2008.

11        THE COURT:  Okay.

12        MR. BILKOVIC:  Can I move on?

13        THE COURT:  Um-hmm.

14        MR. BILKOVIC:  Thank you.

15   BY MR. BILKOVIC:

16   Q.   Now, you had talked about an individual by the name of Don

17   Larson on cross-examination?

18   A.   Yes, sir.

19   Q.   And with respect to Mr. Larson, I think you had testified

20   about five wires that he had sent Mr. Didani?

21   A.   Yes, sir.

22   Q.   And I believe that when Mr. Fink was going through that

23   with you he was referring to your September 11, 2015 report?

24   A.   Okay.

25   Q.   You have that report with you?  I don't want you to look at

```
 1    it.  I just want to see if you have it up there in case I have
 2    to ask you questions from it.
 3    A.   Yes, sir.
 4    Q.   Do you remember what the time frame was of these five
 5    wires?  I don't want you to look at -- tell me if you remember.
 6    A.   I believe so, yes.
 7    Q.   Okay.  What was the time frame of the five wires?
 8    A.   It was five wire transfers within a one-month period-ish.
 9    Q.   And do you recall -- one-month period-ish meaning
10    approximately a one-month period of time?
11    A.   Yes, sir.
12    Q.   And do you recall that approximate period of time?
13    A.   I'd have to look at the report.  It's during 2015.
14            MR. BILKOVIC:  Your Honor, at this time I would
15    ask that --
16    BY MR. BILKOVIC:
17    Q.   Would looking at your report refresh your memory, Agent
18    Bianchi?  Would looking at your report refresh your memory?
19    A.   Oh.  Yes.  I'm sorry.
20            THE COURT:  Okay.  He may.
21            THE WITNESS:  Yes, sir.  It was from May 19, 2015 to
22     June 23, 2015.
23    BY MR. BILKOVIC:
24    Q.   And what about the amount of the wires?  How much were
25    they?
```

Monday, April 24, 2023

1    A.   Twenty-three thousand three hundred and twenty-two total.

2    Q.   And I believe that you indicated that you reviewed a note

3    in the report with respect to what Mr. Larson said about these

4    wires back when he was interviewed about them?

5    A.   Yes, sir.

6    Q.   And what did he say about them?

7    A.   He said he was a victim of an emergency funds scam.

8    Q.   And?  Anything else?

9         MR. FINK:  Judge, I'm still having trouble

10   understanding if this is memory refreshed or if we're just

11   reading the report --

12   BY MR. BILKOVIC:

13   Q.   Don't look at the report.  I want you to tell me if you

14   remember and, if not, I'll ask you to look at your report.

15   A.   Yeah.  I do remember, yes, that he was sending Didani money

16   to get his passport back.

17   Q.   And in that same report you indicate -- there was an

18   ongoing investigation in that same report.  Is there any --

19   well, let me know if it's in that report.  Did you ever see

20   Mr. Didani and Mr. Larson together in 2015?

21   A.   Yes.

22   Q.   And do you recall when that was?

23   A.   The specific date?

24   Q.   Month.

25   A.   August of 2015.

Monday, April 24, 2023

1    Q.   So this would have been after the airport encounter?

2    A.   Correct.

3    Q.   And where did you see them together?

4    A.   At Mr. Larson's residence.

5    Q.   And what city is that located in?

6    A.   Fraser, I believe.

7    Q.   And Mr. Fink asked you about Mr. Larson's background, and

8    you discussed a conviction that he had.  And I'm going to ask

9    you whether or not -- I think you testified that he was

10   released on parole?

11   A.   He was convicted to life in prison and I believe eventually

12   released on parole.

13   Q.   Are you aware of whether he received a sentence of life and

14   then was released as a result of the change in Michigan's lifer

15   law or whether he received a sentence of up to life and got

16   paroled in the normal course of process?

17   A.   I don't know.

18   Q.   There was a discussion that Mr. Fink brought up to you

19   about a text message conversation that you had reviewed with

20   respect to some automobiles involving Mr. Didani and another

21   individual?

22   A.   Yes, sir.

23   Q.   Do you remember the details of that text message

24   conversation?

25   A.   Somewhat.

Monday, April 24, 2023

1    Q.   What do you remember about that text message conversation?

2    A.   That somebody was trying to get a car.  It was a Corvette.

3    They were -- if they got the car, it would be a done deal and

4    that person wouldn't owe him anymore money.

5    Q.   Did you detail the exact -- did you basically copy and

6    paste the exact text message conversation and put it in your

7    report?

8    A.   Yes, sir.

9    Q.   And again, this was a conversation between Mr. Didani and

10   another individual who you indicated had a prior drug

11   trafficking history?

12   A.   Yes, sir.

13   Q.   Do you know the verbatim text messages without reviewing

14   it?

15   A.   No, sir.

16   Q.   Would reviewing it help you basically to give it to the

17   court in the manner which you saw it?

18   A.   Yes, sir.

19   Q.   Okay.  If you could please look at that.

20   A.   Which report?

21   Q.   The September 11, 2015.  And the first line is there an

22   entry you have in your report of Mr. Didani asking, "What's up

23   with the Corvette?"

24   A.   Yes, sir.

25   Q.   The person responds, "Yes, sir.  This mother F got two of

1     them in his garage, brand new, zero miles, $180,000 car"?

2               THE COURT:  Are you going to read them all?

3               MR. BILKOVIC:  I was only going to read one more after

4      this one.

5               THE COURT:  Okay.

6     BY MR. BILKOVIC:

7     Q.   Is that correct?

8     A.   That is correct.

9     Q.   And then Mr. Didani ends up responding after the person

10    indicates one other thing, "Okay.  That's fine, let me know and

11    I come for the car from you.  And, as I say, I will keep my

12    word with you.  Once the car is out of the U.S. you don't owe

13    any money to anyone and you will get $10,000 when the deal is

14    done"?

15    A.   That is correct.

16    Q.   So when we went through the facts you put that in there

17    because you believed, I think you testified, that that was

18    suspicious to you?

19    A.   Yes, sir.

20    Q.   Why?

21    A.   He's essentially taking cash for exporting a vehicle.  It

22    appears that it's going to be stolen.

23    Q.   Pardon me?

24    A.   It looks like it would be a stolen vehicle.  If he gets

25    those cars for us and he would be paid for them, it looks like

1    suspicious criminal across border activity.

2    Q.   And the text messages talked about "I have two Corvettes

3    with zero miles in my garage"; right?

4    A.   Correct.

5    Q.   Now, you don't know whether or not that's what they were

6    talking about; is that accurate?

7    A.   That is true.

8    Q.   But was that one more fact adding to the list of facts that

9    you had been compiling over the course of your investigation?

10   A.   Yes, sir.

11   Q.   And was it your entire investigation or one piece of

12   information that led you to want to copy and get a forensic

13   download of Mr. Didani's phone in July of 2015?

14   A.   By far the entire thing.

15   Q.   And from 2015 to 2016 was there additional information that

16   you had that led you to want to download the phone in 2016 when

17   Mr. Didani came into the country in August of 2016?

18   A.   Yes.

19   Q.   And was part of that information the interview that he gave

20   on August --

21          MR. FINK:  Objection.  That's been several leading

22    questions in a row.

23   BY MR. BILKOVIC:

24   Q.   Did you offer additional reports in this case?

25   A.   Yes.

Monday, April 24, 2023

1   Q.   And do those reports detail -- or August -- let me ask you

2   this.  Do those reports detail the aspects of your

3   investigation?

4   A.   Yes, sir.

5   Q.   And did Agent Nugent fill you in on the interview that was

6   done in Chicago?

7   A.   Yes, sir.

8   Q.   And I know you had mentioned that Agent Nugent did the

9   interview.  You weren't in Chicago; correct?

10  A.   Correct.

11  Q.   So you don't know if it was Agent Nugent or Agent Parisi

12  and one of them relayed it to the other one?  You don't know

13  for sure?

14  A.   I do not.

15  Q.   And they're both here today and they're going to testify;

16  correct?

17  A.   Yes, sir.

18          MR. BILKOVIC:  I have nothing further, your Honor.

19          THE COURT:  Anything else for this witness?

20          MR. FINK:  No, your Honor.  Thank you.

21          THE COURT:  You may step down.  Thank you for coming.

22          THE WITNESS:  Thank you, ma'am.

23          (At 2:19 p.m., the witness is excused.)

24          THE COURT:  Do you gentlemen need a lunch break?

25          MR. FINK:  It was my understanding, Judge -- it's

```
 1   totally on your schedule.  I understand you maybe had a 3:00 or
 2   a 4:00.  I mean, these two witnesses should be quick I know,
 3   but --
 4             THE COURT:  Okay.
 5             MR. FINK:  I can keep going is my answer, but I don't
 6   want to speak for everyone.
 7             MR. BILKOVIC:  It's up to you obviously, you and your
 8   staff.
 9             THE COURT:  Okay.  Let's take about ten minutes or 15;
10   okay?
11             MR. FINK:  Okay.
12             MR. BILKOVIC:  I would ask, Agent Bianchi had Tommy
13   John surgery on Thursday.  I would ask that he be excused.
14             MR. FINK:  Absolutely.
15             MR. BILKOVIC:  Okay.  Thank you.
16             THE COURT:  All right.  Let's take a break, okay.
17   Come back in about 15 minutes.
18             MR. BILKOVIC:  Thank you, Judge.
19             (At 2:20 p.m., court is in recess.  Back on the record
20             at 2:39 p.m.)
21             LAW CLERK:  All rise.  Court is back in session.
22             THE COURT:  All right.  You may call your next
23   witness, please.
24             MR. McDONALD:  The government calls Matthew Parisi.
25             THE COURT:  All right.  You may step forward and be
```

1    sworn in.  Right there, and raise your right hand.

2               (Oath administered.)

3               THE COURT:  You may be seated.  When you're seated,

4    state your full name and spell your last name for the record.

5               THE WITNESS:  Yes, ma'am.  My name is Matthew Parisi.

6    Last name spelling is P-A-R-I-S-I.

7                         — — —

8                     MATTHEW PARISI,

9      at 2:40 p.m. sworn as a witness, testified as follows:

10                        — — —

11                  DIRECT EXAMINATION

12   BY MR. McDONALD:

13   Q.   Sir, where are you employed?

14   A.   I'm currently employed with Customs and Border Protection

15   at Chicago O'Hare International Airport.

16   Q.   For how long have you been employed with Customs and Border

17   Protection?

18   A.   I've been there for 11 years.

19   Q.   Prior to your employment with Customs and Border Protection

20   were you employed in any other law enforcement capacity?

21   A.   No.

22   Q.   Okay.  And you said you're assigned to the Chicago O'Hare

23   area?

24   A.   Yes, sir.

25   Q.   You've been a Border Patrol office you said for 11 years?

1   A.   I've been a Customs and Border Protection officer for 11

2   years, sir.

3   Q.   All right.  And starting back with your original

4   assignment, can you tell us where you were assigned?

5   A.   I was in Calexico, California for about three and a half

6   years.  That was my first duty station.

7   Q.   What were you doing --

8           THE COURT:  Four and a half years?

9           THE WITNESS:  Three and a half years, ma'am.

10          THE COURT:  Okay.

11  BY MR. McDONALD:

12  Q.   What were you doing in Calexico, California?

13  A.   I was a Customs and Border Protection officer, and I was at

14  the border facilitating legitimate trade and travel.

15          THE COURT:  Legitimate what?

16          THE WITNESS:  Trade and travel.

17          THE COURT:  Okay.

18  BY MR. McDONALD:

19  Q.   Make sure you use the microphone.  You can maybe pull that

20  a little closer, so ...

21          THE COURT:  Well, it may not go too much closer.  And

22  you can't scoot up, but if you speak very loudly right there it

23  will come across.

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  Okay.

Monday, April 24, 2023

1   BY MR. McDONALD:

2   Q.   Where, if anywhere, did you go after your assignment to

3   Calexico?

4   A.   I was then sent to Chicago, Illinois.

5   Q.   All right.  And Chicago, Illinois field division or the

6   airport?

7   A.   The airport.  O'Hare International Airport.

8   Q.   Have you been at the airport from -- I guess that would be

9   2004 to present day?

10  A.   Right, 2014 to present date.

11  Q.   Excuse me.  2014 to present day.  When you first started at

12  the airport, can you tell us what your assignment was?

13  A.   Yes.  I was a part of the secondary enforcement unit, which

14  is basically what we do is immigration enforcement.  So any

15  immigration case I oversaw and dictated if they would stay or

16  go back and be deported.

17  Q.   After your assignment with secondary immigration what was

18  your next assignment?

19  A.   I was assigned to the PERT team, which is the Passenger

20  Enforcement Rover Team, in which we go out and get lookouts,

21  TECS record lookouts, and then do an inspection based upon what

22  is being asked of the lookout.

23  Q.   Okay.  There's a couple terms you mentioned there that I

24  want you to explain a little more in-depth.  You said something

25  about a lookout.  What's a lookout?

```
 1   A.   Right.  We have a system that Customs and Border Protection
 2   uses.  It's called TECS.  I don't know the acronym name for it,
 3   but that's the acronym, TECS, T-E-C-S, in which our agency,
 4   CBP, as well as other federal law enforcement agencies are able
 5   to put lookouts, which is basically a request that CBP does an
 6   examination upon their entry into the United States.
 7   Q.   All right.  And TECS is what?
 8   A.   It's a law enforcement database.  It's a tool that we use.
 9   Q.   All right.  And so for how long were you assigned with the
10   PERT team?
11   A.   I was there for roughly two and a half years.
12   Q.   In the course of your two and a half years with the PERT
13   team did you have occasion to conduct border examinations of
14   incoming passengers?
15   A.   Yes.
16   Q.   Have you had the occasion to detain cellular devices or
17   electronic devices during your time with the PERT team?
18   A.   Yes.
19   Q.   All right.  After the PERT team what was your next
20   assignment?
21   A.   I was then assigned to the tactic --
22              THE COURT:  Before you go there, you were assigned to
23   -- what kind of team is it called?
24              THE WITNESS:  It's called PERT, P-E-R-T.  It's the
25   Passenger --
```

Monday, April 24, 2023

```
 1              THE COURT:  Oh, okay.
 2              THE INTERPRETER:  Passenger Enforcement Rover Team.
 3              THE COURT:  Okay.  Thank you.
 4    BY MR. McDONALD:
 5    Q.   So after your assignment with PERT where were you assigned?
 6    A.   I was assigned to the Tactical Terrorism Response Team.
 7    Q.   And that's commonly TTRT?
 8    A.   Yes, sir.
 9    Q.   What is the Tactical Terrorism Response Team?
10    A.   Basically we do any investigations, including CT, which is
11    counterterrorism, or terrorism-related issues when somebody is
12    arriving abroad from an international country.
13    Q.   How long were you assigned to the TTRT team?
14    A.   I was there for three years.
15    Q.   In the course of your assignment with TTRT did you have an
16    occasion to do border inspections of incoming passengers?
17    A.   Yes, sir.
18    Q.   In the course of your assignment with TTRT did you have an
19    occasion to detain cellular devices?
20    A.   Yes, sir.
21    Q.   During a border search?
22    A.   Yes, sir.
23    Q.   All right.  What happens with your assignment after TTRT?
24    A.   I then was promoted to a supervisory Customs and
25    Border Protection officer.
```

1   Q.   What were your duties there?

2   A.   During my tenure with being a supervisor, I worked at the

3   international mail facility, which we interdicted drugs coming

4   in from the mail facility and the DHL, which is -- I'm sorry,

5   ECC.  I don't know the acronym, and I apologize.  But from

6   there I was also a part of the antiterrorism contraband

7   enforcement team, which we did enforcement actions on any

8   drug-related issue coming in from the cargo environment.  I was

9   then a supervisor of the global entry program and the holograms

10  program in which we do background investigations on anybody

11  applying for a SIDA badge to enter the airport and to be in the

12  federal inspection security area.  And I currently am now an

13  acting chief of any -- I'm sorry, of any airport and

14  cargo-related issues on the midnight shift.

15  Q.   Okay.  So you're the current supervisor or the acting chief

16  of all cargo and air operations; is that fair?

17  A.   Correct.

18  Q.   Before we get to your training, I want to try to clarify

19  where your agency exists in the Department of Homeland

20  Security.

21  A.   Yes, sir.  So the Department of Homeland Security is the

22  department in which has three different sections.  There is an

23  OFO part, there is a border patrol part, and there is a air and

24  marine part.  OFO deals with any -- they facilitate legitimate

25  trade and travel any port of entry, which is an airport with an

1    international footprint or a land border that there's a port
2    that connects to an international to either Mexico or to
3    Canada.
4    Q.  All right.  Hold on just a second.  So you said that
5    Customs and Border Protection is made up of three separate
6    subagencies?
7    A.  Correct.
8    Q.  And the first one you said was OFO.  What does OFO mean?
9    A.  That's where I fall under.  They're usually called Customs
10   officers, and that's where I fall.
11   Q.  Right.  But the letters "OFO," what does that mean?
12   A.  Office of Field Operations.
13   Q.  Okay.  And those are the individuals who are at ports of
14   entry or designated places of entry or international airports?
15   A.  Yes, sir.
16   Q.  All right.  And that's the agency that you are employed by?
17   A.  Yes, sir.
18   Q.  What are the other two agencies?
19   A.  The other agency is Border Patrol in which they are the
20   enforcement arm in-between the ports of entry.  Anywhere
21   between -- if there's a border, they have 50 miles beyond that
22   border and that's where their jurisdiction is.  So if there's
23   an airport circling around that airport for 50 miles they have
24   jurisdiction in that area.
25   Q.  Okay.  Are those the individuals in green uniforms that are

1   down usually at the southern border between the United States

2   and Mexico?

3   A.   Yes.

4   Q.   And those are with -- in-between ports?

5   A.   Yes.

6   Q.   And their duty is to what, interdict individuals trying to

7   enter the United States illegally?

8   A.   Yes.

9   Q.   Okay.  And then the third division.  So we have OFO and

10   Border Patrol.  What's the third division?

11   A.   Air and marine.

12   Q.   And what does air and marine do?

13   A.   The marine unit they patrol -- I don't know the mileage

14   beyond any of our shorelines, but they are basically our

15   enforcement arm with -- in the -- anywhere connecting to water

16   around the United States.

17   Q.   Okay.  And, as it sounds, they deal with marine operations

18   or those operations that occur in or over water and air

19   operations?

20   A.   Air operations is our helo.  They give us backup when we --

21   for any interdiction that Border Patrol usually utilizes.  So

22   if they're in the field they usually have the helos out.  So

23   they're able to identify where there's certain groups and

24   basically for video footage of any interdiction.

25   Q.   When you say helo, you're talking about a helicopter?

1   A.   Yes, sir.

2   Q.   Okay.  Now, let's talk briefly about your training as a

3   Customs and Border Patrol officer.  When was the first training

4   you received?

5   A.   I received it in -- I started in April 2012, and I finished

6   the academy -- to the best of my knowledge, I believe it was

7   September of 2012.

8   Q.   All right.  So the first training was at the CBP academy?

9   A.   Yes.

10  Q.   In the course of that training did you receive instruction

11  about border search?

12  A.   Yes.

13  Q.   Did you have an opportunity or an occasion to attend

14  training for the secondary enforcement immigration unit?

15  A.   Yes.

16  Q.   In the course of -- when was that training, do you recall?

17  A.   That training was on-the-job training.  So when I was put

18  on that team I was given three weeks on-the-job training in

19  which we went over any issue I would encounter while performing

20  my duties.

21  Q.   All right.  And during the secondary enforcement training

22  did you receive specific training as it relates to border

23  search?

24  A.   Yes.

25  Q.   Did you attend training for the PERT team?

1    A.   I did.

2    Q.   And do you remember when that training was?

3    A.   I don't remember the date, but it was in Miami and it was

4    for a two-week period.

5    Q.   Did that training involve at least some involvement with

6    border search?

7    A.   Extensively.

8    Q.   All right.  And finally, TTRT training?

9    A.   Yes, sir.  I received on-the-job training.  I as well went

10   to NTC, when is located in Virginia where I spent two weeks of

11   training.  I also was on the JTTF training list in which I

12   spent two weeks with JTTF learning the procedures and the

13   questioning and the types of questions they look for and

14   basically providing them any information that they would need

15   to further an investigation.

16   Q.   All right.  Let's back up.  You said JTC.  Do you know what

17   that stands for, that acronym?

18   A.   It's JTTF, which is the Joint Terrorism Task Force.

19   Q.   All right.  And what about NTC?

20   A.   NTC is the National Targeting Center.

21   Q.   All right.  And so you said that your current role is

22   acting chief and you oversee all cargo and air operations.  Can

23   you be just a little bit more specific as to what you do on a

24   day-to-day basis?

25   A.   Absolutely.  So any immigration expedited removal I have to

1    give the approval on.  Any detainee issue I have to make sure
2    that they are taken care of.  So basically any issue that comes
3    up I have to figure out a solution for it if the officer is not
4    able to.  Any cargo environment that -- in the cargo
5    environment, if there's a seizure, I have to approve the
6    seizure and then facilitate the logistics of getting it to a
7    secure facility.  I also do all administrative duties for those
8    shifts.
9    Q.   All right.  I want to direct your attention to August 6 of
10   2016.  Were you employed with U.S. Customs and Border
11   Protection on that particular day?
12   A.   Yes.
13   Q.   And do you remember in terms of your assignment back in
14   2016, do you remember what your assignment was?
15   A.   Yes.
16   Q.   And what was it?
17   A.   I was on the Passenger Enforcement Rover Team.
18   Q.   And on that particular day did you have an occasion to
19   encounter an individual by the name of Ylli Didani?
20   A.   Yes.
21   Q.   Can you talk me through how it is that on a day-to-day
22   basis you would end up going to encounter a passenger?
23   A.   Yes.  So when we walk in there's a board that has lookouts
24   that we have to sign up, or we're given the assignment by our
25   supervisor.  At that time I was not in a supervisor role.  I

1    was just a regular officer.  So I was assigned Mr. Didani's

2    lookout for the day, in which I then go and look at what the

3    record actually states and find out what the agent is actually

4    looking for.  I don't recall exactly what it said, but in

5    layman's terms I believe it was related to an ongoing

6    investigation.

7    Q.   Do you know if it was related to a specific type of ongoing

8    investigation or --

9    A.   It was a drug-related, ongoing investigation.

10   Q.   Now, so you look at the board.  You figure out that Mr.

11   Didani is one of the individuals that you are going to be

12   encountering or attempting to encounter at the plane?

13   A.   Right.  And then what we do is we actually meet the plane,

14   plane side before they even open the doors for all the

15   passengers to come out.

16   Q.   And did you do that in this case?

17   A.   Yes.

18   Q.   Prior to this date, August 6 of '16, can you estimate for

19   Judge Hood how many times you've escorted a passenger from the

20   plane back to an inspection area?

21   A.   Hundreds.

22   Q.   And can you estimate how many times you've conducted a

23   border inspection or border search of any devices prior to this

24   date?

25   A.   I've done hundreds.

Monday, April 24, 2023

```
 1    Q.   All right.  Do you recall this specific individual, Mr.
 2    Didani?  Do you recall the interaction generally?
 3    A.   I do not.
 4    Q.   All right.  Did you draft a report in this case or some
 5    type of -- did you document your activities here?
 6    A.   Yes.
 7    Q.   Have you had an opportunity to review that report?
 8    A.   I have.
 9    Q.   All right.  Now, generally when you're going to get an
10    individual from a plane you said you go right up to the plane
11    and you wait?
12    A.   Correct.
13    Q.   What happens once the individuals are debarking from the
14    plane?
15    A.   So when we have a lookout we have to positively ID the
16    lookout.  Anybody coming off the plane we have to check their
17    passports upon them stepping off the plane and walking down.
18    So before they even are able to walk down to the hall to get
19    processed we check their passports and visually look for
20    face -- we have to check their passports and make sure that is
21    the correct person.  And that's our technique to positively ID
22    the lookout.
23    Q.   You've continuously said "we."  Do you ever go alone to the
24    gate to escort a subject?
25    A.   During any lookout we always have two officers, at least
```

1    two officers.

2    Q.   And based on your review of the documentation you wrote in

3    this case do you know if you had another individual with you?

4    A.   I did.

5    Q.   And do you know who that individual was?

6    A.   Yes.  It was Officer Leeker.

7    Q.   Okay.  So you and Officer Leeker go to the gate.  You are

8    checking the passengers as they exit the plane?

9    A.   Correct.

10   Q.   And you located -- did you locate Mr. Didani?

11   A.   Yes.

12   Q.   What happens at that point?

13   A.   At that point we then take the passport.  We also take the

14   cellular device that is on the person, and then we put it in

15   airplane mode.  And we explain to the individual you're going

16   to follow us and then we'll inspect you when we get down there.

17   Q.   Okay.  In this case, do you know how many phones, if any,

18   you took from Mr. Didani?

19   A.   From my recollection, I believe he had one cell phone on

20   him.

21   Q.   All right.  And you took that phone?

22   A.   Yes.

23   Q.   And you said that normally you would put it into airplane

24   mode?

25   A.   Always.

```
 1    Q.   Why would you do that?

 2    A.   Because that's our policy.

 3    Q.   But do you know why there's a policy to put it in airplane

 4    mode?

 5    A.   Yes.

 6    Q.   Why is that?

 7    A.   Due to giving that individual the opportunity to delete

 8    anything or to have somebody else delete it via cloud.

 9    Q.   Okay.  So is it fair to say that once you -- based on your

10    understanding, once you put a phone into airplane mode the

11    phone is prevented then from contacting other networks?

12    A.   Correct.

13    Q.   Okay.  Incidentally, do you know where Mr. Didani was

14    arriving from on this particular day?

15    A.   Based off of my report, it was Rome.

16    Q.   Rome, Italy?

17    A.   Yes, sir.

18    Q.   All right.  So you locate Mr. Didani, you take his

19    passport?

20    A.   Yes.

21    Q.   And you take you believe to be one phone?

22    A.   I believe it was one phone, yes, sir.

23    Q.   Do you remember what type of phone it was?

24    A.   In my report, I believe it was an Apple.

25    Q.   Apple iPhone?
```

1    A.   Yes, sir.

2    Q.   And that would have been either on the person of Mr. Didani

3    or in his carryon luggage?

4    A.   Yeah.  We ask if he has a cellular device on his person or

5    with his carryon bag.  We always do that, and then we ask that

6    he provides it to us, or gives it to us.

7    Q.   So once you did that do you, Officer Leeker and Mr. Didani

8    walk somewhere else?

9    A.   Yes.

10   Q.   Where do you walk to?

11   A.   We walk down to the primary processing area.

12   Q.   Is that also commonly called primary inspection?

13   A.   Yes.

14   Q.   How long would you say it took to get from the gate where

15   you originally located Mr. Didani down to primary inspection?

16   A.   I don't recall what gate it was at, but in any regards it

17   would be 10 to 15 minutes within any part of the airport.

18   Q.   And Mr. Didani is not handcuffed at this time; correct?

19   A.   No.

20   Q.   He's just walking with you?

21   A.   Correct.

22   Q.   All right.  Can you just tell us generally what happens at

23   primary inspection?

24   A.   Yes.  During primary inspection the individual that's

25   present is positively ID'd with the passport in which I provide

1    to the officer.  At no time does that passenger have the

2    passport.  He then swipes the passport, which is basically it

3    reads off of our records and our databases to see if there's

4    any lookouts, NCIC records, past arrest history or anything

5    like that.  Once his immigration status is verified and once

6    it's found that he has a lookout or he does not have a lookout

7    then he is released from primary inspections.

8    Q.   Okay.  So the Defendant -- excuse me -- Mr. Didani would

9    have given the -- his passport to the primary inspection

10   officer, or you would have since you had it; correct?

11   A.   Correct.

12   Q.   The primary officer scans the document, then returns it

13   back to you; correct?

14   A.   Yes.

15   Q.   And then what happens after that point?

16   A.   Once that is completed we then go and get the passenger's

17   baggage, checked baggage.

18   Q.   All right.  Before we get there, just as a general matter,

19   does every single person who is flying internationally into

20   Chicago O'Hare or, for that matter, based on your training and

21   experience any international airport, have to go to primary

22   inspection?

23   A.   Yes.

24   Q.   And what's the purpose of that?

25   A.   Check their immigration status.

1    Q.   And to ensure that they are lawfully permitted to enter the

2    United States?

3    A.   Correct.

4    Q.   Now, you said that after dealing with the primary

5    inspection officer you went to go get Mr. Didani's baggage?

6    A.   Correct.  That's the next process.

7    Q.   And that's his checked baggage?

8    A.   Yes.

9    Q.   And so how long would it have taken for you to get from the

10   primary inspection point to the baggage area?

11   A.   Less than two minutes.  It's right next to the primary

12   processing booths.

13   Q.   And when you go get Mr. Didani's luggage are you -- is it

14   just you and Mr. Didani or did you also have another individual

15   with you?

16   A.   No.  Like I said, there's always two officers present

17   during any inspection.

18   Q.   Okay.

19   A.   I believe it would be me and Mr. Leeker.

20   Q.   All right.  What happens when you go to baggage claim?

21   A.   Once we collect all of the passenger's baggage, we then

22   verify that that's his baggage.  And then we escort them back

23   to the secondary processing area, which is secondary

24   inspections.

25   Q.   All right.  So you and Mr. Didani would be like any other

1   person waiting for their luggage that goes around the carousel;

2   right?

3   A.   Correct.

4   Q.   And then you go to secondary inspection?

5   A.   Correct.

6   Q.   What is secondary inspection?

7   A.   Secondary inspection is a separate area where we check

8   everything that is on the passenger's person, the passenger's

9   checked luggage and the passenger's carryon luggage.  This is

10  also where we get a binding declaration of anything that

11  passenger is bringing into the country that he did not leave

12  with.

13  Q.   All right.  We'll get to that -- back to that declaration

14  in a second, but with respect to the area we're talking about,

15  you have -- can you just generally describe in Chicago O'Hare

16  where primary inspection is and how that is in relation to

17  secondary inspection?

18  A.   Absolutely.  So the whole federal inspection security area

19  I would say is about 100 yards by 75 yards.  It's not a big

20  area.  You have carousels that -- we have nine carousels that

21  baggage comes down, we have 62 primary booths, and then we have

22  four secondary baggage inspection areas where we would be

23  processing the passengers.

24  Q.   And so how far would those four secondary inspection booths

25  be from primary?

1    A.   Less than five -- less than three minutes.

2    Q.   Okay.  Now, you had said that at secondary one of the

3    things you do is you have a second binding declaration?

4    A.   Correct.

5    Q.   Where was the first?

6    A.   So also during primary -- I'm sorry -- primary inspections

7    they also get a binding declaration there.  I forgot to state

8    that earlier.

9    Q.   And the purpose of the declaration, you correct me if I'm

10   wrong, but it gives the individual coming into the United

11   States an opportunity to declare what property, merchandise,

12   whatever they may have with them?

13   A.   Correct.

14   Q.   Do you know if Mr. Didani made a declaration at primary in

15   this case?

16   A.   Everybody makes a declaration at primary.

17   Q.   Do you know whether Mr. Didani declared anything at primary

18   inspection based on your report?

19   A.   I do not remember.

20   Q.   Do you know during secondary whether or not Mr. Didani made

21   a declaration?

22   A.   Yes.

23   Q.   And what did he declare?

24   A.   He declared HGH.

25   Q.   HGH.  That's human growth hormone?

1    A.   Correct.

2    Q.   And when I say "declare" that doesn't mean that somehow now

3    it's lawful to bring in HGH, does it?

4    A.   Absolutely not.

5    Q.   Okay.  What's the purpose of a declaration then for

6    criminal purposes?

7    A.   Basically if you -- so Customs checks a lot of different

8    things besides drugs.  So when you make a positive declaration

9    on commerce you're taxed appropriately to what you declared.

10   There's extra penalties if you do not declare that.

11        Mr. Didani declared HGH.  It is a FDA-controlled

12   substance.  Either way, it's illegal.  If he made a declaration

13   or not, it would have been seized and it's still unlawful to

14   bring through international borders.

15   Q.   Okay.  So a declaration just simply could lessen the

16   penalties, Custom penalties?

17   A.   Correct.

18   Q.   Based on your training and experience, it has nothing to do

19   with whether or not someone could be charged, arrested for

20   smuggling drugs into the United States; correct?

21   A.   Yes.

22   Q.   Was the secondary -- excuse me -- the second declaration

23   done before or after Mr. Didani's bags were searched?

24   A.   We always do a binding declaration before we search the

25   person or his luggage.

Monday, April 24, 2023

1   Q.   And did you, in fact, search Mr. Didani's luggage in this

2   case?

3   A.   We did.

4   Q.   And do you know whether you searched his checked luggage or

5   his carryon or both?

6   A.   We checked both.

7   Q.   And did you find any phones in any of the luggage to your

8   memory?

9   A.   To the best of by knowledge, we did find another phone.  It

10  is written in my report.  It was a BlackBerry cellular device.

11  Q.   What else, if anything, did you find inside Mr. Didani's

12  luggage?

13  A.   We found vials of HGH.

14  Q.   Do you know how many vials?

15  A.   The best of my -- from my memory, I believe it was seven

16  vials.

17  Q.   Based on your training and experience, do you know if it's

18  unlawful to bring HGH into the United States?

19  A.   Yes, it is.

20  Q.   Did you seize those vials?

21  A.   I did.

22  Q.   On the basis of seizing those vials, did you pat the

23  Defendant down?

24  A.   Yes.

25  Q.   And in secondary after finding these vials of HGH did you

 1   have occasion to interview the Defendant, if you remember --

 2   excuse me, Mr. Didani, if you remember?

 3   A.   Yes.

 4   Q.   And were you alone during this interview or was someone

 5   else present?

 6   A.   There's always somebody present during the inspection.

 7   Q.   Do you know who that would have been?

 8   A.   That would have been Officer Leeker.

 9   Q.   Do you know how long the interview was?

10   A.   I do not.

11   Q.   As you sit here today, do you recall the details of that

12   interview?

13   A.   I do not.

14   Q.   Is there anything that would refresh your memory as to the

15   details of that interview?

16   A.   The report that I wrote the day of.

17   Q.   Did you detail what the Defendant told you in that report?

18   A.   Yes.

19   Q.   Excuse me.  I keep saying the "Defendant."  I apologize.

20        Mr. Didani during the interview?

21   A.   Yes.

22   Q.   Who prepared the report, just you or someone else?

23   A.   Because I was the primary inspecting officer, I would have

24   wrote it.

25   Q.   Okay.  And does the report accurately reflect your

```
 1   knowledge of the interview?
 2   A.   Yes.
 3   Q.   Was your report drafted when the interview was fresh in
 4   your memory?
 5   A.   Yes.
 6           MR. McDONALD:  Let the record reflect I'm showing
 7   counsel for the Defendant your report.
 8           Let the record reflect that I'm marking Officer
 9   Parisi's report as Government Exhibit number 10.
10           May I approach the witness?
11           THE COURT:  Number what?
12           MR. McDONALD:  10.
13           THE COURT:  Okay.  Yes, you may.
14           MR. McDONALD:  Thank you.
15   BY MR. McDONALD:
16   Q.   Officer Parisi, take a look at that report.  Read it
17   silently to yourself and let me know when you're done.
18   A.   Okay.  I'm done.
19           THE COURT:  Very well.  What was the question?
20           You, gentlemen, if you could just keep it down a
21    little bit.
22           MR. FINK:  My apologies.  That's my fault, Judge.
23           THE COURT:  Okay.  Just a little bit, all right.
24           MR. FINK:  You've got it.
25
```

 1    BY MR. McDONALD:

 2    Q.   Now, without relying on your report at all, are you able to

 3    remember in detail what the Defendant told you during the

 4    interview?

 5    A.   No.

 6              MR. McDONALD:   Judge, at this time I'd ask the witness

 7    under FRE 803(5), which is recorded recollection, that the

 8    witness be permitted to read that portion of the interview of

 9    Mr. Didani on August 6, 2016 allowed into the record.

10              THE COURT:   Any objection?

11              MR. FINK:   I don't know that the foundation of whether

12    he can't recall well enough has been established when we have

13    just gone through detail by detail, including his ability to

14    remember putting a phone in airplane mode, where he walked,

15    what the situation was, and suddenly can't remember any detail.

16    So I object on a lack of foundation that his memory truly is --

17              THE COURT:   Okay.   Lay a better foundation.

18              MR. McDONALD:   Judge, he's testified that he did

19    interview him, but didn't remember the details.   He was given

20    an opportunity to refresh his recollection by reading the

21    report silently.   He read the report silently, and he has still

22    indicated without relying on the report that he cannot recall

23    the details of the interview.   I don't know what additional

24    foundation would be necessary.

25              THE COURT:   So your position is he doesn't remember

1  anything about it?

2          MR. McDONALD:  My position is that this is a recorded

3  recollection under FRE 803 that is a record that, one, is on a

4  matter the witness once knew about, but now cannot recall well

5  enough to testify fully and accurately.  Two, was made by the

6  witness when the matter was fresh in his memory.  And, three,

7  accurately reflects the witness' knowledge, which is everything

8  that he testified leading up to me showing him the report.

9          THE COURT:  Okay.  And you think you're satisfied that

10 he doesn't remember anything?  Because your question was do you

11 remember any of the details.

12         MR. McDONALD:  My question was to him without relying

13 on his report does he remember in detail what Mr. Didani told

14 him during the interview, and he said no.

15         THE COURT:  Okay.  I'll let him do that, but first ask

16 him a few questions about what he remembers not in detail.

17 BY MR. McDONALD:

18 Q.  Officer Parisi, after reviewing your own report, do you

19 remember anything specifically about that interview?

20 A.  To be exact and accurate as possible, no, I do not.

21         THE COURT:  Okay.  But it's the same question.

22 "Specific" is the same as in detail to me.

23         Your objection is overruled.  I am going to allow it,

24 but I think you could have laid a better foundation.

25         MR. McDONALD:  I apologize.

 1          THE COURT:  Go ahead.  You can read it.

 2          THE WITNESS:  "Subject Didani, date of birth 10-25,

 3   1977, Albanian passport."

 4          THE COURT:  No, but that's the whole report.

 5          MR. McDONALD:  Yeah.  Just please -- if I may, your

 6   Honor.

 7          THE COURT:  Why don't you indicate to him what you

 8   want him to read.  You may step forward and do that.

 9          MR. McDONALD:  Thank you.

10   BY MR. McDONALD:

11   Q.  Officer Parisi, I'm just interested in the interview

12   portion of Mr. Didani's report to you.  So wherever you see

13   initially that Mr. Didani stated something you can begin from

14   there.  I believe it's probably the third line.

15   A.   Okay.  "Subject stated that he is en route to the

16        Intercontinental Presidential Hotel in Mexico City, Mexico at

17        address, Campos Eliseos 218, Miguel Hidalgo, Col. Chapultepac

18        Polanco, 11560 Ciudad de Mexico, D.F.  Subject has a

19        reservation for two days to attend a wedding for Didani's

20        friend named Puzio, Erick at the hotel.  Didani stated that

21        Puzio lives in Detroit where they became friends eight to ten

22        years ago.  Didani stated that he owns a home at address

23        15843 Sabre Line, Fraser, Michigan 48026 in which is  vacant

24        when he travels and lives in Albania.  The subject also

25        stated that he currently owns and operates a trucking

Monday, April 24, 2023

1    business in the Michigan area named Michigan Freight in which

2    he has operated for seven years.  Adriatik Sheko is his

3    business partner for this company and operates it when Didani

4    is out of the country.  Subject stated that he used to

5    operate a second trucking company named ANL Michigan

6    Transportation, which is no longer in business.  Didani

7    stated that he also owns and operates a mineral company in

8    Tirana, Albania named US Mineral where he sells chrome and

9    coal.  The subject could not give me an exact address, nor a

10   business card.  Subject's home address in Albania is RR.Naim

11   Frasheri Shkalla F.85, Tirana, Albania 1001.  Didani has

12   multiple trips to Turkey during 2015.  Subject stated" --

13        MR. FINK:  Your Honor, we've got to focus on what was

14   stated in the statement as opposed to the other parts of the

15   report.

16        MR. McDONALD:  I'm not sure that that's not what

17   Didani --

18        THE COURT:  Well then maybe you should pose a question

19   and see if it is.

20   BY MR. McDONALD:

21   Q.  With respect -- based on your knowledge, with respect to

22   the statement "Didani has multiple trips to Turkey during

23   2015," do you recall if that's a part of the interview, or

24   rather that was some information added by CBP in this report?

25   A.  I don't recall.

Monday, April 24, 2023

1   Q.  All right.  Well, forget that sentence then and move to the

2   next sentence that says "Subject stated," please.

3   A.  All right.  "Subject stated that business in Turkey were

4       his biggest customer.  Subject could not recall any names

5       of the business, nor provide any evidence of doing business

6       with anyone in Turkey.  Subject stated that when he travels

7       to Turkey he stayed at Elite Hotel near the airport.  Subject

8       would not stay more than a week and could not provide any

9       address or business he had visited.  Subject stated he did

10      not have any of his records with him.  This was why he could

11      not provide the information.  The last time Didani was inside

12      Turkey was July of 2015" -

13              MR. FINK:  Objection again to the same.  Whether this

14       is part of the statement or his research, I don't know.

15              THE COURT:  Counsel?

16  BY MR. McDONALD:

17  Q.  The last sentence that you began to read -- we'll move on.

18              Is there any other statements in this report that

19  talks about Didani making a statement, in the narrative

20  portion?

21  A.  No.

22              MR. McDONALD:  All right.  May I approach the witness

23  and grab the report?

24              THE COURT:  You may.

25

1    BY MR. McDONALD:

2    Q.   Now, Officer Parisi, you said that you initially seized an

3    iPhone, a Apple iPhone, from Mr. Didani at the gate.  And then

4    you thought that you had found a BlackBerry in his luggage; is

5    that accurate?

6    A.   We detained.  We did not seize.

7    Q.   Okay.

8    A.   And, yes, that is correct.

9    Q.   You were the one that detained those phones?

10   A.   Yes.

11   Q.   And do you know what happened with the phones that day?

12   A.   Yes.  Because of our agreement with HSI, any time we find

13   an illegal substance we have to make notification to HSI.  HSI

14   responded.  The phones were then transferred over to HSI.

15   Q.   Do you know who from HSI responded?

16   A.   Yes.

17   Q.   Who was that?

18   A.   Agent Nugent.

19   Q.   When you detain a cellular phone during the course of a

20   border search -- and, by the way, would you agree that your

21   detention of those two phones during the bag exam and at the

22   time that you met Mr. Didani at the gate would be characterized

23   as a border search?

24   A.   Absolutely.

25   Q.   When you detain a phone during a border search, are you

1    required to fill out a form?

2    A.    No -- I'm sorry, yes.  I apologize.  Yes, we are.

3    Q.    What type of form are you required to fill out?

4    A.    6051D.

5    Q.    Did you fill out a 6051D in this case?

6    A.    I did.

7          MR. McDONALD:  May I approach the witness?

8          THE COURT:  Yes.

9          MR. McDONALD:  For the record, this has already been

10    marked.

11    BY MR. McDONALD:

12    Q.    I'm showing you what's been marked as Exhibit number 6.  Do

13    you recognize what that is?

14    A.    I do.

15    Q.    Can you identify it for the record?

16    A.    I'm sorry?

17    Q.    Can you identify it for the record?

18    A.    Yes.  This is a 6051D for two detained cellular devices.

19    Q.    Is that the form that you filed out on August 6, 2016 after

20    detaining Mr. Didani's iPhone and BlackBerry?

21    A.    Yes.

22    Q.    Incidentally, do you know whether or not Mr. Didani's

23    BlackBerry turned on?

24    A.    In my report, there was an issue with the BlackBerry

25    device, and it would not turn on at that time.

1  Q.   Do you see your signature anywhere on Exhibit 6?

2  A.   Yes.

3  Q.   And can you identify where it is and if there's a date next

4  to it?

5  A.   Yes.  It's on item line 20, the detaining officer.  It is

6  my printed name, my signature, and the date is 8-6, 2016.

7  Q.   Was this form filled out at or near the time you detained

8  Didani's phones?

9  A.   Yes.

10 Q.   Is this a form that is kept in the ordinary course of your

11 occupation?

12 A.   Yes.

13 Q.   Was it the regular practice of CBP to fill out these forms

14 when electronic devices are detained?

15 A.   Yes.

16         MR. McDONALD:  Move for admission of 6.

17         THE COURT:  Any objection?

18         MR. FINK:  No objection.

19         THE COURT:  Six is admitted.

20         MR. McDONALD:  Thank you.  May I retrieve the exhibit?

21         THE COURT:  You may.

22 BY MR. McDONALD:

23 Q.   Now, with respect to this form, after you fill it out do

24 you give Mr. Didani a copy of this form?

25 A.   Yes.

Monday, April 24, 2023

1    Q.   And do you know if Mr. Didani was ultimately allowed to

2    leave?

3    A.   Yes.

4    Q.   All right.   Now, you've been a law enforcement officer for

5    how many years?

6    A.   11 years.

7    Q.   And you've done countless border searches; is that fair?

8    A.   Yes.

9    Q.   And countless baggage inspections?

10   A.   Yes.

11   Q.   And you've been trained on border search and border search

12   authority?

13   A.   Yes.

14   Q.   Based on your training and experience, given that Mr.

15   Didani brought HGH into the United States, any information you

16   knew from TECS about this underlying investigation, was it your

17   belief there it was reasonable suspicion to conduct a further

18   border search of this phone?

19   A.   Yes.

20        MR. McDONALD:  May I have one moment?

21        THE COURT:  Yes.

22        (Briefly off the record.)

23        MR. McDONALD:  No other questions.  Thank you.

24        THE COURT:  You may cross-examine.

25        MR. FINK:  Thank you, Judge.

```
 1              Officer Parisi, good afternoon.  My name is Wade Fink.
 2     I represent the Defendant, Ylli Didani.  It's nice to meet you.
 3                          CROSS-EXAMINATION
 4     BY MR. FINK:
 5     Q.   Officer, currently where are you stationed?
 6     A.   In Chicago O'Hare International Airport.
 7     Q.   So you live in the Chicago area, out of state?  Do you live
 8     out of state?
 9     A.   Yeah, I live out of state.
10     Q.   You traveled in for today's hearing?
11     A.   Correct.
12     Q.   You visited anywhere in Detroit besides the courthouse?
13     A.   I'm sorry?
14     Q.   Have you visited anywhere in Detroit besides the
15     courthouse?
16     A.   Yes.  When I came in last night, yes, I did.
17     Q.   I'm not asking you specific, but generally can you tell me
18     the addresses of the places that you visited in Detroit?
19     A.   I cannot tell you the addresses.
20              MR. McDONALD:  Objection, relevance.
21              THE COURT:  How is it relevant?
22              MR. FINK:  Just the reasonableness and someone not
23     being able to recall every address that they visited.
24              MR. McDONALD:  The fact that this witness would travel
25     to other --
```

Monday, April 24, 2023

1          MR. FINK:  I just want to know if he recalled

2     something from yesterday, whether -- the questions and the

3     statement that were read about my client not remembering

4     specifics.

5          THE COURT:  Okay.  Go ahead.  Overrule your objection.

6     Go ahead.

7     BY MR. FINK:

8     Q.  Do you remember any of the addresses that you visited

9     yesterday?

10    A.   No, I do not.

11    Q.  Do you know the address of this courthouse?  You just

12    generally know that you're in Detroit, right, and went to some

13    places; right?

14    A.   I know I'm in the Federal Courthouse, yes, in Detroit.

15    Q.   Thank you, Officer.

16          Officer, at the beginning, and please correct me if

17    I'm wrong, at the beginning of your testimony on direct exam

18    you answered a question that you don't really recall the

19    interaction with Mr. Didani.  Do you remember that?

20    A.   Correct.

21    Q.   And you said you reviewed a document or documents to I

22    guess refresh your recollection; is that accurate?

23    A.   Yes.

24    Q.   What exactly did you review prior to this to then testify

25    about the entire encounter?

```
 1   A.   I reviewed that report.
 2   Q.   So the only thing that you reviewed to refresh your
 3   recollection was this incident report that was admitted as
 4   Exhibit 6?
 5   A.   Yes.
 6           MR. McDONALD:  Objection.  That was not admitted as
 7    Exhibit 6.  Exhibit 6 was the 6051D.
 8           MR. FINK:  My apologies.  Was that report admitted?
 9           MR. McDONALD:  It was not admitted.
10   BY MR. FINK:
11   Q.   Okay.  The report that was not admitted, but you were
12   discussing and you read from, is that the only report that you
13   reviewed to refresh your recollection?
14   A.   Yes.  That report and the 6051D, yes.
15   Q.   Okay.  So your testimony and the specifics you gave after
16   you explained to the court that you really didn't have specific
17   memory, that's all based on your review of this report?
18   A.   Correct.
19   Q.   Okay.  Did you make certain guesses about what happened or
20   did you do it all from memory?
21   A.   No.  After countless -- after doing my job for a long time,
22   I've become very accustomed with a routine.
23   Q.   Sure.
24   A.   And that routine has not differed from my inspection.
25   That's my recollection.
```

1    Q.   So let me ask it this way instead of going point by point.

2    If you testified to something that isn't specifically in that

3    report, your testimony is just based on your general practices;

4    correct?  I can give you a specific example if that helps.

5    A.   It's based upon procedures and, you know, our regulations

6    and -- yes.

7    Q.   For example.  For example, you stated that when you

8    encountered Mr. Didani you placed the phone into airplane mode.

9    Do you recall testifying to that?

10   A.   Yes.

11   Q.   Is that in your incident report?

12   A.   No, it's not, but it's in our policy.

13   Q.   Okay.  But that's my question.  Obviously your testimony in

14   my view in multiple ways was somewhat different from the

15   report, but I'm asking you if it was that's based on just your

16   general procedure, not necessarily a specific memory as to Mr.

17   Didani; is that accurate?

18   A.   Yes.

19   Q.   Okay.  Thank you, Officer.  Do you know when, for example

20   -- let me go back to that airplane policy.  Do you know when

21   the airplane mode policy was adopted by CBP?

22   A.   I don't know, but it is a area located for all Chicago AOR.

23   That is a rule and that's a policy that we have to abide by.

24   Q.   Did you know that that policy was adopted in 2018?

25   A.   It was a area-specific policy for Chicago.

```
 1   Q.   So it's your testimony that the CBP had a policy in Chicago
 2   to place phones in airplane mode in 2016?
 3   A.   Yes.
 4   Q.   Was it a written policy?
 5   A.   Ever since I was in CBP, that was the policy.  Even when I
 6   was in the secondary enforcement unit when I first came to
 7   Chicago, at any time that you inspected a cellular device you
 8   needed to put that in airplane mode.
 9   Q.   And that could have been just a policy amongst your
10   specific department if it wasn't written?  That's just
11   something you understood to be the rule?
12   A.   That's how I was taught, and that's what I was told that
13   that is policy and that's how I was trained.
14   Q.   Understood.  Thank you, Officer.  Can you explain to me,
15   and for the benefit of the court, the interplay between other
16   governmental law enforcement agencies and CBP?  Specifically
17   what I'm referring to in that interplay is when they ask CBP to
18   assist in these border searches, interviews, what have you, is
19   that something that you deal with often in your job, requests
20   from other agencies?
21   A.   Every single day.
22   Q.   Every day, okay.  Specifically do you get those requests
23   from Homeland Security Investigations often?
24   A.   We get them from every federal agency, yes.
25   Q.   So there's often cooperation amongst agencies to do these
```

Monday, April 24, 2023

1    things; correct?

2    A.   Correct, yes.

3    Q.   And oftentimes these other agencies, HSI is the example I'm

4    giving, but that could be other agencies, are relying on you,

5    Customs and Border Protection, to actually carry out the

6    interview, the detention, whatever they're asking you to do?

7    They're often relying on you; right?

8    A.   Yes.   HSI has the same exact authority as CPB does.   They

9    have every border search authority that is in law.

10   Q.   No, I understand that.   I'm just asking sometimes they have

11   to rely on you to do the actual interview or whatever they're

12   requesting, they have to have CBP actually do it.   Perhaps

13   someone's not on-site, perhaps they can't get there in time.   I

14   mean, is that an accurate statement that sometimes they'll just

15   ask CBP to do it?

16   A.   That is an accurate statement, because we work hand in hand

17   together.

18   Q.   Sure.   And then if HSI is on-site you can either do it

19   together, maybe HSI will do it themselves, but, you know, it

20   varies; right?

21   A.   But because Customs is at that airport that's kind of our

22   house.   So we expect a courtesy to either let us know, and

23   we'll do the inspection.   Like I said, we have to follow proper

24   procedure and policy in which we'll transfer off to another

25   government agency such as HSI, DEA and such, but ultimately

```
 1    that's our house.  So they need to come to us first and then
 2    we'll decide on our course of action.
 3    Q.   That's helpful information.  I appreciate that, Officer.
 4    So essentially in the interplay between the governmental
 5    agencies CBP in your experience, and I know that could be
 6    different, but at O'Hare and in your experience there's an
 7    expectation that other law enforcement agencies will give you
 8    the courtesy of involvement, because that, as you said, is your
 9    house?
10    A.   Yes.
11    Q.   And you would expect, and correct me if I'm wrong, you
12    would expect that these other agencies would be mindful of your
13    policies and procedures and how CBP handles things; right?
14    A.   Yes.
15    Q.   Okay.  I want to ask --
16              Do you have a copy of your report, Officer, still?
17    A.   I do not.
18              MR. FINK:  Judge, can I approach?
19              THE COURT:  Yes, you may.
20              MR. FINK:  Thanks.  Would you like a copy, your Honor?
21              THE COURT:  No, I'm fine.
22              MR. FINK:  There you are.
23              THE WITNESS:  Thank you.
24              THE COURT:  The government is going to give --
25              Did we admit that?
```

1     MR. McDONALD:  It was not admitted, your Honor.

2     MR. FINK:  I'm just going to ask him if he remembers

3  first.

4     THE COURT:  Okay.  That's okay.  I just want to say I

5  knew we admitted something.

6  BY MR. FINK:

7  Q.  Officer, do you recall -- and certainly you've seen a lot

8  more of these reports than me, but on a certain portion, I'm

9  referring to Page 3 of your report here at the bottom under

10 "TECS Information," do you recall making a notation in there

11 that "the subject declared seven vials of Kigtropin and the

12 substance was seized," and the second part of that, "If

13 encountered, hundred bag exam is recommended."  Do you recall

14 that, and if not could you look at Page 3 for me?

15 A.  I'm looking at it.

16 Q.  Does that refresh your recollection looking at what I just

17 read?

18 A.  Yes.

19 Q.  So in this report there's two sentences there.  "On 8-6,

20 2016 subject declared seven vials" -- I'm going to call it

21 HGH -- "Kigtropin.  The substance was seized."  And then it

22 says, "If encountered, hundred percent bag exam is

23 recommended"; right?

24 A.  Yeah.  Yes, sir.

25 Q.  The second part of that sentence is hypothetical suggesting

1    that after the fact if something is encountered to do a bag

2    exam; right?

3    A.   Yes.

4    Q.   So does that -- to you it seems -- at least it seems to me,

5    but correct me if I'm wrong, that there was a declaration made

6    even before the bag exam was done that HGH was in my bags;

7    correct?

8    A.   Correct.

9    Q.   So there was a declaration made by Didani before he even

10   knew you were searching or had his bags; right?

11   A.   Correct.

12   Q.   Otherwise, you wouldn't have written "if encountered

13   hundred bag exam requested"; right?

14        So does that mean he put it on a declaration form on

15   the airplane perhaps?

16   A.   I don't recall.

17   Q.   Is that possible?

18   A.   It could be possible.

19   Q.   Is it possible that he told primary that he has it?

20   A.   It could be possible.

21   Q.   I'm just try to figure out what are the possibilities as to

22   when this was declared, if it was done before the bag exam,

23   that's all.

24   A.   It could have been declared at primary and it could have

25   been on his declaration.

1  Q.   Certainly based on that, Officer, in your experience it

2  certainly doesn't seem like he was trying to hide what he had;

3  correct?

4  A.   Well, he did, yes.  He declared it, correct.

5  Q.   Do you know if Kigtropin -- this is if you know, do you

6  know if it's legal in Albania?

7  A.   I do not know.

8  Q.   Do you know if it's legal anywhere in Europe?

9  A.   I do not know.

10 Q.   Did you find out or did you ask anyone?

11 A.   I didn't.  It's a FDA-controlled substance, and it's not

12 legal in the United States.

13 Q.   Of course.  I don't dispute that.  I'm just asking if you

14 have any concept of where it was coming from being --

15 A.   Yeah.  I don't know any other countries and the legality of

16 the HGH.

17 Q.   How much is 3.7 milliliters in liquid form?  Can you give

18 us a frame or reference?

19 A.   So a vial is about this big dependent --

20 Q.   Like a nail polish?

21 A.   Yeah, it's -- nail polish, it's taller than that.  But on

22 each vial if will the volume how much liquid is inside.

23 Q.   How many vials did you discover?

24 A.   From my report, it said seven.

25 Q.   They must not have been full; right?  If you had seven

1    vials, it's 3.7 milliliters.  It seems like a small amount.

2    But correct me if I'm wrong.  You have the experience.  Do you

3    remember?

4    A.   I don't recall.

5    Q.   Okay.  Is 3.7 milliliters a lot of liquid in your

6    experience?

7    A.   When it comes to HGH and steroids, yes, that's a dosage.

8    Q.   Okay.  That's a dosage.  What does that mean?

9    A.   Depending on how much HGH and steroids you're using --

10   Q.   Sure.

11   A.   -- you would inject it into a needle, or put it in a needle

12   in a syringe.

13   Q.   So it's like a single dose?

14   A.   I don't know if it's a single dose or not.  It all depends

15   on that individual how much they're taking.

16   Q.   Understood.  I just want to go back in order, and I know

17   some of this might be repetitive so forgive me.  The initial

18   encounter with Mr. Didani was as he was exiting the airplane;

19   correct?  You were describing the process of checking

20   passports.  Do you recall that?

21   A.   Yes.

22   Q.   Okay.  And once you did identify him with your partner,

23   which you said it was Leeker; correct?

24   A.   Correct.

25   Q.   Once you identified Didani that's initially when you took

Monday, April 24, 2023

1  the iPhone, detained the iPhone; correct?

2  A.  Correct.

3  Q.  Now, did you ask him for his phone or how did -- how did it

4  come to pass that you came into possession?  Did you ask, did

5  you take?  How did that go down, if you recall?

6  A.  So during the specific encounter, I cannot tell you what I

7  said.

8  Q.  What's your general practice?

9  A.  My general practice is I ask for an individual's electronic

10  devices, if they have any and how many they have.  I will then

11  take possession of that, or let them put it in airplane mode,

12  but I would hold the electronic device until we got back to

13  baggage secondary.

14  Q.  Have you had anyone ever refuse to do that?

15  A.  No.

16  Q.  Have you had anyone deny they had a cell phone?

17  A.  I have never -- I'm sorry.  Repeat that, please.

18  Q.  Say to you "I don't have a cell phone," something of that

19  nature?

20  A.  Yeah, I've heard that.

21  Q.  And what happens when someone denies it?  Do you inquire

22  further?

23  A.  Well, I inquire, but I have yet to find a cell phone on

24  somebody who said they don't have one.

25  Q.  Okay.  Understood.  The -- initially you took -- the point

1    of taking his cell phone, I know this may not be your

2    recollection, but if you recall was there any other

3    conversation at that point with Mr. Didani?

4    A.   I don't recall.

5    Q.   Did you have possession of his passport at the time as well

6    at this initial encounter?

7    A.   Yes.  I would have possession when I encounter him at the

8    airplane upon me ID'g him.

9    Q.   So you have possession of his passport, possession of his

10   iPhone, and you've now asked -- and I know this might be based

11   on general practice if you don't recall specifically Mr.

12   Didani, but you have asked him to come with you to inspection;

13   correct?

14   A.   Correct.

15   Q.   Okay.  He's not handcuffed.  You made a point of saying

16   that; right?

17   A.   Yes.

18   Q.   But you do have two pieces of his property; right?

19   A.   Correct.

20   Q.   And you have asked him to come with you; correct?

21   A.   Correct.

22   Q.   Okay.  First stop you make is primary inspection; right?

23   A.   Yes.

24   Q.   And for those of us who aren't experts, but have travelled

25   internationally, primary inspection is the booth, for lack of a

1   better term, with an agent at it?

2   A.  Yes, correct.  That's where everybody goes that comes off

3   the plane.  That's exactly where they go to --

4   Q.  That's where I go when I'm going to get my bags; right?

5   A.  Yes.

6   Q.  Okay.  But Mr. Didani is different in some sense, because

7   he's with you and Leeker; correct?

8   A.  He still has to go through the process.  We're just

9   escorting him to make sure that he can't delete anything from

10  the cell phone, and then we could keep eyes on him and the

11  entire time until our inspection is completed.

12  Q.  So do you wait in line with him?  I mean, I don't know if

13  you remember in this instance, but if there were a line would

14  you wait in line with the individual?

15  A.  We usually give them the VIP treatment and bring them right

16  in the front, yes.

17  Q.  Maybe I'll ask you to detain me then so I can skip the

18  line.

19          Officer, so you said that part of the reason that you

20  do it is to make sure that there's no spoilation or deletion of

21  evidence, but also to keep an eye on them; correct?

22  A.  Correct.

23  Q.  If that person were not to come with you, do you have

24  policies and procedures of what you would do in that instance?

25  A.  Yeah.  We would actually -- we would take control of the

1   individual, probably handcuff them and then continue with our

2   -- continue on our way to primary operations, but --

3   Q.   So saying that --

4   A.   -- as of yet today I have never had anybody say no to me.

5   Q.   I'm glad to hear that, but I'm asking that because on

6   direct examination Mr. McDonald and you made a point about not

7   being handcuffed just like any other person.  But in reality,

8   Officer, if Mr. Didani refused your orders of any way he was

9   not free to just walk back to another airplane; correct?  You

10  would have used force, if necessary?

11  A.   Well, he's not free to go anyway.  He has to be processed

12  and go through the proper inspection and primary and then go

13  through our -- go through the federal inspection security area

14  and then be released through Customs.

15  Q.   Sure.  But he's not --

16  A.   But he's able to leave.

17  Q.   He's not just not free to leave outside of Customs, he's

18  not free to leave your immediate presence either; correct?

19  A.   Correct.

20  Q.   Okay.  And I know you said it hasn't happened, but should

21  it the policy and procedure is you could handcuff or use other

22  force to coerce compliance; right?

23  A.   You could, yes.

24  Q.   All right.  On that note, let me ask you this, because I

25  know it might be different at different airports.  But at

1    O'Hare do you get your checked baggage before going through

2    primary or after?

3    A.   After primary.

4    Q.   So you go through primary with whatever carryon you might

5    have; correct?  You are temporarily admitted or whatever, you

6    pass primary or asked to go to secondary.  Whatever the case,

7    you still have to get your checked bags first; right?

8    A.   Correct.

9    Q.   And, if it's with you, if you're escorting someone for one

10   reason or another, you go with them to pick up those bags;

11   right?

12   A.   Correct.

13   Q.   Okay.  And you said it was like any other person at baggage

14   claims.  Do you remember that?

15   A.   Correct.

16   Q.   Although, you have possession of his phone and passport;

17   right?  So it's a little different than other people that have

18   just gone through primary; right?

19   A.   He has free movement to do whatever he wants.  He can go to

20   the washroom or anything like that.  We just don't let him have

21   his cell phone and his passport until we have completed our

22   inspection.

23   Q.   I appreciate that.  I just -- precisely speaking, he's not

24   like every other person; right?  He's being escorted by you and

25   you have couple pieces of his important property; right?

```
 1   A.   At this time he is just like every other person, because
 2   he's getting his luggage like anybody else, free to move about
 3   however he feels.
 4   Q.   Okay.  After this, after we identify his bags, that's when
 5   we go to the secondary room that you discussed; right?
 6   A.   Correct.  And this is a private area.  It's a little
 7   separated from the public so there's no embarrassment or
 8   anything like that.  Yeah.
 9   Q.   Sure.  Now, we had another agent describe this.  The only
10   people really that are observing this are anyone else that's in
11   secondary; right?
12   A.   Correct.
13   Q.   Not the general public, just if anyone else is in that
14   room, but otherwise it's just you?
15   A.   Yes.
16   Q.   And the agents that are with you; correct?
17        Now, is that where the interview took place, or would
18   have taken place?
19   A.   So because I was on the PERT team we actually had a
20   designated area.  So it would have only been me and Leeker with
21   the subject at that time.  Nobody else.
22   Q.   Now, the interview was conducted, the one that you read
23   into the record; right?  That was conducted by you and Leeker;
24   is that accurate?
25   A.   Correct.
```

```
 1   Q.   Was there -- do you know a Special Agent Nugent?
 2   A.   I do.
 3   Q.   Okay.  Was he present during the interview?
 4   A.   So I don't recall if he was present during the interview.
 5   I know he was present after the initial find of the vials of
 6   HGH.
 7   Q.   Okay.  But you don't -- do you recall him asking any
 8   questions?
 9   A.   I don't recall that, no.
10   Q.   Okay.  You do remember, though, specifically that you and
11   Officer Leeker did ask questions; right?
12   A.   Correct, yes.
13   Q.   All right.  When you initially got the assignment from your
14   supervisor, you would have gotten it that morning; correct?
15   A.   Correct.
16   Q.   Okay.  So you didn't know anything the night before; right?
17   A.   No.
18   Q.   You found out about it that morning?
19   A.   Correct.
20   Q.   And you said you did -- you got a little background
21   information.  Do you recall that?
22   A.   Yeah.  I always go through the analytics before I do my
23   inspection of the lookout, yes.
24   Q.   Sure.  Can you describe for me generally what the analytics
25   will show you?
```

Monday, April 24, 2023

1    A.   It will show me all his information.  It's a TECS.  I can

2    search them in our law enforcement databases.  I can find out

3    his previous travel internationally, find out any lookouts that

4    have been placed on him, any previous baggage inspections, any

5    previous seizures or any other violations that he has had

6    previously.

7    Q.   Are there any notations about what he may be investigated

8    for my HSI?

9    A.   I believe it was a drug related -- drugs and weapons

10   investigation from -- after I looked at my notes.

11   Q.   Is there -- in these kind of situations, either

12   specifically to Mr. Didani or just generally speaking, is there

13   anymore detail beyond that that you're able to look before you

14   go do your lookout for a particular person?

15   A.   Can you --

16   Q.   Like is there any details about what the evidence or the

17   investigation has shown so far, this person has been traveling

18   suspiciously, this person is linked to drug cartels, this

19   person is X, Y and Z?  Can you get those kind of details in

20   these reports?

21   A.   No.

22   Q.   So typically you don't know much more beyond what the

23   general concern is, for lack of a better term?

24   A.   Well, not everybody's under investigation.  So obviously

25   there's something when I find a lookout that has currently

Monday, April 24, 2023

```
 1   under investigation for drugs and guns.  It's a little bit --
 2   my awareness is heightened a little bit.
 3   Q.   Interesting.  So would you -- do you know the difference
 4   between a routine and a nonroutine border search?
 5   A.   A routine and a nonroutine?
 6   Q.   Yeah.  Have you ever heard that term before at CBP?
 7   A.   No.
 8   Q.   You're not trained on the delineation between those two?
 9   A.   No.
10   Q.   So you did -- well, let me ask you this then on the topic.
11   You did mention there are circumstances where you'll have a
12   lookout or a TECS assignment or a report that doesn't really
13   have any specific investigation tied to it; right?
14   A.   Correct.  Anybody who comes internationally is up for
15   inspection.
16   Q.   It could just be Wade Fink traveled to the Middle East and
17   it's his turn to be searched?  I mean, that's possible?
18   A.   I'm sorry.  Can you repeat the question?
19   Q.   I'm Wade Fink when I say that.  I'm saying it could just be
20   random person, me, Wade Fink, traveled to the Middle East this
21   week and it's his turn to be, you know, asked why?
22   A.   Well, the unit I'm in at this particular time we don't do
23   random inspections.  It is targeted inspections.  That's all I
24   do.
25   Q.   Okay.  Your unit?
```

1    A.   My unit that I was at during this time.

2    Q.   But CBP also does lookouts and these things of this nature

3    for people that may not be targeted; correct?  It might just be

4    random, or no?

5    A.   There are random inspections.  They're called COMPEXs, but

6    that's just a random thing where we will talk to somebody.

7    Q.   I understand, okay.  So I'm going to use routine in a

8    colloquial sense, not in a legal definition.  But it would be

9    routine to randomly send someone to secondary that just, you

10   know, either pops up on the computer or is the sixth number out

11   of ten.  There are random secondary searches; right?

12   A.   There are random, yes.

13   Q.   And that has a typical routine that goes with it.  They go

14   to secondary, you search X, Y and Z, and then they're either

15   admitted or not admitted; right?

16   A.   It's more of like an audit, yes.

17   Q.   But when it comes to you there's specifics?

18   A.   Correct.

19   Q.   There's a reason that we're looking at this person;

20   correct?

21   A.   Yes.

22   Q.   And it may be a more intrusive investigation than the

23   ordinary person; right?

24   A.   Yes, yes.

25   Q.   It may be that we're going to ask a lot of questions here,

1    because we've got to get to the bottom of this, or it may be

2    that I'm going to want you to look very deeply into his or her

3    phone?  There's certain things that may be different than a

4    random check; right?

5    A.   I've had extensive training on questioning.

6    Q.   Sure.

7    A.   So my questioning is a little bit more thorough than a lot

8    of my peers, but because of my participation to Tactical

9    Terrorism Response Team I have a little bit of a heightened

10   questioning background.

11   Q.   But that's what's desired, I would assume, when there's a

12   targeted search; right?

13   A.   Absolutely.

14   Q.   I mean, just searching random person it's not as intrusive

15   necessarily as a targeted person; right?

16   A.   You would be surprised on what we find on regular COMPEX

17   inspections, though, yes.

18   Q.   I'm sure.  I wouldn't want to come to someone as thorough

19   as you, God forbid.

20            No, Officer.  I appreciate the candor.  I'm just

21   asking that when you have specific information usually there's

22   a reason -- you've told me there's a reason it comes to you,

23   that's a targeted person?

24   A.   Correct, there's a reason.

25   Q.   You very well might not know the answer to this, but maybe

Monday, April 24, 2023

 1  you can tell me in your general experience why this might be.

 2  On Page 3 of 6 of the report here under the information listed

 3  about my client, Ylli Didani, it has a birthday that's not his

 4  and an address that's not his.  How does information get

 5  entered into the system?  Is that something that you do or is

 6  that already there?

 7  A.   You said on Page 3 of 6?

 8  Q.   Correct, 3 of 6, which has got the Bates label on the

 9  bottom right of 08086.

10  A.   So because this is a -- this is my write-up.  It's more

11  than likely I put that in there.

12  Q.   Okay.  So if it's incorrect, which you would have no way of

13  knowing at this moment, I understand that, but if it's

14  incorrect it would be you entered it incorrectly; correct?  Or

15  there was a reason for you to enter the wrong birthday, I don't

16  know, but you entered it; right?

17  A.   You said wrong birthday?

18  Q.   Yeah.  It's a messy question.  Let me ask you again.

19  A.   Okay.

20  Q.   The date of birth that's entered on Page 3, okay.

21  A.   Okay.

22          THE COURT:  Show him where you're referring to,

23   please.

24  BY MR. FINK:

25  Q.   Do you see it or do you want me to --

245

```
1    A.   I'm on Page 3, yes.  I see the date of birth.

2    Q.   Okay.  The middle of Page 3 is the date of birth for Ylli

3    Didani; correct?

4    A.   Yes.

5    Q.   That birthday, would that be entered by you on this report?

6    A.   Yes, it would be.

7    Q.   It wouldn't already be there from past information?

8    A.   You know, so our systems have changed.  I don't remember if

9    it is automatically populated.

10   Q.   Okay.

11   A.   Right now it is.  I don't remember if in the old TECS

12   system if it's automatically populated.  I'm sorry.  I can't

13   give you an accurate answer.

14   Q.   Don't be sorry.  It's possible that you entered it, but the

15   new system pre-populates?

16   A.   Correct.

17   Q.   Same thing with the address?

18   A.   Same thing with the address.  Everything is populated.

19   Q.   Understood.  Can you remind me how you came across -- and

20   you might need to refer to the report, I think it's Page 5 and

21   6 under the narrative -- how you came across the second phone

22   the BlackBerry?

23   A.   I'm going to look at my notes.

24   Q.   Of course, please.  Take your time.

25   A.   I don't see the specifics on the second phone, the
```

1  BlackBerry cellular device, or the Apple iPhone.

2  Q.  On the last page of your report, you write "HSI responded"

3  -- this is the last sentence of the narrative on the last page.

4  A.  Yeah.

5  Q.  "HSI responded and detained two cellular phones, Apple

6  iPhone," and it spells out the model number, "and a BlackBerry

7  phone, which would not turn on," and it gives the date and

8  time, "by HSI Special Agent Nugent."  Do you see that?

9  A.  Maybe I misunderstood the question.  I thought you asked me

10  how did I come across the phone.

11  Q.  I did.  I did ask you that.

12  A.  I don't have any specific --

13  Q.  Your answer is you don't know how you came across it?

14  A.  Correct.

15  Q.  But it certainly happened, in your memory at least, later

16  in the investigation, because all you took at first was an

17  iPhone; right?

18  A.  I believe it was an iPhone, correct.

19  Q.  So the BlackBerry must have come later, either with the

20  baggage or in some other circumstance; right?

21  A.  Well, the BlackBerry because of the issue of it not turning

22  on I believe that -- my memory recollects that it was found in

23  the bags.

24  Q.  Okay.  So you took custody or detained these two phones;

25  correct?

```
 1   A.   Correct.
 2   Q.   Did you manually go through them at all in any way?
 3   A.   No.  I would have wrote it.  I would have wrote it down if
 4   I did, because I've always --
 5   Q.   That's your practice?
 6   A.   It's my practice.  I do not have it in this report, so I
 7   don't believe I did.
 8   Q.   So your belief is that you don't remember, but your belief
 9   is because you didn't write it down you likely didn't go
10   through the phone at that point; correct?
11   A.   I see that I got the phone information.  So I probably
12   looked at the phone information for the report and detention,
13   but I don't believe I did a manual examination on the cellular
14   device.
15   Q.   Now, Exhibit 6, which was admitted, is the receipt for that
16   detention, and you recall that; right?
17   A.   Yes.
18   Q.   And that specifically mentions the two phones that were
19   detained; right?
20   A.   Yes.
21   Q.   Now, when you detain these eventually, you know, as you can
22   see at the bottom, which you were asked about at direct
23   examination, it moves to other agencies, and you know what
24   that's called.  It's called chain of custody; right?
25   A.   Right.
```

Monday, April 24, 2023

1   Q.   So the signatures that we see at the bottom are going from

2   your hands to another agency, to another person in that agency,

3   what have you, but that's what we're looking at when we look at

4   that bottom box; right?

5   A.   Correct.

6   Q.   Initially the detention of the phones and the custody of

7   the phones was in the control of the Customs Protection --

8   Customs Border Protection; right?

9   A.   Yes.

10  Q.   CPB.  When you did that, when you're holding those phones

11  in your pocket, it's very clear from your direct examination

12  that you are well familiar with policies, you are well trained,

13  we're very lucky to have you.  When you had those phones in

14  your hands, in your mind, and at all times, in fact, during Mr.

15  Didani's detention, you are operating under CBP policy; is that

16  correct?

17  A.   Correct, until it's transferred over to HSI in which it

18  would be transferred --

19  Q.   Whatever happens with HSI is not my question.  When you are

20  operating, when you are doing your job and you have those

21  phones, you are using CBP policy; correct?

22  A.   At that time, yes.

23          MR. FINK:  No more.  Thank you, Judge.

24          Thank you, Officer.

25          MR. McDONALD:  If I may.

```
 1              THE COURT:  Yes.
 2                     REDIRECT EXAMINATION
 3   BY MR. McDONALD:
 4   Q.   Once you hand over the phone to another agent, in this case
 5   HSI, do you know whose policy controls?
 6   A.   As soon as it's transferred over to --
 7              MR. FINK:  Objection to -- forgive me, Officer.  Sorry
 8   to cut you off.
 9              Judge, this is again a legal conclusion, which I don't
10   see what the foundation for him to decide what policy controls.
11   He answered what policy he follows, and you're going to decide
12   which ones should have been followed.  I think it's beyond his
13   expertise, it's speculative, and it calls for a legal
14   conclusion.
15              MR. McDONALD:  I think he can answer what he believes
16   -- what policy he believes to control once he hands a phone off
17   to another sister agency.
18              THE COURT:  I think he can do that, too.  So it's
19   overruled even though I know that I will not treat it as legal
20   conclusion, because I'll be making it.
21              MR. FINK:  Thank you, Judge.
22              THE COURT:  You may answer.
23              THE WITNESS:  The policy dictates that once it's
24   transferred over to another agency it then is under the
25   umbrella of their policy.
```

1    BY MR. McDONALD:

2    Q.   Oh.  Your own policy says that, is that what you're saying?

3    Are you saying that CBP policy dictates that once a phone is

4    transferred to another agent it's that other agency's policy

5    that controls?

6    A.   Yes.

7    Q.   All right.  Just a couple more.

8    A.   I want to -- to the best of my knowledge, yes.

9    Q.   All right.  Now, all people who are entering primary

10   inspection are not free to leave; correct?

11   A.   I'm sorry.  Repeat the question.

12   Q.   Anyone who's entering primary inspection from an

13   international flight is not free to leave, they are -- they

14   need to be examined by primary inspection?

15   A.   Correct.

16   Q.   All right.  The last thing I want to talk to you about --

17   well, two more things, but the second to last thing, I guess,

18   is Mr. Fink asked you on your report about this Page 3, and

19   there was a notation that if encountered -- well, you noted on

20   Page 3 of your report that seven vials were encountered and

21   that were found and if encountered a hundred percent bag exam

22   should take place?

23   A.   Yes.

24   Q.   I want to compare that with the narrative of your report

25   where you say during baggage -- during a search of his baggage

```
 1   -- and I'll quote it for you here.  This is on Page 5 of 6.
 2          MR. FINK:  I'm sorry.  If this is being used as
 3   impeachment, I have no objection, but otherwise there would
 4   have to be a basis for him to refer to the report, a
 5   recollection, something.  If he's impeaching him with this
 6   report, then okay.
 7          MR. McDONALD:  I'm not impeaching him with the report.
 8   I'm addressing an issue that Mr. Fink raised about two
 9   different portions of his report or his testimony that say
10   something different.  So I'm simply asking him if he in his
11   report -- well, I'll ask it another way if I may.
12          THE COURT:  You may.
13          MR. McDONALD:  Thank you.
14          THE COURT:  Sustained.  You may ask it another way.
15   BY MR. McDONALD:
16   Q.  Officer Parisi, do you remember in your report if you wrote
17   when the seven vials of Kigtropin were located?
18   A.  I'm sorry.  Repeat the question.
19   Q.  Do you recall writing in your report at what point the
20   seven vials of HGH were found in Mr. Didani's luggage?
21   A.   I don't believe I stated exactly when it was found.
22   Q.   Okay.  Do you remember if your report talks about that?
23   A.   May I reference it?
24   Q.   Well, you first have to tell me if you remember it.
25   A.   I don't remember it.
```

Monday, April 24, 2023

1  Q.  Would it refresh your memory if you took a look at your
2  report?
3  A.  Yes.
4  Q.  All right.  Please do so.  Read it to yourself and let me
5  know if and when your memory is refreshed.
6  A.  Okay.  My memory is refreshed.
7  Q.  All right.  And so do you now remember if your report talks
8  about when the Kigtropin or the HGH was found?
9  A.  Yes.
10 Q.  Where was that?
11 A.  During the baggage exam of the subject.
12 Q.  Now, Mr. Fink had asked you about a prior portion of your
13 report on Page 3.  Do you remember that?
14 A.  Yes.
15 Q.  Can you explain why those two things appear to be
16 different, or if they're different at all?
17 A.  You said different with the milligrams or milliliters?
18 Q.  No, no.  I'm referring to Page -- Mr. Fink asked you on
19 Page 3 of your report.  At the bottom there's a statement in
20 the TECS information in the remarks.  Do you remember him
21 asking you about that?
22 A.  Yes.
23 Q.  All right.  Here you say that the subject declared seven
24 vials of HGH and the substance was seized?
25 A.  Yes.

1    Q.   "If encountered, a hundred percent bag exam is

2    recommended."

3           But you just had said that you encountered the vials

4    during the baggage exam.  So I'm trying to understand --

5    A.   I think everybody's confused about what this is.  This is

6    actually a TECS lookout.  In order to complete the seizure,

7    this needs to be inputted.  So that has no bearing about

8    anything about the seizure itself.  This is just because -- so

9    when he travels again this is going to pop.  This is a lookout

10   just like when it was brought to my attention.

11   Q.   Oh, I see.  So your note here, "If encountered, 100 percent

12   bag exam is recommended," is for future encounters?

13   A.   Correct.  In order to complete the seizure, this needs to

14   be inputted.  I have no -- I have no -- it has to be done.  I

15   can't skip that part.

16   Q.   All right.  I've got one more question.  After you detained

17   the phones, interviewed Mr. Didani and handed the phones to

18   Agent Nugent, was that the extent of your involvement in this

19   case?

20   A.   Yes.

21           MR. McDONALD:  Thank you.  Nothing else.

22           THE COURT:  I have a question kind of like that, and

23   my rule still applies.  If you object, you should object now.

24   Otherwise, it's waived.

25           I think you testified to the copy of that form 6051D

 1   was given to Mr. Didani and then he was allowed to leave?

 2              THE WITNESS:  Correct.

 3              THE COURT:  And does that mean that you released him?

 4              THE WITNESS:  Correct.  At no time was he arrested or

 5   put in handcuffs.  All that was with the HGH seizure was an

 6   administrative seizure.  It wasn't a criminal seizure.

 7              THE COURT:  Okay.  Now, somebody who is one of those

 8   random people that gets taken to secondary, if they refuse to

 9   go do they get handcuffed and taken to secondary?

10              THE WITNESS:  Yes, yes.  I mean, the COMPEX was

11   enacted by Congress.  It has no -- we have no way with that.

12   We have to meet a certain percentage of COMPEXs nationwide

13   mandated by Congress.

14              THE COURT:  Okay.  All right.  Thank you.

15              Anything else of this witness?

16              MR. FINK:  Can I just follow up on your question,

17   Judge --

18              THE COURT:  Yes.

19              MR. FINK:  -- to the witness?

20                         RECROSS EXAMINATION

21   BY MR. FINK:

22   Q.  Officer, a passenger coming from overseas or is a foreign

23   national, foreign citizen or permanent resident, what have you,

24   they can elect to return to their home country, can they not?

25   A.  They could, but they still have to go through our

```
 1    processes, because they're not going to go right back on the
 2    plane.
 3    Q.   So it's your position that if a foreign national arrives in
 4    the United States and does not wish to go through CBP that they
 5    cannot turn around and get back on the plane?  Is that your
 6    position?
 7    A.   Once they exit that plane, they have to be processed.
 8    Q.   Do you take that position with regard to the border on land
 9    as well?  Is that your understanding?  If someone is in the
10    tunnel, for example, coming from Windsor and they wish to
11    return to Canada, perhaps they forgot a passport, for whatever
12    reason they might do, are they free to do that?
13    A.   It's a different area, and I can't specify in that because
14    I don't work at the border anymore and I --
15    Q.   Understood.
16    A.   I don't know.
17    Q.   Let me try to put some meat on the bones with an example.
18              THE COURT:  Do you need to be standing?
19              MR. McDONALD:  No, I don't.
20              MR. BILKOVIC:  I actually told him to sit down, too,
21     Judge.
22    BY MR. FINK:
23    Q.   Last one, because I know we've got one more witness.  I'll
24    just put meat on the bones.  When there was a vaccine
25    requirement, do you recall that to enter the country from
```

Monday, April 24, 2023

1   foreign nationals?

2   A.   Yes.

3   Q.   If someone flies to the United States and realizes, oh, my

4   God, I forgot my vaccine proof and they need to return, they

5   would be free to return to their country; correct?

6   A.   No, they wouldn't.

7   Q.   You would detain them?

8   A.   That's a controlled area.  They have to be processed

9   through Customs.  Once they exit that plane they have to go

10  down.  If they don't have the proper documentations, they will

11  go on the plane, the next plane.  We will provide that.  We

12  have an MOU with all the airlines nationwide.  They will be on

13  the next flight available to go to the same destination that

14  they came from.

15  Q.   We're not saying different things.  My question to you is

16  they do not necessarily have to be arrested and detained; is

17  that correct?

18  A.   But they will be.

19  Q.   You're telling me that if someone wants to return to their

20  home country invariably they will be handcuffed and taken to a

21  new plane?

22  A.   They will be escorted to a detention area in which they

23  will wait the next plane available for them.

24  Q.   But not necessarily handcuffed; right?

25  A.   Right.

```
 1   Q.   I think we're saying the same thing, but my question to you
 2   is there is a difference between a person who is targeted and a
 3   random person entering the country, is there not?
 4   A.   I don't understand the question.
 5   Q.   You treat targeted individuals who enter the country with a
 6   heightened sense of scrutiny of some kind, do you not?
 7   A.   Yes.
 8             MR. FINK:  Thank you.
 9             Thank you, Judge.
10             THE COURT:  Okay.  Now, you were standing.  Do you
11   want to come back up and ask another question?
12             MR. McDONALD:  No, no.  Thank you, your Honor.  I've
13   just been sitting all day, your Honor.
14             THE COURT:  Okay.  Me, too, but I am not standing up,
15   and I wish if you would -- I think it just kind of, you know,
16   intimidates the witness.
17             MR. McDONALD:  I understand.
18             THE COURT:  Okay.  You may step down.  Not that you
19   could be intimidated, but --
20             THE WITNESS:  Thank you, your Honor.
21             THE COURT:  You may step down, and you're free to go.
22             THE WITNESS:  Okay.  Thank you.
23             (At 4:03 p.m., the witness is excused.)
24             MR. McDONALD:  May I call the next witness, your
25   Honor?
```

```
 1              THE COURT:  Yeah.  Isn't that why your colleague went
 2    out?
 3              MR. McDONALD:  No.  He actually -- I think he went out
 4    to go to the restroom, but --
 5              THE COURT:  Oh.
 6              MR. McDONALD:  I'm calling Special Agent Dan Nugent.
 7    It is our last witness, your Honor.
 8              THE COURT:  Okay.  That's great.
 9              MR. McDONALD:  May I step out in the hallway just to
10    grab him?
11              THE COURT:  You certainly may.  I thought he went out
12    to get the witness.
13              (Briefly off the record.)
14              THE COURT:  All right.  Come right up and be sworn in.
15    Right up here.
16              MR. FINK:  Your Honor, just for the record --
17              THE COURT:  Excuse me a second.
18              Tell your colleague that I really like it if you're at
19    counsel table that if you want to be excused you tell me that
20    you want to be excused.
21              MR. McDONALD:  Do you want me to tell my colleague,
22    your Honor?
23              THE COURT:  I do.
24              MR. McDONALD:  Yes, your Honor.
25              MR. FINK:  On that note, my co-counsel has a flight at
```

```
 1    6 p.m.  So he may excuse himself, if it's okay with the court,
 2    around 4:15, 4:30, if the court is okay with that.
 3              THE COURT:  That's fine, as long as he does so
 4    quietly.  And 4:15 is going to be in about five minutes, okay.
 5              MR. FINK:  Thank you, Judge.
 6              THE COURT:  You're welcome.
 7              (Oath administered.)
 8              THE COURT:  Okay.  When you're seated, state your full
 9    name.  Spell your last name; okay?
10              THE WITNESS:  Okay.
11              THE COURT:  There isn't any dispute about who these
12    witnesses are; right?
13              MR. FINK:  No, Judge.
14              THE COURT:  Because I have been, at the request of
15    other attorneys, been making them take their masks down, but I
16    think you don't have any dispute about who they are; right?
17              MR. FINK:  No, Judge.  I very much appreciate you
18    asking, but no.
19              THE COURT:  Okay.  You don't either; right?  But
20    they're your witnesses so I assume you don't --
21              MR. McDONALD:  I don't either, your Honor.
22              THE COURT:  Okay.  Very well.
23              State your full name.  Spell your last name.
24              THE WITNESS:  Daniel Nugent, N-U-G-E-N-T.
25              MR. McDONALD:  Your Honor, may I have one moment?
```

```
1              THE COURT:  You may.

2              (At 4:05 p.m., briefly off the record.)

3              MR. McDONALD:  I apologize, your Honor.

4              THE COURT:  You don't have to apologize.  I was trying

5    to make it so you wouldn't have to do that, but okay.  Let's

6    proceed.

7                        —   —   —

8                        DANIEL NUGENT,

9      at 4:05 p.m. sworn as a witness, testified as follows:

10                       —   —   —

11                    DIRECT EXAMINATION

12   BY MR. McDONALD:

13   Q.   Where are you employed, sir?

14   A.   Homeland Security Investigations.

15   Q.   And what particular office?

16   A.   I am currently assigned to the special agent in charge in

17   Chicago.

18   Q.   How long have you been employed with Homeland Security

19   Investigations?

20   A.   A little over 14 years.

21   Q.   Did you have any law enforcement career prior to Homeland

22   Security Investigations?

23   A.   I worked for Customs and Border Protection for

24   approximately five years.

25   Q.   What about prior to Customs and Border Protection?  Law
```

1   enforcement?

2   A.   No.

3   Q.   And can you tell Judge Hood what your current duties are

4   with Homeland Security Investigations?

5   A.   Currently?

6   Q.   Currently.

7   A.   Currently I'm assigned to Counter-Proliferation.

8            THE COURT:  Counter ...

9            THE WITNESS:  Proliferation Investigations.

10  BY MR. McDONALD:

11  Q.   All right.  And just briefly, what is Counter-Proliferation

12  Investigations?

13  A.   It's essentially illegal exports of weapons and controlled

14  technology from the United States.

15  Q.   Back when --

16           THE COURT:  Excuse me just a minute.  Illegal exports

17   of technology and what else?  What did you say first, firearms?

18           THE WITNESS:  Weapons.

19           THE COURT:  Weapons, okay.  All right.  Thank you.

20           Go ahead, Counsel.

21           MR. McDONALD:  Thank you, your Honor.

22  BY MR. McDONALD:

23  Q.   When you first started with Homeland Security

24  Investigations, were you employed in the Chicago office?

25  A.   I was employed at the Chicago O'Hare Airport office.

1    Q.   When you first started with HSI?

2    A.   Yes.

3    Q.   Back in August of 2016 were you employed with the United

4    States Homeland Security Investigations at Chicago O'Hare?

5    A.   Yes.

6    Q.   And back on that day what were your duties?

7    A.   My duties were mainly to investigate narcotics smuggling,

8    bulk cash smuggling.  And during specific times where I was the

9    duty agent I would handle seizures at the ports of entry at the

10   local mail unit in the airports.

11   Q.   Prior to 2016 had you received any training as it relates

12   to border search authority?

13   A.   Prior to 2016?

14   Q.   Correct.

15   A.   Yes.

16   Q.   And when you initially became employed with Customs and

17   Border Protection did you reach border search authority

18   training?

19   A.   Yes.

20   Q.   Did you also receive training when you came to HSI?

21   A.   Yes.

22   Q.   On August 6, 2016 do you recall if that was a day that you

23   were on duty?

24   A.   Yes.  I was -- that was a day on one of my duty weeks.

25   Q.   Okay.  And so what are your responsibilities when you're on

1    duty?

2    A.    When I'm on duty, I would frequently get calls from CBP,

3    Customs and Border Protection, about seizures made at the

4    international mail unit as well as seizures made at Midway

5    Airport and O'Hare Airport.

6    Q.    In the course of your duties as a duty agent, would you

7    ever respond to the airport to handle requests for other

8    offices around the country?

9    A.    Yes.  That was another frequent duty that I had to perform

10   while I was a duty agent.

11   Q.    And prior to 2016 can you estimate how many times you would

12   assist another agency with a request at the airport?

13   A.    It was another agency or -- most of the time the request

14   came from Homeland Security investigations, or ICE at the time,

15   and it was a frequent request that I would get multiple times

16   per duty week.

17   Q.    Okay.  And how often were you on duty?

18   A.    I was on duty at that time probably one week every month

19   and a half to two months.

20   Q.    Before August 6 of 2016 did you have on occasion to receive

21   information from another individual, someone by the name of

22   Ylli Didani?

23   A.    Yes.

24   Q.    And from whom did you receive that information?

25   A.    HSI Task Force Officer Josh Bianchi.

1    Q.   He's from Detroit?

2    A.   Yes.

3    Q.   Can you tell Judge Hood what the nature of that information

4    was?

5    A.   From what I recall, the information I received was that HSI

6    Detroit was investigating this individual for either drug

7    smuggling or drug trafficking.

8    Q.   Any other information from Officer Bianchi besides the

9    nature of the investigation?

10   A.   I was informed that he was coming in from out of the

11   country.

12   Q.   On what day?

13   A.   I believe August 6.

14   Q.   All right.  And were you asked to do anything -- did

15   Officer Bianchi ask you to do anything once Mr. Didani came

16   into the country on August 6?

17   A.   Yes.  The task force officer in Detroit, Bianchi, asked

18   that Mr. Didani have a secondary inspection conducted at the

19   port of entry.

20   Q.   Okay.  On August 6 did you have on occasion to go to

21   secondary inspection at the Chicago airport per HSI Detroit's

22   request?

23   A.   Yes, I did.

24   Q.   And do you remember if you were at home before you went to

25   the airport or you were already at the airport?

1    A.   I don't specifically recall, but with it having been a

2    Saturday I believe that I probably arrived at the airport

3    sometime during the inspection or shortly thereafter.

4    Q.   All right.  And when you arrived in secondary do you recall

5    speaking with anyone?

6    A.   I spoke to Officer Matthew Parisi.

7    Q.   And what, if anything, did Officer Parisi tell you?

8    A.   He told me that they had located what they suspected to be

9    human growth hormone inside of Mr. Didani's luggage?

10   Q.   Based on your training and experience as a special agent

11   with Homeland Security Investigations, do you know if it's

12   unlawful to bring in or smuggle HGH into the United States?

13   A.   Yes, it is illegal to import.

14   Q.   Do you know when you got there if an interview of Mr.

15   Didani had been conducted?

16   A.   I believe a standard interview, secondary inspection

17   interview, took place between the CBP officers doing the

18   inspection and Mr. Didani.

19   Q.   Do you know whether you received any information about that

20   interview once you got into secondary?

21   A.   Yes.  I believe that statements made by Mr. Didani to the

22   CBP officers was relayed to me.

23   Q.   And did you communicate what was relayed to you to Officer

24   Bianchi in Detroit?

25   A.   I believe that I did.  That would be something that I would

1    normally do.

2    Q.   Okay.  Did there come a time when you came into possession

3    of Mr. Didani's cellular phone or phones?

4    A.   Yes.

5    Q.   How many phones did you come into possession of?

6    A.   I recall there being two cellular cell phones.

7    Q.   Can you describe them generally?

8    A.   I believe one phone was an iPhone and the other phone was a

9    BlackBerry.

10   Q.   And can you describe how you came into possession of Mr.

11   Didani's phone?

12   A.   Those phones were provided to me from Officer Parisi.

13   Q.   What, if anything, did you do with Mr. Didani's phones

14   after getting that from Mr. Parisi?

15   A.   I conducted a cursory inspection of one of the phones.

16   Q.   Do you remember which phone you conducted a cursory

17   inspection of?

18   A.   No, I do not.

19   Q.   And when you say -- when you said cursory inspection, what

20   do you mean?

21   A.   Just a brief search of like photographs stored inside the

22   phone.  Nothing intrusive, nothing where we hooked up

23   technology to it to dump the phone.

24   Q.   Do you remember if you conducted that manual search in the

25   presence of Officer Parisi or Mr. Didani?

```
 1   A.   I don't recall.
 2   Q.   Can you tell Judge Hood what, if anything, you found during
 3   this manual search of the Mr. Didani's phone?
 4   A.   I recall finding a -- what appeared to be a photograph of a
 5   hand-drawn picture of what appeared to be a cargo container
 6   with a raised floor and an arrow pointing, I believe, to the
 7   raised floor.
 8   Q.   Okay.  So just so I'm clear, you said you saw a handwritten
 9   drawing of what appeared to be what?
10   A.   A cargo container.
11   Q.   With a arrow pointed where?
12   A.   I believe to like a raised floor.
13   Q.   All right.  And was that significant to you in any way?
14   A.   That was significant to me because I'm familiar that drug
15   smuggling occurs inside of cargo containers with raised floors.
16   Q.   And you're familiar with that based on your experience as
17   an HSI special agent assigned to conduct drug investigations?
18   A.   Yes, as well as intelligence reports that I've read in the
19   past.
20            MR. McDONALD:  May I approach the witness with --
21            THE COURT:  You may.
22            MR. McDONALD:  -- Defendant's Exhibit number 1 that's
23   been admitted?
24            THE COURT:  You may.
25
```

1    BY MR. McDONALD:

2    Q.   I'm showing you, Special Agent Nugent, Page 5 of Defense

3    Exhibit number 1.

4              MR. FINK:  Officer, can you tell me what the Bates

5     label on the bottom right is, the number at the bottom right?

6              THE WITNESS:  Didani-00220.

7              MR. FINK:  Thank you.

8    BY MR. McDONALD:

9    Q.   For the record, I'm showing you Page 5 of defense

10   exhibit -- Defendant's Exhibit number 5.  Can you identify what

11   you see on that page?

12             THE COURT:  I thought it was number 1.  It's not?

13    It's Exhibit 5?

14             MR. FINK:  Defendant's 1.

15             MR. McDONALD:  Maybe I misspoke, your Honor.  What I

16   meant to say was Defendant's Exhibit 1, Page 5.  If I misspoke,

17    I apologize.

18             THE COURT:  All right.  I thought you said Exhibit 5.

19    Sorry.  Okay.  Go ahead.

20   BY MR. McDONALD:

21   Q.   On Page 5 do you recognize any photos that are familiar to

22   you?

23   A.   The image on the bottom left.

24   Q.   How many photos are on that page?

25   A.   Four.

```
 1   Q.  And you said in the bottom left there's a photo you
 2   recognize.  How do you recognize it?
 3   A.  It looks very similar to what I saw on his phone when he
 4   came in.
 5   Q.  And that's the hand drawing of what you believe to be a
 6   container with an arrow pointing to the floor?
 7   A.  Yes.
 8           MR. McDONALD:  May I reapproach?
 9           THE COURT:  You may.
10           You all at counsel table have to be a little bit more
11    quiet, please.
12           MR. FINK:  I'm so sorry, Judge.
13           THE COURT:  Okay.
14           MR. McDONALD:  May we have one moment, your Honor?
15           THE COURT:  You may.
16           (At 4:17 p.m., briefly off the record.)
17   BY MR. McDONALD:
18   Q.  Just so we're clear, you're not certain if this is the
19   exact photo of what you saw when you were manually scrolling
20   it, but it's something similar to that?
21   A.  It was something similar to that, yes.
22   Q.  At that point what happened after you saw this image during
23   a manual review?
24   A.  I stopped searching the phone and --
25   Q.  Why -- I'm sorry.  Go ahead.
```

1    A.   I stopped searching the phone.

2    Q.   Why did you stop searching the phone?

3    A.   Because I saw what may have been evidence of a crime.  So I

4    stopped searching and sent it up to Detroit.

5    Q.   Okay.  And did you make a -- you said you sent the phones

6    to Detroit?

7    A.   Yes.

8    Q.   And how did you do that?

9    A.   Via Fed Ex, I believe.

10   Q.   Okay.  But you make a decision after you scroll through

11   these photos to detain the phones; is that fair?

12   A.   Yes.

13        MR. McDONALD:  All right.  May I approach the witness

14   again?

15        THE COURT:  You may.

16   BY MR. McDONALD:

17   Q.   I'm showing you Government's Exhibit 6.  It's already been

18   admitted.  Do you recognize what's in front of you?

19   A.   Yes.

20   Q.   And can you identify it for the record?

21   A.   It's a DHS form 6051D for line item 1 and line item 2, two

22   cell phones.

23   Q.   And is that the form that you remember being used for the

24   detention of Mr. Didani's iPhone and BlackBerry?

25   A.   Yes.

1    Q.   Do you see your signature anywhere on that?

2    A.   Yes.

3    Q.   Where do you see your signature and what is the date next

4    to your signature?

5    A.   It's the first line of the acceptance chain of custody

6    where I took custody of the phones from Officer Parisi on

7    August 6 of 2016.

8    Q.   Okay.  The next line, signature line, do you know the date

9    of that?

10   A.   Looks like August 9th of '16.

11   Q.   And does it indicate an individual?

12   A.   Yes.

13   Q.   If you can read it, who is that?

14   A.   Osborn, Special Agent with HSI.

15   Q.   And do you know Special Agent Osborn?

16   A.   No.

17   Q.   Now, based on your training and experience, given that Mr.

18   Didani attempted to unlawfully bring in HGH into the United

19   States and information you had learned on the -- from the TECS

20   record along with this manual review of the phone, did you

21   believe there was reasonable suspicion to further search -- or

22   forensically search his phone?

23   A.   Yes.

24   Q.   Why did you believe that?

25   A.   I believe that because of what was found on the phone, the

 1   totality of the circumstances, I guess, what was found on the

 2   phone, what was found in his luggage, and the fact that he was

 3   under investigation for drug smuggling or drug trafficking.

 4   Q.  All right.  Now, are you familiar with HSI policy with

 5   respect to -- back in 2016 with respect to the electronic --

 6   excuse me -- border searches of electronic devices?

 7   A.  Yes.

 8   Q.  And have you been trained -- back then were you trained on

 9   that particular policy?

10   A.  Yes.

11        MR. McDONALD:  May I approach with Government's

12   proposed Exhibit number 11?

13        THE COURT:  You may.

14        MR. McDONALD:  May I approach the witness?

15        THE COURT:  Yes, you may.

16        MR. McDONALD:  Thank you.

17   BY MR. McDONALD:

18   Q.  Special Agent Nugent, I'm showing you what's been marked as

19   -- and for the record I'm taking Exhibit 6 back, but I'm

20   showing you Government's Exhibit number 11.  Do you recognize

21   that?

22   A.  Yes.

23   Q.  What is that?

24   A.  That is the Immigration and Customs Enforcement border

25   search of electronic devices memorandum.

1  Q.  Is that a copy of the policy that governs border searches

2  for electronic devices that would have been applicable back in

3  2016?

4  A.  Yes.

5        MR. McDONALD:  Move for admission of 11?

6        THE COURT:  Any objection?

7        MR. FINK:  No objection.  Just to note for the record

8  that this does not have a Bates stamp on it.  I was shown it

9  Saturday.

10       THE COURT:  Okay.  It's admitted as number 11.

11       MR. FINK:  Thank you, Judge.

12 BY MR. McDONALD:

13 Q.  According to that policy, Exhibit number 11, do you know

14 how long agents are permitted to detain a phone under HSI

15 policy to conduct a border search?

16 A.  30 days.

17 Q.  And at the time you received the phone from Officer Parisi

18 is it fair to say that HSI policy would be applicable at that

19 point on?

20 A.  Yes.

21       MR. FINK:  Objection, Judge.  You've overruled it

22 before, but objection about his expertise, foundation, legal

23 conclusion.

24       THE COURT:  All right.  I'm not treating it as a legal

25 conclusion, but I am going to let him answer.

274

```
 1            MR. FINK:  Thank you, your Honor.
 2            THE COURT:  So noted for the record.
 3            MR. McDONALD:  Thank you, your Honor.
 4            THE COURT:  What is the question again, though?  I
 5    want to know how you phrased it.
 6            MR. McDONALD:  The question was based on his
 7    understanding of the policy once he took possession of the
 8    phones is HSI border search policy applicable at that point.
 9            THE COURT:  Okay.  All right.  I just want to be sure.
10    Okay.
11    BY MR. McDONALD:
12    Q.  Just one final question if I may, Special Agent Nugent.
13    Based on what you testified today, that you showed up at
14    secondary, detained some phones, did a manual review of one of
15    the phones and then sent those phones to Detroit, was that the
16    extent of your involvement in this case?
17    A.  As far as I can remember, yes.
18            MR. McDONALD:  May I have one minute, your Honor?
19            THE COURT:  Yes.
20            (At 4:23 p.m., briefly off the record.)
21            MR. McDONALD:  No other questions.  Thank you.
22            THE COURT:  Do you wish to cross-examine?
23            MR. FINK:  I do, Judge.
24            MR. BILKOVIC:  Your Honor, may I have permission to
25    leave for five minutes to use the restroom?
```

```
 1                THE COURT:  Yes, you may.
 2                MR. BILKOVIC:  Thank you.
 3                MR. FINK:  I object.
 4                THE COURT:  You're objecting to what?
 5                MR. FINK:  Him leaving for the bathroom.
 6                THE COURT:  I'm very sorry about that.  Overruled.
 7                Did you have any interaction with anyone, anyone in
 8      Detroit, relative to these phones after you took possession of
 9      them?
10                THE WITNESS:  I'm sure that I would have called
11      Officer Bianchi, or TFO Bianchi, and told him what I found on
12      the phone.
13                THE COURT:  Okay.
14                THE WITNESS:  That would be my normal practice.
15                THE COURT:  All right.  Go ahead, please.
16                          CROSS-EXAMINATION
17      BY MR. FINK:
18      Q.  Agent, were you present during the interview or questioning
19      of Mr. Didani on August 6, 2016?
20      A.  I don't recall.
21      Q.  It's not a no, it's a don't remember?
22      A.  I don't remember.
23      Q.  So if you are mentioned in reports by TFO Bianchi as making
24      statements about the interview, I mean that theoretically could
25      be accurate you're saying?
```

1    A.   In regards to what Mr. Didani said during his secondary --

2    Q.   Right.  Attributing his notes to what you told him, is it

3    inaccurate or has it escaped your memory?

4    A.   No.  It's possible that I showed up at the airport and I

5    was provided with information about what was said.  And then I

6    called Officer Bianchi and I said this is what was said per the

7    CBP officers that interviewed him.

8              (At 4:25 p.m., briefly off the record.)

9    BY MR. FINK:

10   Q.   Agent Nugent, just to finish up and to clarify that, you

11   don't have a specific memory as you sit today testifying of

12   being part of the interview of Didani on August 6, 2016; is

13   that right?

14   A.   That's correct.

15   Q.   You don't have that memory; right?

16   A.   I don't have that recollection.

17   Q.   So, if I were to ask you questions about what was said or

18   what Bianchi said you said, you're not going to recall the

19   specific details?

20   A.   Can you repeat that, please?

21   Q.    If I repeat to you some of the notes that were made by

22   Agent Bianchi about what you told him, you're not going to have

23   any recollection as we sit here today of that interview;

24   correct?

25   A.   I would not have a recollection.

Monday, April 24, 2023

1   Q.   Are you familiar with iPhones, Agent?

2   A.   Yeah, somewhat.

3   Q.   Do you have one?

4   A.   I do.

5   Q.   Can you physically carry drugs on your iPhone?

6   A.   Physically carry drugs on your iPhone?

7   Q.   Right.

8   A.   I don't believe you can.

9   Q.   Okay.  So you weren't looking for physical drugs when you

10  opened and manually searched his phone; right?

11  A.   I wasn't looking, correct.

12  Q.   What were you looking for on his phone?

13  A.   I was looking for -- for the most part, merchandise

14  relating to HGH.

15  Q.   Pictures of drugs?

16  A.   Perhaps pictures of drugs, yes.

17  Q.   Did you look at -- pursuant to that presumably, and correct

18  me if I'm wrong, you looked through his photos; correct?

19  A.   I believe I did.

20  Q.   How much time would you say you spent looking through the

21  photos?

22  A.   I don't recall.

23  Q.   Do you know if it was more or less than an hour?

24  A.   I don't recall.  I don't think I ever spent an hour looking

25  through somebody's phone, no.

Monday, April 24, 2023

1   Q.   Do you know how long it took you to find the alleged

2   container picture?

3   A.   I don't.

4   Q.   Do you have that in front of you still, Agent, the

5   container picture?

6   A.   I do not.

7   Q.   If you need me to bring it to you, you can look at it.

8           You testified pretty definitively on direct

9   examination that what you saw was a shipping container.  Do you

10  recall that?

11  A.   I recall that, yes.

12  Q.   Okay.  What about that picture gives you the impression

13  that it's a shipping container?  And, if you need to see it,

14  please let me know.  Maybe you know by your recollection.

15  A.   I'm going to go off my recollection.

16  Q.   Sure.

17  A.   You know, it was I believe a square thing, and it appeared

18  to have -- something made me think it had a raised floor with

19  an arrow and like a number that I equated to presumably being

20  related to drug smuggling.

21          MR. FINK:  Judge, do you have Defendant's 1?

22          THE COURT:  I think maybe I do.

23          MR. FINK:  Document titled "Photos and messages from

24  Didani's cell phone."

25          THE COURT:  Maybe I don't.

1              Yeah, I think you took it back.  The government took

2    it back.

3              MR. FINK:  I'm producing it to your law clerk just so

4    you can see that.

5              THE COURT:  Okay.  You know, though, I did see it so

6    maybe I do have it.

7              MR. FINK:  On that page that's open for your Honor,

8    that's the -- just so everybody -- I'm showing a picture that

9    was shown to the picture of the container you're describing.

10             THE COURT:  This is not the container.

11             Oh, it's the sketch.  Oh, yes.  Okay.

12             MR. FINK:  Sketch of the container.

13             THE COURT:  Okay.  Do you need to see it?

14             THE WITNESS:  If you don't mind, Judge, I guess.

15             THE COURT:  Pass it to him.

16             THE WITNESS:  Thank you.

17             MR. FINK:  Here's another copy of that.

18             THE COURT:  I thought I had that.  I looked at it when

19   he pulled it up.

20             It's Defendant's 1; right?  Is this Defendant's 1?

21             MR. FINK:  That's a page from Defendant's 1 just so

22   you can see what I'm referring to.

23             THE COURT:  Okay.  I have it.  I have it, I believe.

24   Find the page, and you can take it back.

25             MR. FINK:  220, I think.

```
 1              THE COURT:  Yeah, I got it.  I do have it.
 2   BY MR. FINK:
 3   Q.   Officer, let me clarify that.  You did say on direct
 4   examination you're not sure if this is the precise sketch that
 5   you saw on his phone; correct?
 6   A.   Correct.
 7   Q.   But this is at least similar to what you recall seeing?
 8   A.   Yes.
 9   Q.   And this image where I think we can see the word "floor"
10   and perhaps a number at the bottom, this is what you're
11   alleging to be a shipping container; correct?
12   A.   Either this or something similar to that, yes.
13   Q.   Of course.  I understand.  But something similar to that?
14   A.   Yes.
15   Q.   If you look at this image, whether it was that one or not
16   that you saw in August, looking at this image before you do you
17   see a shipping container?
18   A.   I see what -- all I can say is at the time I interpreted it
19   to be a shipping container based on the totality of the
20   circumstances.
21   Q.   Sure.  I'm asking you right now looking at that picture
22   does that appear to you to be a shipping container?
23   A.   It could be.
24   Q.   But it also could be a sketch of a living room; right?
25   A.   It could be.
```

1   Q.   Thank you, Officer.  Do you recall looking through anything

2   else in Mr. Didani's phone that day?

3   A.   I don't recall.

4   Q.   Okay.  Is it possible you did?

5   A.   It's possible, yes.

6   Q.   How is it you were able to get into the phone?  Do you

7   remember?

8   A.   I don't recall.  I see that on the 6051 detention form

9   there appears to be a PIN number written.  So my assumption is

10  that -- and this is an assumption.

11  Q.   That's okay.

12  A.   That Mr. Didani was asked for his password and he provided

13  it.

14  Q.   Do you recall were you looking through the BlackBerry or

15  the iPhone, if you recall?

16  A.   I don't recall.

17  Q.   A PIN.  You said PIN.  That could be either -- I just

18  associate that with the old BlackBerrys, but you could mean

19  that to be iPhone, too, for all you know?

20  A.   A passport to get into a phone.

21  Q.   Pass code or PIN.  Understood.  And you don't recall how

22  much of the other parts of the phone that you looked at?

23  A.   I don't.

24  Q.   But you stated on direct examination whatever you recall

25  today you were pretty certain that you saw evidence of

1    criminality; correct?

2    A.   Possibly, yes.

3    Q.   Something concerned you; right?

4    A.   Yes.

5    Q.   So much so that you locked the phone; right?

6    A.   I don't know if I locked it.

7    Q.   Turned it off?

8    A.   I don't recall.

9    Q.   Did the screen go from lit to not lit?

10   A.   I don't recall.

11   Q.   So much so that you stopped looking at it; correct?

12   A.   Yes.

13   Q.   So much so that you sent it about 300 miles to Detroit;

14   correct?

15   A.   I shipped if off to Detroit, yes.

16   Q.   So what was the purpose of looking through the phone that

17   afternoon?

18   A.   The purpose of looking through the phone initially is

19   because at the time I didn't need reasonable suspicion to go

20   through any phone.  But based on what was found in his luggage,

21   you know, he was attempting to bring in something that's

22   prohibited to the United States.  So we were looking further

23   into that.

24   Q.   Okay.  So it's your position and your understanding that at

25   the time -- even before the HGH, you don't need reasonable

Monday, April 24, 2023

1   suspicion or anything to go through that phone?  That's your

2   understanding?

3   A.   My understanding was at that time that was correct.

4   Q.   Regardless of the HGH; right?

5   A.   Correct.

6   Q.   Now we have the HGH, and it's your position that not only

7   do I have the right to do this at the border, but now I have

8   evidence of physical contraband in his baggage; correct?

9   A.   Can you say that again, please?

10  Q.   Sure.  I'm making sure I understand your thought process.

11  You indicated to me first that it was your belief that you

12  don't need reasonable suspicion, period, to go through

13  someone's phone at the border; right?  That's your overarching

14  belief; correct?

15  A.   Correct.

16  Q.   Okay.  But in this case not only do we have that

17  background, but also you had actual contraband that was found

18  in his baggage; correct?

19  A.   Correct.

20  Q.   So that in your mind justified further intrusion into his

21  phone as well; right?

22  A.   Yeah.

23  Q.   Okay.  To look for what?

24  A.   To look for evidence of a crime, to look for --

25  Q.   Of what crime?

1   A.   I would say a crime related to drug smuggling or drug

2   distribution.   He was under investigation I was told for either

3   drug smuggling or drug distribution.   He came through the

4   airport, he had prohibited items, and based on the totality of

5   the circumstances I went through his phone.

6            I saw a picture that I thought might be a cargo

7   container with a raised floor with numbers under it that I

8   thought maybe there is going to be -- maybe this is a cargo

9   container with kilos of any kind of drug in it.

10  Q.   So let me understand this correctly, because that was a lot

11  to unpack.   The reason you went through the phone, that was my

12  original question, the reason you went through the phone is

13  because, number one, you don't have to have a reason, but you

14  found narcotics and you had background information from before

15  that this guy was being investigated for some kind of crime.

16  Did I recap that correctly?

17  A.   That is correct.

18  Q.   Okay.   So the reason -- the answer to my original question

19  is for those reasons you decided to go through the phone?

20  A.   Yes.

21  Q.   But then you find evidence allegedly of a crime, a

22  container or living room, and you decide I need to stop now;

23  right?

24  A.   Yes.

25  Q.   Why?

1   A.   I believe at that time -- there's been so many changes to

2   the border search law relating to electronic devices, but if

3   I'm not mistaken I may have been told at some point around then

4   that if you find evidence of a crime that the wise thing to do

5   would be to stop searching, and that's what I did.  I stopped

6   searching, and I sent it up to the investigating agent for them

7   to make a determination on what they wanted to do next.

8   Q.   Thank you for your candor on that point.  Let me ask you,

9   where would you have heard that information that the cautious

10  thing to do is to perhaps take it through the legal process?

11  Where would you have heard that?  From your supervisors, from

12  policy?  What would you have heard it from?

13  A.   If I had heard that before then, it probably would have

14  been from one of our principal legal advisors with our agency.

15  Q.   Well, you had it circling around in your head.  You just

16  shared it with me, right, changes in the law and the safest

17  thing to do?  I mean, that's what you just testified to; right?

18  A.   Yes.

19  Q.   So obviously --

20  A.   Assuming that that was at that time what was in my mind.

21  Q.   Well, that's what I'm asking you, why did you stop, and

22  that's your answer.  So I'm just asking where that information

23  was coming from, and you said perhaps legal counsel; correct?

24  A.   Perhaps, yeah.

25  Q.   Okay.  And this changing area around the law, if you

1    recall, and the training that you may have received or

2    discussion you may have had is because cell phones carry so

3    much information; correct?

4              MR. McDONALD:  Objection, Judge.  He has not laid a

5    proper foundation to ask this witness about the intricacies of

6    the changing border search law and whether this witness would

7    know that to begin with.  So objection, lack of foundation.

8              MR. FINK:  I'm asking something that was offered by

9    this witness and what he was told, what he understands, what

10   the discussions were.  It's very important to a reasonable

11   suspicion analysis as to why the intrusion was done and then

12   stopped.

13             THE COURT:  Now you're asking a broader question than

14   that, and I'm going to allow the question, one, because it

15   follows up on a answer of the witness himself, and also because

16   he was asked whether or not he had an iPhone similar to, or at

17   least in the family of phones that he had, and he might know

18   based on that what the can contained.

19             Your objection is overruled.

20   BY MR. FINK:

21   Q.   To rephrase, Officer -- or, Agent, excuse me, the question

22   was that one of the reasons, was it not, that you were

23   receiving this training and the changes in law, as you said, is

24   because of the tremendous capacity to carry so much data on

25   modern cellular devices; correct?

1  A.   I don't know what the reason was.

2  Q.   So when you say --

3  A.   I don't recall.

4  Q.   So when you say changes in the law and things that were

5  being discussed that was in the back of your mind, you just had

6  a general understanding that I'm to be cautious with how much I

7  should search; is that fair?

8  A.   Yeah, I tend to be cautious.  Yes.

9  Q.   Open the phone and look a little bit and then turn it off?

10 A.   No.  It's open the phone, and if I find evidence of what I

11 suspect to be a crime I stop and then I forward it to the

12 investigating agents to make a determination on what they feel

13 is the proper protocol to follow in terms of continuing a

14 border search or getting a search warrant.

15 Q.   Did you seek any warrants in this case yourself?

16 A.   No, I did not.

17 Q.   Did you solicit a arrest warrant or charges related to the

18 steroid that was found?

19 A.   No.

20 Q.   Did you share any of the information that you saw on the

21 phone with any local law enforcement, your local U.S.

22 Attorney's Office or anyone in Illinois?

23 A.   No.

24 Q.   In fact, you released Mr. Didani with the exception of

25 detaining his cell phones?  He himself was released; correct?

1    A.   I believe he was, yes.

2    Q.   I'm curious as to why if you had evidence of a crime

3    occurring in your jurisdiction that it was your decision just

4    to send the phones to Detroit and wash your hands of it.  Is

5    there a reason why you didn't report the crime occurring in

6    your jurisdiction?

7    A.   I don't believe that the amount of HGH that was found with

8    Mr. Didani would have been prosecuted federally and --

9    Q.   So you used your discretion that you have as an officer on

10   whether to report or seek charges in certain instances; right?

11   A.   Yes.

12   Q.   And the same is true of what you saw in the phone?  You

13   said you saw criminality on the phone, but that you just

14   shipped off to Detroit and didn't say anything locally;

15   correct?

16   A.   I don't think I could charge him with having a picture of

17   what I suspected to be of what it was.

18   Q.   I agree.  Thank you.

19        Just one moment, Agent.  I want to make sure.  I think

20   I'm done.

21        Oh.  There is one more category quickly.  Go back to

22   the beginning of this August 6 day.  Did this come -- did Mr.

23   Didani and the fact that he was being requested for a stop, did

24   that come to your attention that day, on August 6?

25   A.   I can't say for sure, but I believe the request came

1    before, maybe a couple days before he came in.

2    Q.   Typically would it?  Would you get a couple days heads-up?

3    A.   It depended on the agent that is investigating, you know, a

4    person coming through.

5    Q.   Sure.  And the information that you received -- last

6    question, or last category or question -- the information you

7    received from Special Agent Bianchi, what specifically were you

8    aware of before encountering Mr. Didani or detaining his

9    phones?  What were you aware of in terms of the investigation

10   and what it was related to?

11   A.   Like I said before, I was told that Mr. Didani was under

12   investigation for -- I can't recall if it was drug smuggling or

13   drug trafficking, but that's what I remember.

14   Q.   Were there any specifics about what the evidence was in

15   that investigation?

16   A.   I don't recall.

17   Q.   Okay.  In ordinary situations, would you get that detail or

18   would you just be told the general nature of the investigation?

19   A.   Usually it was the general nature of the investigation.

20           MR. FINK:  Okay.  Thank you, Officer.

21           THE COURT:  Anything else of this witness?

22           MR. McDONALD:  Nothing of this witness.  Thank you.

23           THE COURT:  All right.  Very well.

24           Thank you, sir, for coming.  You may step down.

25           (At 4:43 p.m., the witness is excused.)

1          MR. McDONALD:  Your Honor, may the two witnesses who

2     testified after Officer Bianchi be excused?

3          THE COURT:  I thought I already excused the other

4     gentlemen.

5          MR. McDONALD:  May this witness be excused?

6          THE COURT:  Yes.  I just said he could be excused.

7          MR. McDONALD:  Thank you.

8          THE COURT:  And do you have further witnesses?

9          MR. McDONALD:  We have no further witnesses.

10          THE COURT:  Okay.  What about defense?

11          MR. FINK:  Judge, at this time I don't have any

12     witnesses.  If I may propose what we would like to have happen,

13     I would like to get a transcript of today and I would like to

14     further brief a suppression issue.  And I discussed this with

15     the government.  I suspect they'll be in agreement with this

16     proposed plan.

17          Once we've briefed it and you've made a ruling on the

18     suppression issue, if it's favorable to the defense then there

19     would be a need for further evidentiary hearings on what the

20     fruits of that constitutional violation was.  If there is not

21     found to be a constitutional violation, there may be motions to

22     challenge specific warrants in this case, but it would be a

23     entirely different path.  So we were hopeful to get a

24     transcript and brief the issue.

25          As to the other two defense pending motions, there's

1    one on the constitutionality and other due process concerns

2    with the MDLEA.  I think in the same amount of time to write

3    the brief, the supplemental briefs for today, the government

4    and the defense can stipulate to what the evidence is necessary

5    for a determination on that motion.  In other words, I don't

6    think we'll require a hearing.

7            And then as to the final defense motion, because it's

8    on the pleadings on the indictment an evidentiary hearing is

9    not necessary.

10           So all of that to say, Judge, that we would ask for

11   supplemental briefing and a ruling and then we can determine

12   the next steps.

13           THE COURT:  Okay.  What does the government wish to

14   do?

15           MR. BILKOVIC:  No objection, Judge.  The only other

16   thing that we talked about is if the court does grant the

17   request for time for additional briefing.  When we do come back

18   to argue that, I believe that we had discussed that's the point

19   in time we could argue the additional motions as well, because

20   we do not believe that they will require any testimony.

21           MR. FINK:  I agree with that, Judge.  I would like

22   oral argument at least on the MDLEA issue as well.

23           THE COURT:  Okay.  All right.  So you all need another

24   day, is that it?

25           Okay.  You have transcript to get from two different

1    court reporters, so I don't know what date that will be.  So

2    I'll have to have Ms. Saulsberry give you a date.  I'll find

3    out from them how long.  And when you get it how long do you

4    need to brief?

5           MR. FINK:  Once it's in my possession -- I am having a

6    child in two weeks.  So I'm taking a brief paternity leave to

7    help my wife, but once those --

8           THE COURT:  What does that mean?

9           MR. FINK:  That means that -- the reason I'm asking

10   for six weeks --

11          THE COURT:  What does -- oh, okay.  You're asking for

12   six weeks?

13          MR. FINK:  Right.  I didn't want you to think that it

14   would take me that long, but I just have a period in there.

15          THE COURT:  Yeah, I think so.

16          Six weeks is okay with you?

17          MR. BILKOVIC:  That would be fine, your Honor.

18          THE COURT:  Okay.  So six weeks from now or from when

19   you get the transcript?

20          MR. FINK:  I was saying from now.

21          THE COURT:  Okay.  Let's take it from now.  If you

22   don't get the transcript fairly expeditiously, you can come

23   back and stipulate how much more time you need.

24          What's six weeks from now?

25          LAW CLERK:  June 5th.

Monday, April 24, 2023

```
 1                THE COURT:  Is that six weeks from now?  Give us a
 2      week to like look at it.
 3                LAW CLERK:  Yeah.  Six weeks is June 5th.
 4                MR. FINK:  What was it?
 5                THE COURT:  June 5th you need to file your
 6      supplementals.
 7                And then they want to come back.  Let's give them a
 8      day to come back.
 9                You can file those supplementals both at the same
10      time; right?
11                MR. BILKOVIC:  Yes, your Honor.
12                MR. FINK:  Yes.
13                THE COURT:  Okay.  And then come for argument.
14                When can they come for argument?
15                (A brief discussion was held off the record.)
16                THE COURT:  Okay.  The 26th.  We're going to do it
17      June 26th.
18                Do you want to come in the afternoon or the morning?
19                MR. FINK:  Judge, on June 26th I have a murder trial
20      that actually is going in Oakland County Circuit Court.  If I
21      can do -- it will probably be jury selection late afternoon I
22      can maybe make it, but ...
23                THE COURT:  What about the 27th?
24                MR. FINK:  I presume I'll be in trial.
25                THE COURT:  How long will you be in trial?
```

```
 1              MR. FINK:  That's only probably a three-day.
 2              THE COURT:  How many days?
 3              MR. FINK:  Three.  Three days.
 4              THE COURT:  Okay.  So they have to come after.
 5              MR. FINK:  So the 29th or later?
 6              THE COURT:  No, you can't.
 7              They have to come after July 9th then.
 8              LAW CLERK:  Right.
 9              THE COURT:  Okay.
10              LAW CLERK:  July 12th.
11              THE COURT:  July 12th?
12              LAW CLERK:  Yes.
13              THE COURT:  And what time?
14              LAW CLERK:  Two o'clock.
15              THE COURT:  Two o'clock.
16              Are you going to take more than three hours?
17              MR. BILKOVIC:  No.
18              MR. FINK:  No.
19              THE COURT:  Okay.  Two o'clock on July 12th, okay.
20              MR. FINK:  July 12th, 2 p.m. for arguments, Judge;
21    correct?
22              THE COURT:  Right, um-hmm.
23              MR. FINK:  Your Honor, the other thing is -- and this
24    is -- I'm raising this for purposes of my client, and this
25    might need to be briefed.  My client wishes to subpoena the
```

 1    commander who signed the consent forms for jurisdiction in the

 2    United States.  As his attorney, my advice has been, in my

 3    reading of the law as well as my expert witness, that we do not

 4    have standing to challenge the adequacy of the certification

 5    documents.  My client feels, however, that given the statements

 6    that were made in those documents and the dates of when consent

 7    was given it's necessary to cross-examine the commander on

 8    whether or not he actually could receive the consent given the

 9    timing of his appointment.

10          It's my belief under case law we don't have standing

11    to challenge if they're conclusively proven, but my client is

12    insisting that I raise that issue with you.  If you'd like me

13    to brief his position, I can do that, but I just wanted the

14    court --

15          THE COURT:  It's up to you, but you can't raise it

16    orally.  You have to --

17          MR. FINK:  I just want the court to be clear on that

18    dynamic here.

19          THE COURT:  That's okay, but you can't -- there has to

20    be some case law in it and everything like that.

21          MR. FINK:  Sure.

22          THE COURT:  So if you want to raise it you're going to

23    have to raise it in a motion.

24          MR. FINK:  I understand.

25          MR. BILKOVIC:  Your Honor, I do have one question.

Monday, April 24, 2023

1     Does the court want the exhibits or do you want us to take

2     custody of them and resubmit them with our --

3               THE COURT:  No, I want them.  I want the exhibits.

4               You have your own copy, don't you?

5               MR. BILKOVIC:  Not my own copy, but I wrote down what

6     they were so I know what they are.

7               THE COURT:  So can you leave them with us?

8               MR. BILKOVIC:  I can leave them with you.

9               THE COURT:  What about your exhibits?  Did you give me

10    all of them?

11              MR. BILKOVIC:  Your Honor, may I approach the witness

12    stand to see if our other two exhibits are up there?

13              THE COURT:  Yes, you may.

14              MR. BILKOVIC:  Thank you.

15              THE COURT:  I have Defendant's 1.

16              MR. FINK:  Thank you, Judge.  I'm going to approach

17    with our exhibits; okay?

18              THE COURT:  Okay.  That's fine.

19              MR. FINK:  You might have 1 already.

20              THE COURT:  I have Defendant's 1 already.

21              MR. FINK:  Here's 2 and 3.

22              MR. BILKOVIC:  And here are the government's 1 through

23    9 and 11.  I don't believe we admitted 10.

24              THE COURT:  Okay.  I'll take those.

25              MR. FINK:  This is Defendant's 1.

```
 1              THE COURT:  I have Defendant's 1.
 2              MR. FINK:  Well, fine.  I'll take it.
 3              THE COURT:  I think I have Defendant's 1 in there.
 4              MR. FINK:  She doesn't have Defendant's 1.
 5              THE COURT:  You don't think so?
 6              MR. FINK:  Because I have the tag on it.
 7              THE COURT:  I know, but I marked one.  You gave me one
 8    and I think I marked it.
 9              MR. FINK:  Well now you have a prettier copy that's in
10    color.
11              THE COURT:  All right.  Anything else that you need to
12    give me?
13              MR. BILKOVIC:  No, your Honor.  Thank you for your
14    patience and giving us the time for today's hearing.
15              THE COURT:  Okay.  All right.  Very good.
16              MR. BILKOVIC:  It was very helpful that we were able
17    to do all the testimony in one day.  Thank you so much.
18              THE COURT:  Okay.  No problem.
19              Now, Mr. Fink, do you have anything else?
20              MR. FINK:  Judge, I do not have anything else at this
21    time, no.
22              THE COURT:  All right.  I don't think it's
23    unreasonable, because it is a different kind of issue that
24    doesn't ordinarily come up.  So if it wasn't an issue that
25    ordinarily arose -- if it was an issue that ordinarily arose, I
```

1    would just let you make an oral motion, but because it's not I

2    think that you need to give me a brief.

3              MR. FINK:  I totally understand.

4              THE COURT:  Okay.  Anything else?

5              MR. BILKOVIC:  No, your Honor.

6              THE COURT:  Okay.

7              MR. BILKOVIC:  Have a good night.

8              THE COURT:  Thank you very much.

9              (The proceedings were adjourned at 4:53 p.m.)

10                            —   —   —

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      CERTIFICATE OF COURT REPORTERS

4

5          We certify that the foregoing pages is a correct

6   transcription of the record of proceedings in the

7   above-entitled matter.

8
                              **s/Sheri K. Ward**_____
9                             Sheri K. Ward,
                              Federal Official Court Reporter
10                            United States District Court
                              Eastern District of Michigan
11

12                            _**s/Sheila D. Rice**_____
                              Sheila D. Rice
13                            Federal Official Court Reporter
                              United States District Court
14                            Eastern District of Michigan

15
    Date:  05/11/2023
16  Detroit, Michigan.

17

18

19

20

21

22

23

24

25