**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

— — —

UNITED STATES OF AMERICA,

        Plaintiff,

  v.                       Case No. 21-20264

YLLI DIDANI,

        Defendant.
_____/

**PRETRIAL CONFERENCE**
**BEFORE THE HONORABLE DENISE PAGE HOOD**
**UNITED STATES DISTRICT JUDGE**

Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Wednesday, October 9, 2024

**APPEARANCES:**

**For the Plaintiff:**     Mark Bilkovic
                          Timothy P. McDonald
                          UNITED STATES ATTORNEY'S OFFICE
                          211 W. Fort Street, Suite 2001
                          Detroit, Michigan  48226
                          (313) 226-9623
                          (313) 226-0221

**For the Defendant:**    Wade Fink
                          WADE FINK LAW, P.C.
                          550 W. Merrill Street, Suite 100
                          Birmingham, Michigan  48009
                          (248) 712-1054

*To obtain a copy of this official transcript, contact:*
*Sheila D. Rice  Official Court Reporter*
*(313) 234-2610 • sheila_rice@mied.uscourts.gov*

**TABLE OF CONTENTS**

MATTER_____PAGE

**<u>PRETRIAL CONFERENCE</u>**
Proceedings........................................   3

Certificate of Court Reporter.....................  66

Detroit, Michigan

Wednesday, October 9, 2024

1:56 p.m.

_   _   _

THE CLERK:  All rise.

The United States District Court for the Eastern District of Michigan is now in session, the Honorable Denise Page Hood presiding.  You may be seated.

The Court calls Case Number 21-20264, United States of America versus Ylli Didani.

Appearances, please.

MR. BILKOVIC:  Good afternoon, your Honor.  Mark Bilkovic and Timothy McDonald on behalf of the United States.

THE COURT:  How are you?

MR. BILKOVIC:  I'm okay, Judge.  How are you?

THE COURT:  I'm fine.  Nice to see you both, and you may be seated.

Mr. Didani first.

DEFENDANT:  Ylli Didani.  Good afternoon, your Honor.

THE COURT:  Good afternoon to you, too.  You're representing yourself right now.

DEFENDANT:  And Wade Fink is the standby attorney, your Honor.

THE COURT:  Okay.  Thank you, and he's present.  You may be seated, too.  Good afternoon.  It's nice to see you.

DEFENDANT: Nice to see you, your Honor.

THE COURT: Okay. I should first say -- I have a list of things I want to go over, but first I should say is that I received -- let's see, a few documents. One is the Government's -- where did I put that?

I received the Government's motion from 9-25 asking to adjourn the trial 90 to 120 days listing a number of reasons. And then filed today, I don't know what time -- maybe I should ask them if they would affix the time at the top so I could tell if I should have read it by the time I get here, but --

MR. FINK: They should not have.

THE COURT: Okay. I have the standby counsel's motion to adjourn trial, response to the Government's motion to adjourn trial. And then I have a document. Mr. Didani, it's from you, but I don't think it's filed.

Do you think it's filed?

DEFENDANT: Your Honor, you know, I just give it to my standby counsel, because --

THE COURT: But you know that your standby counsel is not required to do your filings for you. I told you that before.

DEFENDANT: Right, your Honor. It was a miscommunication, because it said that -- I had no idea the Government had filed a motion to adjourn the trial.

THE COURT: Well, why don't you have that?

You didn't serve one on him?

DEFENDANT:  They send it --

THE COURT:  Excuse me one second.  Let me ask the Government.

Did you send one to him?

MR. BILKOVIC:  Yes, we did.

THE COURT:  To him at his --

MR. BILKOVIC:  At Milan.

THE COURT:  Okay.  You didn't get anything at Milan?

DEFENDANT:  Yes, I did.  I got it late, your Honor.

THE COURT:  I know you don't expect me to see that from here, do you?

DEFENDANT:  It was a few days ago, your Honor, I got it, you know, and --

THE COURT:  Three days ago, okay.  So then you asked Mr. Fink to file this for you?

DEFENDANT:  No.  I did that really quick by myself, your Honor.

THE COURT:  You what?

DEFENDANT:  I did that by myself really very quick.

THE COURT:  Did what by yourself?

DEFENDANT:  The response -- objection.

THE COURT:  I know, and did you file it with the clerk's office?

DEFENDANT:  No, I haven't filed it yet, your Honor.

THE COURT:  You know, you have to file it for it to get to me and for the other side to see it and all that kind of stuff, okay.  I have it.  I just -- it doesn't help me to have this --

DEFENDANT:  Please, your Honor, consider that.  You know, I will file it.

THE COURT:  Less than half a day before I'm going to be out here.

DEFENDANT:  I'm asking you to consider that, your Honor.

THE COURT:  Okay.  So you know it's your responsibility, unless you ask the standby counsel and they agree, but it's your responsibility, okay.

Didn't I make all that clear before?

DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  All right.  Well, I have those three things then, but let's start where I think --

Well, first of all, Mr. Fink, are you going to file this for Mr. Didani?

MR. FINK:  I received it this morning, Judge, and I told Ms. Saulsberry I will take it upstairs to the clerk's office and file it, and I -- as Mr. Didani figures out how to be pro se counsel, I have to ask for some latitude in hopefully considering that --

THE COURT:  I'm giving that to him, but, you know,

he's got to be able to do these things himself. I can't continually give him the opportunity to do this at this kind of hour.

MR. FINK: I will help, Judge, facilitate between the clerk's office and Mr. Didani on the Court's behalf as well to make sure he has the ability to do that.

THE COURT: All right. Okay. We had a status conference, and at that status conference back in September I ruled that Mr. Didani could represent himself and I appointed standby counsel, and then I scheduled this status conference for a couple reasons. One is to see if Mr. Didani, having looked at the discovery, still wanted to represent himself, and to obtain a different standby counsel. And it's my understanding that there was some discussion with the Federal Community Defender between themselves and Mr. Fink and somebody else; is that right?

MR. FINK: That's accurate, your Honor.

THE COURT: Okay. And you're aware of that; right, Mr. Didani?

DEFENDANT: Yes, your Honor.

THE COURT: Okay. The Federal Community Defender appoints the counsel. And so since I had appointed Mr. Fink I think they thought they should check with whoever they thought might be appointed and Mr. Fink to see who could be most up to speed. And since he's with you I assume that he's continuing

as standby counsel; is that correct?

DEFENDANT:  Your Honor --

THE COURT:  This is a easy question.  Is it correct or not?

DEFENDANT:  Well, for the moment it's correct, your Honor, but we have a --

THE COURT:  Okay.  "For the moment" is good enough for now.

DEFENDANT:  Okay.

THE COURT:  And so now I have a motion to continue the trial date 90 to 100 days -- 120 days from the Government, and then I have all these discovery issues.  And so I need to know what is the status of the discovery?

And let me hear first from the Government.

MR. BILKOVIC:  Your Honor, I might have Mr. McDonald step in on some of this, because he's been responsible for the discovery while I've been preparing for my other trial.  But it's my understanding that all the materials that we mentioned in here, the discovery materials, we've got them on the hard drive.  We got them to Mr. Fink, and I believe that was on September 24th.  We had them ready basically as far back as August 1st, but then when Mr. Fink withdrew, filed a motion to withdraw, he didn't pick them up.  So then we got them back at the last court hearing.  We went through them, prepared them again for Mr. Fink.  Mr. Fink retrieved those.  And then we

received an E-mail, I believe, from Mr. Fink that he had mailed the discovery to Mr. Didani on September 24th.

THE COURT:  Okay.  And now did you receive that?

DEFENDANT:  Yes, your Honor, I received the discovery.

THE COURT:  Okay.  And so, Mr. McDonald, does he have all the discovery?

MR. McDONALD:  Other than Jencks information, he has all of the discovery.

THE COURT:  Okay.  When are you going to provide that?

MR. BILKOVIC:  The Jencks material?

THE COURT:  Yes.

MR. BILKOVIC:  The law enforcement, more in advance of trial, but the protective order we have right now for the non-law enforcement we cannot -- no longer utilize that protective order, because Mr. Fink is no longer representing him.  So we would basically -- depending on the protective order that's in place, we would work out a time period to provide him the non-law enforcement Jencks at least 14 days and as many as 30 days prior to trial.

THE COURT:  Okay.

MR. BILKOVIC:  But to do that we have to have a protective order in place.

THE COURT:  And what about the law enforcement Jencks material?

MR. BILKOVIC:  Law enforcement Jencks material we'll

provide 30 days prior to trial.

THE COURT:  I want the other provided 30 days prior to trial, too, since he's representing himself.

Do you have any objection to that?

MR. BILKOVIC:  As long as the protective order is in place.

THE COURT:  Okay.  And so you need to have a protective order with Mr. Didani?

MR. BILKOVIC:  Yes.

THE COURT:  And do you have one that you've offered to him?

MR. BILKOVIC:  We have one that we filed previously, but it's no longer valid and --

THE COURT:  No, I know that, but do you have a new one that you want him to look at to see whether or not he'll agree to it?

MR. BILKOVIC:  No, but we could have one to him this week.

THE COURT:  Okay.  I'd like you to do that this week, and provide a copy to Mr. Fink.  And then I'd like you all to have --

Mr. Didani, can you have a phone conference?  You're at Milan; right?

DEFENDANT:  Yes, your Honor.

THE COURT:  Can you have a phone conference with the

Government?

DEFENDANT:  Yeah, I can have a phone conference.

THE COURT:  Can you set that up, Mr. McDonald, so you can have a phone conference to discuss what the limitations of it would be?

MR. McDONALD:  Yes, your Honor.

THE COURT:  Okay.  You can set that up and include Mr. Didani and Mr. Fink?

MR. McDONALD:  Yes, your Honor.

Is there a timeframe in which the Court wants that?

THE COURT:  You're going to get it to him Friday, which means he probably won't get it Friday; right?  It just has not been my experience that that much happens on Friday, but what do you think?

MR. FINK:  I'm sorry to interrupt, Judge.  Seven to ten days has been by experience getting mail from clients from Milan.

THE COURT:  Okay.

MR. McDONALD:  I guess that would be --

THE COURT:  No, I don't think Mr. Didani -- you don't need more than a week to look at it; right?

DEFENDANT:  No, your Honor.  I -- the new discovery I have right now went through --

THE COURT:  Not the discovery.  The protective order.

MR. FINK:  When we send you something to read, you can

read it quickly?

DEFENDANT:  Yes, I can read it quickly.

THE COURT:  Okay.  Let's do it faster than that.  So if you mail it out Friday --

Do you already have it ready?

MR. BILKOVIC:  No, but it will be some tweaking the other one, so it won't take us long to do.

THE COURT:  Okay.  So Friday is the 11th -- no.

THE CLERK:  Yes, it is.

THE COURT:  The 11th.  So you're going to mail it out then.  Let's assume that it gets there the following Friday, which will be the 18th.  And then the next Friday can you have a conference?

MR. BILKOVIC:  The 25th, your Honor?

THE COURT:  Yes.  Can you do that?

MR. BILKOVIC:  Yes, your Honor.

THE COURT:  Okay.  All right.  So they're going to send you a protective order.

Mr. McDonald, you can help me with what it's going to say, but basically it's going to say who can look at the material that you're going to give him and besides him, if anyone.  I think it probably should include his standby counsel.  And who he's prohibited from providing the material to.

Is that basically what it's going to say?

MR. McDONALD:  Yes, your Honor.

THE COURT:  Okay.  Do you understand that, Mr. Didani?

DEFENDANT:  Yes.  Yes, your Honor.

THE COURT:  That means they're probably going to tell you you can't share it with a whole lot of people; okay?

DEFENDANT:  Of course, your Honor.

THE COURT:  Okay.  All right.  So that will be October 25th.

Ms. Saulsberry, you're keeping a little tab of this; right?

THE CLERK:  Yes, I am.

THE COURT:  Okay.  And all the discovery, except the Jencks materials, are to him; right?

MR. BILKOVIC:  With one caveat.  We brought it up in the last motion.  There was the --

And, your Honor, would the Court have an objection to me sitting?  I've thrown my back out like twice in the last couple of weeks.

THE COURT:  You what?

MR. BILKOVIC:  Does the court have any objection to me sitting?

THE COURT:  No, but you have to use the microphone, and I'm sorry you've been throwing your back out.

MR. BILKOVIC:  Your Honor, there was the outstanding MLAT material that we had from overseas that we were being told

they would not give us because of a pending trial.  We received an E-mail this Monday that that trial is concluded.  They are now in a position to share that evidence with us.  We expect to have that evidence in the next few weeks, and as soon as we get it, within seven days of receiving it, we'll redact whatever relevant -- or irrelevant portions are not required.  We'll review it and we'll make sure that Mr. Didani gets that.  If need be, we'll hand deliver it to him within seven days of receiving it.  We can actually drive that to Milan.

THE COURT:  Okay.  But this is kind of a -- we should receive it in seven to ten days from today?

MR. BILKOVIC:  We expect that we'll have it in two to three weeks.

THE COURT:  Why is it taking that long?  This is like --

MR. BILKOVIC:  Because it's a foreign country that's getting it to us.  We don't --

THE COURT:  But what foreign country is it?

MR. BILKOVIC:  It's United Kingdom.

THE COURT:  So they have the internet.  They don't want to do it over the internet?

MR. BILKOVIC:  I don't know why they are requiring two to three weeks to get it to us.

THE COURT:  I don't either.

MR. BILKOVIC:  I think it's --

THE COURT:  You find that out.  It's too long.  If they're done with trial, why wouldn't they just be able to put it in a box and have it scanned and sent to you, or put it on one of the express services?

MR. BILKOVIC:  We will make that request.

THE COURT:  Okay.  But you think it's two to three weeks.  That's way too long, but okay.

MR. BILKOVIC:  Let's go two weeks.  Even if that's too long, we will do what we can do to get it within the next two weeks.

THE COURT:  Okay.  So that would be the 25th, and then he'd have it the week after that, which would be the 1st; right?

MR. BILKOVIC:  Correct.

THE COURT:  Okay.  And that's all the discovery stuff except the Jencks material?

MR. BILKOVIC:  Correct.

THE COURT:  Okay.  All right.  And that's all the discovery then?

MR. BILKOVIC:  Yes.

THE COURT:  Okay.  So we totally will have all the discovery to him by November 1st; is that right?

MR. BILKOVIC:  Yes, your Honor.

THE COURT:  Okay.  What about your witnesses?

You know, I understand all this two-step process and

everything, but how long do you think it would take you to get your witnesses here?

MR. BILKOVIC:  I will state, your Honor, I will guess the overseas witnesses are going to require approximately 60 days.

THE COURT:  Okay.  So that means you haven't done anything to get them here for November 5th; right?

MR. BILKOVIC:  Correct.

THE COURT:  Don't you think you should have done that?

MR. BILKOVIC:  Your Honor, there's a couple of reasons why we didn't do that.

THE COURT:  I know there are reasons why, but I just think that probably you should have maybe decided that I was going to do something different and say you had to start on November 5th.

MR. BILKOVIC:  And, your Honor, if the Court does that, we will deal with what we need to deal with.

THE COURT:  All right.  So give me a better answer than that.

MR. BILKOVIC:  Your Honor --

THE COURT:  Because if you're saying we'll deal with what we have to deal with, okay, it means to me that you could get them here in less than 60 days.

MR. BILKOVIC:  No.  It means that we would not be able to have them at trial.  What I'm saying is when Mr. Fink filed

a motion to withdraw we basically made a calculation, and we know it's up to the Court, but when Mr. Fink filed a motion to withdraw and did not pick up the discovery that we had available on August 1st, we took that as there is no way that new counsel or Mr. Didani would be ready effectively to try this case by November 5th.

So instead of going through the steps of doing this twice we did not make attempts to secure the foreign country witnesses for November 5th.  And, if the Court orders us to go to trial on November 5th, we will procure as many witnesses as we can.  We will not be able to procure the foreign witnesses, but we will -- if the Court orders --

THE COURT:  How many foreign witnesses do you have?  I don't mean to cut you off.

MR. BILKOVIC:  I understand.  I don't mean to push back.  I just want to let the Court know it's not --

THE COURT:  No, but you are pushing back.  That's why I feel I can --

MR. BILKOVIC:  Approximately ten to 12 foreign witnesses.  In that matter, we believe that would have been less had Mr. Fink stayed on the case, because we do believe, based on discussions, that there would have been stipulations to some of those witnesses, which we no longer think there are going to be.

THE COURT:  But have you offered them?

MR. BILKOVIC:  Pardon me?

THE COURT:  Have you offered them?

MR. BILKOVIC:  We discussed them throughout, like things that we would meet and stipulate.  Like stipulating to toxicology reports, that was not necessarily going to be an issue when Mr. Fink was on the --

THE COURT:  But how do you know it's an issue with Mr. Didani?

MR. BILKOVIC:  I mean, I think Mr. Fink put it in his motion today that that's going to be an issue.

THE COURT:  It might be.  I agree that it might be.

Now, tell me this.  Have you offered any of the stipulations to Mr. Didani representing himself?

MR. BILKOVIC:  No, we have not, but we can do that.

THE COURT:  Please do that.  Can you do that by Friday?

And the same, whatever you're sending him on this Friday, include that.  And then you can also talk about that on October 25th; right?

MR. BILKOVIC:  Yes, your Honor.

THE COURT:  Okay.  And then you can tell me that you only need some other number of foreign witnesses; right?

MR. BILKOVIC:  Possibly.  Hopefully.

THE COURT:  Are any of them like not toxicology --

MR. BILKOVIC:  Yes.  There are law enforcement

witnesses and there are civilian witnesses.

THE COURT:  Okay.  Tell me how many of those there are?

MR. BILKOVIC:  Law enforcement witnesses, approximately five.  Mr. McDonald says five to ten.  I think we could probably deal with closer to five.  Plus, the toxicology witnesses --

THE COURT:  No, don't count them.  Count the other people.

MR. BILKOVIC:  Okay.  Approximately five.

THE COURT:  And those are ...

MR. BILKOVIC:  Law enforcement witnesses.

THE COURT:  You said that.  Now, the five law enforcement and five civilians?

MR. BILKOVIC:  Actually, six law enforcement.  Mr. McDonald reminded me of one other item.  So six law enforcement.

THE COURT:  And any others?  All the rest are toxicology?

MR. BILKOVIC:  No.  Civilian witnesses as well.

THE COURT:  How many civilians?

MR. BILKOVIC:  Approximately four.

THE COURT:  Four?

MR. BILKOVIC:  Yes.

THE COURT:  Okay.  All right.  Tell me what's in the

Jencks material, just generally?  Like how much is it?

MR. BILKOVIC:  The Jencks material consists of basically law enforcement witness statements regarding seizures, regarding the investigation that law enforcement did, witnesses they talked to.

And then Jencks material consists of civilian witnesses that are both unindicted co-conspirators of Mr. Didani as well as people that Mr. Didani was dealing -- was in communication with in this case that are not necessarily unindicted co-conspirators, but assisted him in doing things with respect to his plans.

THE COURT:  All right.  Do you know what an unindicted co-conspirator is, Mr. Didani?

DEFENDANT:  Of course, your Honor.

THE COURT:  What is it?

DEFENDANT:  If I -- I would like to have at least, you know, the --

THE COURT:  No, no.  Do you know --

DEFENDANT:  Yes.  Yes, I -- yes.

THE COURT:  Do you know what question I'm going to ask?  Because part of my job is to make a good record.

DEFENDANT:  Yes, your Honor.

THE COURT:  And, if you jump because you think you know what my question is, then you answer, but there's no record of what my question was, okay.  So let me get my

question out, then you answer; all right?

DEFENDANT:  Okay.

THE COURT:  Okay.  Do you know what an unindicted co-conspirator is?

DEFENDANT:  Yes, your Honor.

THE COURT:  What is it?

DEFENDANT:  Someone who probably -- allegedly conspired with me to -- furthermore to the conspiracy.

THE COURT:  And what?  Was not indicted?

DEFENDANT:  And is not indicted, your Honor.

THE COURT:  Okay.  Great.  All right.  So now you know there are approximately how many of those statements altogether?

MR. BILKOVIC:  Of law enforcement or unindicted co-conspirators?

THE COURT:  All of them altogether.  How many statements?  They're from what, one to five pages, one to ten pages?

MR. BILKOVIC:  There are some that are longer than others.  There are some that are lengthy, and there are some that are a few pages long.

THE COURT:  Okay.  Are there any more than ten pages?

MR. BILKOVIC:  With Grand Jury material, yes, but not -- I would say probably two to three that would be in excess of ten pages.

THE COURT:  Okay.  And the rest of them are less than ten pages?

MR. BILKOVIC:  Ten pages.

THE COURT:  And they're how many of them altogether?

MR. BILKOVIC:  Probably 20 to 30.  And I'm trying to think in going through here as what would qualify as Jencks.  I mean, all the law enforcement would qualify as the witnesses we're going to have testify.

THE COURT:  Okay.  How many hours would it take you, Mr. Fink, to look at those?

MR. FINK:  Just the Jencks material?

THE COURT:  Yes.

MR. FINK:  Twenty to 30, ten pages each, and then --

THE COURT:  No, no, not ten pages each.  They're only two or three that are ten pages or more.  The rest of them are regular Jencks material, which is what, one to five pages?

MR. FINK:  Sounds like I can do that very quickly.

THE COURT:  You guys are great.  I love "very quickly, lengthy," and all that, but you all know I'm looking for something much more precise.

MR. FINK:  Days, maybe not even plural.

THE COURT:  Okay.  All right.  Good.  Okay.  Do I need to have you argue about your motions?

MR. BILKOVIC:  Your Honor, unless the Court has questions, I would like to just make a couple of statements and

then --

THE COURT:  Okay.  I do have a question about the Government's.  Has this trial before Judge Berg been set before?

MR. BILKOVIC:  We had -- no, this is the first.

Has it been set before?  Yes.

THE COURT:  It's been set before for trial; right?

MR. BILKOVIC:  Yes.  And that defendant has been in custody for, I think, four or five years on this case.

THE COURT:  Okay.  And how many times has it been set before?

MR. BILKOVIC:  I think we adjourned it.  I would have to go back and look.  I want to say it's been adjourned approximately three times.  And the last time we adjourned it I believe we scheduled the date in February, because we wanted to make sure that we had a firm date.  So we set enough time out to allow that.

THE COURT:  Did you have a plea cutoff?

MR. BILKOVIC:  We had a final jury pretrial today.

THE COURT:  And was that also the plea cutoff?

MR. BILKOVIC:  Yes.  The plea cutoff, I think, is passed.  We're planning on starting next Wednesday at nine o'clock in the morning.

THE COURT:  Next Wednesday you're going to start the trial for February?

MR. BILKOVIC:  No.  I'm saying it was scheduled -- the last time we adjourned it we decided on the October 16th date back in February.

THE COURT:  All right.  And it's going to take how many weeks?

MR. BILKOVIC:  Approximately -- because Judge Berg informed us today that he's gone for two days.  So we think it's going to take all total with jury deliberations approximately two weeks.

THE COURT:  Okay.  All right.  What do you want to add?

MR. BILKOVIC:  Your Honor, the only thing -- should I come to the podium?

THE COURT:  If you'd like, but you told me you wanted to be seated so --

MR. BILKOVIC:  I would prefer to.  Thank you.

THE COURT:  But I did say you can be seated, but you have to use the mic.

MR. BILKOVIC:  Okay.

THE COURT:  Okay.

MR. BILKOVIC:  Your Honor, I just want to make sure the Court -- you know, I've never tried a case in front of this Court.  I haven't had many cases in front of the this Court.

THE COURT:  Mr. McDonald, have you?

MR. McDONALD:  No, your Honor.

THE COURT:  Which one?

MR. McDONALD:  I have not.

THE COURT:  You have not tried one?

MR. McDONALD:  No.  No, your Honor.

MR. BILKOVIC:  I don't make a habit of filing motions to adjourn trials.  Generally if I am involved in a case and it gets adjourned it's because there's a stipulation amongst the parties.

So I did not take the decision to file this lightly.  This case has had a very long path.  But a lot of the adjournments, most of the adjournments, are not due to us.  There have been several motions that have been filed by the defense.  Those motions took time.  There have been at least -- there have been three attorneys now, including Mr. Fink, that have been representing the defendant that have filed motions to withdraw.  There have been multiple hearings in this case that have taken time.  This case has a lot of complex issues.

And while Mr. Didani, you know, at the last hearing says I don't need to look at this stuff, it's all duplicative, it is not.  And I think the last thing that anybody wants to do is have to try this case again.

So while we cannot force Mr. Didani to review the discovery that we're giving him, we do want to make sure that he has enough time to do that.  And having this trial on November 5th with Mr. Didani only receiving all of that

information September 24th, it is humanly impossible for him to review all of that information.

One of the reasons that we wanted this adjournment is to allow him the time to go through it, allow him, if he gives him permission, time for us to basically either meet with him or meet with Mr. Fink and kind of zero them in on the items that we believe are important for them to review so they can focus on those items.

We also want to make sure that Mr. Didani has the opportunity to fully explore with us, and he can say no, but we're planning on presenting a formal Rule 11 plea offer to him.  We want to have time for him to do that.

And I understand this case has taken a long time to get to where we are at, but realistically this is the first time that we have filed a motion requesting an adjournment.  We believe that there are multiple reasons for that.

And I can tell the Court right now, if the Court does grant the motion, we will not come back and say we need more time, we will not come back and say witnesses are not available, because if the Court gives us the time that we need, if we're not able to produce those witnesses by then, then that falls on us and we're willing to accept that.  But, more importantly, if gives Mr. Didani the opportunity to have to review all the material that is against him, look at the law that we are prosecuting him under, so he later cannot say,

look, I didn't have the time, I didn't realize this stuff was that much.

So for all of those reasons -- and again, I don't make this lightly, Judge.  I know that you have not have cases with me that have gone to trial, but we put a lot of time and thought as to whether we should file this motion.  And we believe that this is the best course of action based on the uniqueness of this case and the history of this case.

THE COURT:  Counsel, I hope my reputation is not that I don't believe attorneys when they speak as officers of the court in front of me, or that I judge somebody's motion to adjourn by the number of times they themselves have filed one or the number of times that their office has filed one, but on the basis of what is actually in their motion.

MR. BILKOVIC:  And I didn't --

THE COURT:  I'm just letting you know, I hope your office doesn't think that I'm --

MR. BILKOVIC:  No, and that's not -- that's actually not what I'm saying.  I guess what I'm trying to say is I would not be surprised if there are attorneys that file motions requesting adjournments because they just are not willing or, you know, excited about trying a case.  I don't want the Court, not having a history with me, to think that that is the case.  We put a lot of time and thought into this.  I just -- please do not take it that way.

THE COURT:  I don't have it.  I don't have it.  I'm just letting you know --

MR. BILKOVIC:  Okay.

THE COURT:  -- that I would not presume that you're filing a motion frivolously.

MR. BILKOVIC:  Thank you, your Honor.

THE COURT:  Okay.

MR. FINK:  Me, too.

THE COURT:  Have you ever had a case before me all the way to trial, Mr. Fink?

MR. FINK:  I have not, your Honor.  I've had cases with you, but not through trial.

THE COURT:  I don't assume that you would file something frivolously either.

MR. FINK:  Thank you.

THE COURT:  That doesn't mean I won't think that in the future, but I don't think that about either side now, nor do I think that about Mr. Didani.  He has, since the time that he first appeared before me, said he was ready to go to trial, even though he did not have his lawyers here that were his main lawyers or any of that.

So, anyway, I think we should hear from you, Mr. Fink, next, because Mr. Didani needs to respond both to the Government's request and your kind of request that you, as standby counsel, should be here, and that you also have reasons

not to be ready.

MR. FINK:  I appreciate that, Judge.  I think that's probably the right order.

I will say the threshold issue I think the Government raises in their motion, which I think is an important one and I think the Court should address, and I'm sure you will have anyway, with Mr. Didani is the desire to have me as standby counsel.  Now, that's a twofold analysis.  The first part of it is whether he wants standby counsel.  And depending on the answer to that, if it's yes, that's the answer to the first question.  If it's no, then there's a subquestion, does the Court feel as though standby counsel should be appointed anyway, and I think the answer to that question should be yes.  So in either case, I think there should be standby counsel for the reasons in the motion.

But the Government -- the second part of it is the most important point.  The Government raised the issue of my statements in the motion to withdraw citing a breakdown in the communication and problems that we were having in our relationship.  It is my view, in addition to what I wrote in my motion, that a lot of that is alleviated by my current role.  I think some of the friction and problems in our relationship had to do with my strategic decision making that I still stand by, but I was disagreed with by my, at the time, client and now his own attorney, Mr. Didani.  So I think some of that has been

alleviated by the new relationship between us.

There's also been a softening of some of both of our language with each other, in our relationship just person to person outside of the context.  So I am comfortable serving in that role, despite my comments in the motion, which at the time were true and, frankly, if I remained as lead counsel, probably wouldn't have changed.  So I am comfortable in that role.

To just may be more precise on something the Court said earlier, the FDO did not only investigate the ability of other standby counsel that stepped in, but actually someone met with Mr. Didani at Milan.  And it became a real impractical and feasible thing with Mr. Didani's request for the timing of his trial and the ability to appoint other counsel.  So I was asked by the FDO.  And in aid of them and this Court and my care for Mr. Didani, I am willing to serve in that capacity, but I do think Mr. Didani should comment on that portion of the relationship given what the Government raised in their motion.

So that was a long windup, Judge, to the threshold issue that I think the Court needs to address.

As to the continuance, I could not find a case directly on point where the issue was ripe with the exact precise question where standby counsel makes a request and the client directly contradicts that request.  By inference in the cases I cited for you, there was a standby counsel request independent of the lawyer/client party in those cases where the

Court relied upon standby counsel's request and representations to support and germin (ph).

So I think that I have the ability ethically to make that request, and you have the power to grant it, even over objection. And the reasons for that are many. I list some of them in the motions.

I think one of the most important parts here, though, Judge, is probably the most obvious. This is going to be a lengthy trial, whether it's six, seven, eight, nine or ten. I know you've had a lot of numbers thrown at you right now. The estimate is eight to ten.

I am expected to be able to take over for Mr. Didani, whether it's day one or day 15 or day 25. That means that my preparation, even though I'm relegated to standby counsel, is virtually the same if I am to be expected to aid this Court as standby counsel and aid my former client, Mr. Didani. I have to be ready. I already found that to be a challenge without the gap between my termination, or requested termination by Mr. Didani, my motion to withdraw and then reappointment. That was even additional time lost.

In the interim, Judge, before I was appointed standby counsel, or asked again, I also had a trial scheduled for that same date, which I cited for you in the brief.

And finally, your Honor, I think that out of due care for my other clients in the last months of planning I think

that picking a date where I can fashion a schedule based on what this Court likes to do in trial, for a trial of this length, the days of the week, the times of the week, I think that is only fair to me and my clients and the other parts of my practice.  And I think on balance 120 days, given the full scope, while I know it's frustrating to Mr. Didani for the reasons I just stated, serve the interest of justice and outweigh the interest of Mr. Didani to have it four months or so earlier, a hundred days earlier.  That's after all what it is, a balancing test.

So unless the Court has any questions, those are my general thoughts.

THE COURT:  I do not.  Thank you.

MR. FINK:  Thank you.

THE COURT:  Now, wait a minute.  You told me you had a trial when again?

MR. FINK:  That trial, I believe, is scheduled, if not the day before, the day -- let me just be precise.

THE COURT:  I know it's in here somewhere.

MR. FINK:  I don't think I put the precise date, but I'm going to tell you it so that I am precise on the record here.  This was scheduled for -- "Please see the attached notice to appear."

Monday, November 4th is People versus Jeffrey Adams.  That's 23-28019-FC out of the Livingston County Circuit Court

with Judge Geddis.  That is going to be a difficult one to adjourn.  It was not my choice to set it on that date, and, in fact, Judge Geddis knew of a conflict I may or may not have, but that's another story.

And whether or not I could adjourn that, hopefully I don't have to make that decision, but I do think that that is my preparation for that.  However far she's willing to move it, even if she was, also plays into the calculus.  But I think it's a far lesser -- of lesser import than my ability to take over at any time.

THE COURT:  Okay.  Mr. Didani.

DEFENDANT:  Your Honor, with all due respect to standby counsel, Wade Fink, I object to his request.  Wade Fink he knew very well that I was very firm about November 5th.  So he should have never accepted the standby counsel if he knew that I was very firm on November 5th.

Also, your Honor, before I start my argument opposing the Government's request, I wanted to make something -- as far as July 1, the Spain request, one of the assistants of International Affairs, the request of Spain it was that the Government had a firm date, October 8th, for trial.  So they requested Spain on July 1st to send all information as far as the investigation that happened on those countries.  So the Government told Spain on their request, Jason Carter, that they have a firm date for October 8th.  I'm not sure --

THE COURT:  For trial?

DEFENDANT:  For trial, yes.  So I'm not sure why the Government on October 8th didn't ask Spain in July -- on July 1st, why didn't they ask Spain in the same time to bring those witnesses here.

THE COURT:  One second, please.

(At 2:34 p.m., briefly off the record.)

THE COURT:  Go ahead.  I'm sorry.

DEFENDANT:  On July 1st, your Honor, this Court was firm and gave the Government two days.  One was October 8th.  One was November 5th.  The Government International Affairs, Jason Carter, made a request to Spain that we have a firm date.

Now, at that point, July 1st, there was no issue between me and my counsel other than stipulation that he entered with Mr. Bilkovic as far as jurisdiction.  So that's another thing.  So there was no problem.  So if the Government didn't request Spain, those witnesses to be prepared for October 8th is behind me, you know.  It's July 1st.

So I just wanted to make this point, your Honor, you know, that all this argument is going back and forth.  We didn't have my lawyer, the wait, it's ineffective, or he's coming, he's going.  They had a firm date, your Honor.  So they could have asked Spain on July 1st not only to bring that information as far as the discovery, but they could have asked Spain about their witnesses they have in Spain.  It's been six

months.  It's almost six months, your Honor.

THE COURT:  Okay.  Do you have more argument relative to their motion?

DEFENDANT:  Yes, your Honor.  So it's -- I just wanted to make clear here, because I'm looking at some -- another load is added up to January 14, two thousand -- maybe '20.  Is that --

THE COURT:  You're asking him about a piece of discovery?

DEFENDANT:  No, it's on there.  The Government -- it's supposed to be five loads the Government is seeking to prosecute.  There are six.

THE COURT:  About some of the evidence in the case?

DEFENDANT:  There is six.

THE COURT:  No.  I want you to respond to their motion to adjourn.

DEFENDANT:  Okay.  Your Honor, I object to it, you know, because -- there are too many reasons.  The Government blamed my lawyers that --

THE COURT:  Well, frankly, your lawyers didn't come to court.  I had to order them to court, just so you know.

DEFENDANT:  Yes, your Honor.

THE COURT:  I sent out an order telling them they had to appear.

DEFENDANT:  Yes, your Honor, but --

THE COURT:  They had not voluntarily appeared.

DEFENDANT:  Yes, your Honor.  Because the Government say the attribution to their delay is because my lawyer is filing motions.

THE COURT:  But you disagree with that?

DEFENDANT:  We have to understand that, your Honor, that there is not -- my lawyer is filing a motion in October 18, 2022.  The Government in October 25th, 2022, entered jurisdiction -- motion for jurisdiction, you know.  It took the Government after too many extensions to reply.  And I put it in detail, it's out there in the motion, the Government is the only one who extended, because -- a lot of reason.  The lead counsel was in a trial, Billy Arnold trial.  And so a lot of --

THE COURT:  Doing what?  Losing ...

DEFENDANT:  Billy Arnold's trial.  So this is not -- the Government had filed in 2022 another extended delay based on Billy Arnold's trial.

THE COURT:  And that's the trial before Judge Berg?

DEFENDANT:  No.  That was before Judge -- Judge Berg, yes, your Honor.

THE COURT:  Okay.

DEFENDANT:  Now, here we go again, there is another trial.  Judge --

MR. McDONALD:  It was Cox.  That was the prior judge.

DEFENDANT:  Judge -- prior, but it was Judge Berg.

Judge Cox it was after, you know, but in 2022.  So here we go again all right now, your Honor.  The lead counsel is in another trial, you know.

And it appears that in February 5th, 2024, Judge Berg again entered this.  So the lead counsel knew eight months ago that again those two dates they are almost close to each other.  And I don't understand.  The same thing is happening with Billy Arnold.

So the lead counsel is preparing every other trial, but my trial.  This is a one-man indictment, your Honor, you know.  And so we're almost four years, close to four years.  And everybody prefer to do every other trial but my trial.  It's the only one that's been ineffective.  And who's been delaying in this trial is the Government, your Honor, from the beginning how this case began.

The Government never had jurisdiction -- under maritime drug law.  The Government, even after my first indictment, they superseded me.  There is no case under maritime drug law that you could take somebody under custody and they're superseding over some certificate.

So the only -- my lawyers cannot file -- the Government tells my lawyer we're going to supersede him, we're going to supersede him.  My lawyer cannot file under maritime drug law's motion without the Government producing those certificates.  And this is -- the issue has been over here,

your Honor, and the Government doesn't understand in front of this Court. And it's -- having a certificate doesn't suit you with a jurisdiction. Certificate is claim that you have the primary consent, that you see the suspect based on high seas. That's why they say maritime, that you boarded, that you boarded the vessel, that you see the crew. That's 70503(a), your Honor. And then extend it to the land of conspiracy, 70506(b).

The only -- the only person, the only cite who's been ineffective in this one is the Government, your Honor. It's insulting to this Court. It's insulting to the Second Circuit. It's insulting to the Eleventh Circuit. It's insulting to this circuit.

There is no case under MDLEA that the boat had left, seized in another port, without the United States help. The Government can scream all they want. You want to prosecute this case over here. It doesn't happen. It doesn't exist. Maybe the Government -- I can leave them -- not necessarily MDLEA, and they can understand what the MDLEA require, so --

THE COURT: So let me just understand this. You're objecting to the adjournment of trial because you believe there's no case based on jurisdiction; is that correct?

DEFENDANT: Your Honor, I'm going -- my --

THE COURT: I'm just asking.

DEFENDANT: Yes, your Honor.

THE COURT:  Okay.

DEFENDANT:  But I'm going -- my point is -- to close, your Honor, is that this case is prolonged not because of Wade Fink.  The only people you have to see in this courtroom why this case is prolonged so long is the two guys right there, with all due respect, Mark Bilkovic and McDonald.

So there is a lot of -- I put some issues out there, your Honor, on detail.  And, if the Government wishes more time, I do put it on the -- there are two things.  I want a bond, because it's just like I said, your Honor.  My mother and my family dying.  And between this time if you for somehow -- I'm ready to go to trial --

THE COURT:  I misunderstood your thing.  I thought your parents were ill.

DEFENDANT:  Yes, with cancer, both of them.

MR. FINK:  Terminally ill.

DEFENDANT:  So --

THE COURT:  They're not deceased, they're ill?

DEFENDANT:  They're ill, terminally ill.

THE COURT:  All right.

DEFENDANT:  So I'm ready to prepare.  I have watched every -- when their discovery came from Holland, that authority, now we're waiting from England.  I don't know.  Maybe in two years we're going to have from another country.  That's what the Government is doing.  Their use of 3292, your

Honor, the Government knows you cannot seek evidence four years later after you have somebody under custody.  There is no case like it, your Honor.

So the only -- the only person who is here being ineffective and who's prolonging this trial is Mr. Mark Bilkovic and McDonald.  And, if, your Honor, for some way, somehow, I'm ready to go to trial on November 5th, I know exactly which way they're going.  I have looked at all the -- last week I looked at almost thousands of pages of investigation of my ability, 2022, 2023.  Mr. Didani is in Milan all these years.  Why the Government chose to dump all this paperwork irrelevant to this Court is beyond me.

Again, with Holland, that's authorities.  Dumping thousands of pages that's irrelevant to this Court, but it's okay.  I'll take my time and I can see each one page, and I'm ready to go to trial in November 5th.

THE COURT:  Okay.

DEFENDANT:  But, your Honor, if some way you give them more time, I would like to have a bond hearing.

THE COURT:  Okay.

DEFENDANT:  And, not only that, if you give them more time, I would like to revisit subject matter jurisdiction.

THE COURT:  I'm not promising that.

DEFENDANT:  There is -- I would like to revisit that, your Honor.

THE COURT:  I still am not promising that.

DEFENDANT:  But in case, your Honor, in case, you know, in case that you willing to give the Government more time, four months, I would like to have a emergency bond and I would like to revisit subject matter jurisdiction, your Honor.

THE COURT:  Okay.  All right.  Do you all need to say anything else about this?

MR. BILKOVIC:  The only thing I would like to say is with respect to the pages that he's talking about that he was wondering why we dumped them off, this is the discovery that we provided to the original defense counsel, the majority of it in 2022, and he did not get it to Mr. Fink when he withdrew.  So what we did is we reproduced it and it was turned over to Mr. Didani in Milan.  We didn't --

THE COURT:  You provided it to who in 2022?

MR. BILKOVIC:  Provided it to, I think, Brian Kaplan who was the attorney of record.

THE COURT:  That was the gentleman who I had to force to appear?

MR. BILKOVIC:  Yes.  And then when Mr. Fink, when he withdrew and Mr. Fink tried obtaining it from him, he was not -- he didn't provide it to him.  He either didn't have it or refused to provide it to him.  So we then did it again.

MR. FINK:  That's accurate.  That's how we, when we had the last hearing, tried to explain what I had and didn't

have.  That's for the reasons just stated.

I just want to make -- this is for the record, Judge. I mean, to my knowledge there is not a motion cutoff that he is -- Mr. Didani would have to ask for leave.  He does know the consequences of filing a motion and my --

THE COURT:  I don't think so.

MR. FINK:  If there's been --

THE COURT:  I don't think he understands the consequences of filling a motion.

MR. FINK:  That's why I'm saying it, Judge.  I want to say that, because there are several things that we have talked about.  And I just want him to understand so that there's no question about this later.

Judge Hood, Mr. Didani, and this Court will entertain anything you file, but if you file a motion that --

THE COURT:  Stops the clock.

MR. FINK:  It stops the Speedy Trial clock, but you are not too late to revisit these issues that you're talking about.

And I think that's very important, Judge, for a lot of reasons that I say that.

THE COURT:  Okay.  Very good.  I've heard your arguments, and I think there are a lot of competing interests. I'm sure along the way, having now had three --

How many trials have you had, Mr. --

MR. BILKOVIC: Since when?

THE COURT: Not total. I just want to know have any of the three of you counsel ever had a trial, a criminal trial, with a person representing themselves?

MR. BILKOVIC: In 1995, my first felony trial in Oakland County Circuit Court. None since.

THE COURT: None since, okay.

MR. BILKOVIC: Thankfully.

MR. McDONALD: Yes, your Honor, in Oakland County, not in Federal Court.

MR. FINK: Never, your Honor.

THE COURT: Then you should know, Mr. Didani, I have had --

Three, Ms. Saulsberry? Three.

THE CLERK: Um-hmm.

THE COURT: And in the last two -- I think we'll probably make some new law about what has to be done relative to standby counsel and also the authority of the Court to appoint someone who either thinks they're as smart as any lawyer they could ever have, or they're just dissatisfied with every single lawyer that I give them, even though every new lawyer might be even a better lawyer than before. And I'm not saying you don't have the right to represent yourself.

But, for instance, you've brought a motion here today. The motion has to be filed. That's like a really fundamental

issue.  And you told me you had studied all the rules of procedure and evidence and so I believed you.  But you're not abiding by them, and you should know that I will start to hold you more and more accountable for that, all right.

One of the things that I think has to be juggled is that, of course, we have a lot of important cases in this court, and we have -- what do we have now, 15 plus six -- 21 judges that hear cases.  Almost all of them hear criminal cases.  And, of course, their dates are going to bump into one another.  And, of course, like in this trial, there are reasons why trials get set over for different kinds of reasons.  So that's another issue.

One of the issues with standby counsel is that they do, and you should know, in at least -- actually, this is the fourth one, Ms. Saulsberry.  In at least one case where I had a person representing themselves they near the beginning, maybe a couple days into trial, asked that their counsel take over.  And the counsel, if they take over, has a completely different set of rules and responsibilities for proceeding with trial than does -- the same as they would if they were representing you from the beginning.  Their responsibility is to be effective counsel.

And while it is entirely up to you whether you want to look at the discovery beforehand, I think the standby counsel has to look at the discovery beforehand to be sure they know

what the case is and what might be presented, all right, for two reasons.  One, in the event that you turn to them and say I really can't do this, I'd like you to step in and I'm going to tell the judge, or two, to make sure that they advise you so that you don't commit an error that we can automatically see and could avoid and, therefore, avoid having another trial.

And so I think that we're going to get all the discovery that you get in advance by -- what date did I say, November 1?

THE CLERK:  Yes, Judge.

THE COURT:  And then a month before trial you're going to get some Jencks material, which it's going to take some days to go through.  And I understand that your time of going through it might be different than everybody else's, because it's the only trial that you have, and the other counsel have other trials.

And so I am going to grant -- and I don't disagree.  I hope the Government won't come here on the trial date and not submit any of the evidence that they've said they need to get to you and not submit a shred of it, or not submit any of the witnesses that they've told me they need to bring from overseas.  I'd be entirely disappointed if they come here.  Although, it's also their choice if they come here with no overseas witnesses.  I will be surprised, okay.

But I am going to grant the adjournment.  You guys, I

think four months is too long.  And you should know that if I grant it for 90 days it messes up my schedule, too.

Who has the 90-day problem?

I have it, right?  I have a trial I'm trying over, right, in February?

THE CLERK:  Yes, Judge.

THE COURT:  Is that the tax one?  He's on bond; right?

THE CLERK:  Which one?

THE COURT:  The one I'm trying over.

THE CLERK:  No, he's on bond.

(At 2:52 p.m., briefly off the record.)

THE COURT:  I want to do it on February 11th.  Can you all do that?

MR. FINK:  Can you make a call for me to Judge Toia at Macomb County?

THE COURT:  Ms. Saulsberry will call him, and if he needs my personal voice on the phone I'll do that.

MR. FINK:  Thank you, Judge.  Then, yes.

THE COURT:  And will you provide that information to Ms. Saulsberry?

MR. FINK:  I will.

THE COURT:  Okay.  What kind of trial is it?

MR. FINK:  Murder, Judge.

THE COURT:  So your client is in custody?

MR. FINK:  He is not actually.

THE COURT:  Oh.  Well, then --

MR. FINK:  Third retrial.

THE COURT:  Okay.  Who is the AUSA on that case?

THE CLERK:  Carl Gilmer-Hill.  And David Steingold is the attorney.

THE COURT:  We need to call them, okay.

MR. BILKOVIC:  You would rather do a trial with us than them, I think.

THE COURT:  I've already tried it once.  It will be no surprises to me, I don't think.

MR. BILKOVIC:  February 11th --

THE COURT:  I could be totally long.

MR. BILKOVIC:  February 11th is satisfactory to the Government.  We appreciate the quick consideration.  We will have foreign witnesses here.  We will not come back and tell you we need more time.

THE COURT:  Okay.

MR. FINK:  May I ask you, Judge, your typical trial schedule so I can do some math here with the Government as to what we expect?

THE COURT:  Right now, and until further notice, which I reserve to take note of, I have you come for trial at 9:00.  If you get here a little bit before 9:00, we actually can get started at 9:00.  I have softly -- I don't know.  Is there such a thing as soft intimidation?  I think I've softly intimidated

the jurors by the third day to come on time.

And, if you get here by 9:00, we'll go from 9:00 to 1:00.  I usually take -- what does your office tell you, 15 or 20 minutes break, because the jury just can't last, okay.  And I do that because if I do that I can assure that the defendant gets back to Milan.

And because Mr. Didani is representing himself, I think, like if you were in trial, when you get finish with trial, you go do some work for the next day.  And in order for him to do that he needs to get out of here by the time that they are last going to transport him.  Otherwise, he'll be in a predicament where he can't use any of his materials.

And that's no disrespect to Milan, but the marshals, you agree that's been my experience in the past?

MARSHAL:  Yes, Judge.

THE COURT:  Yeah, I think so.  And you should know that -- well, yeah.

MR. BILKOVIC:  Every day, Judge?

THE COURT:  Yeah, but there are a couple days in there between the 1st and the 11th -- well, between the 11th and the -- whenever you end that we won't be in trial.  Like we won't be in trial on the 21st.

What day of the week is that, do you know?

THE CLERK:  The 21st?

MR. FINK:  This may be a silly question while

Ms. Saulsberry is looking it up, Judge.  Presumably, just in managing my practice, as things come up in certain days there's some flexibility in this length of a trial if --

THE COURT:  Yes, there is, but not a lot, but the --

Do you know what day that is?

THE CLERK:  It's a Friday.

THE COURT:  It's a Friday?

THE CLERK:  Um-hmm.

THE COURT:  So we'll be off for sure the 21st.  And then there's also Columbus Day, which I think is actually the Monday before that.

THE CLERK:  The 17th.

THE COURT:  The 17th.

MR. FINK:  So no trial the 17th?

THE COURT:  And maybe not on the Monday following the 21st, but I reserve the right to have trial on that day.

MR. FINK:  Okay.  But generally speaking, Judge, barring a holiday, the Court schedule or --

THE COURT:  Monday through Friday.

MR. FINK:  -- it's Monday through Friday, 9:00 to 1:00?

THE COURT:  Yes.

MR. BILKOVIC:  Would the Court like to set a final jury pretrial just to go over --

THE COURT:  Yes, I do.  I want you to know that no

matter what you file between today and February -- what did we say, 11th?

THE CLERK:  Yes.

THE COURT:  They'll be no adjournment of that day.  So if any other judge of this Court sets a date you tell them that Judge Hood has set a date, she's not going to adjourn it, please, Judge, call her and say how unreasonable she is or that she adjourned it partly because you had a trial date in November, or when was it, October?

MR. FINK:  May I use that statement to State Courts as well, Judge?

THE COURT:  You may.  Just tell them it's a date that I'm not going to move.

MR. FINK:  Yes, Judge.

THE COURT:  And you can tell them why.  Tell them the defendant is representing himself, that he didn't want it adjourned from a November date, and that he's in custody.

MR. FINK:  Yes, your Honor.

THE COURT:  Okay.  All right.  And, if for any reason either one of you is going to be unable to appear for some unforeseen reason, you need to have somebody that's prepared to step in, as will I.  In the event that I think I'm going to have some reason why I will not be able to appear, I will have somebody ready to step in, okay.

I'm going to set -- Ms. Saulsberry, do you think we

can get somebody down here from Pretrial to interview him before he has to go back, or downstairs, they can meet him downstairs?  I'm going to transport until four o'clock; right?

MR. FINK:  Transport is already gone; right?

THE COURT:  No.  They told me I have until 4:00.  I don't?  The marshal is here.

MR. FINK:  Oh.  I meant to Milan.  My apologies.

THE COURT:  Aren't you going back to Milan?

DEFENDANT:  You know, I said, you know, because the other problem is I haven't had nothing to eat.  I haven't eaten today, in the morning.

THE COURT:  You haven't eaten?

DEFENDANT:  Nothing.

THE COURT:  The marshals have food down there, don't they?

DEFENDANT:  No, I can't eat.  It's a special diet, your Honor.

THE COURT:  So you haven't eaten because you haven't been at Milan?

DEFENDANT:  No.

THE COURT:  Milan doesn't have special meals?

MR. FINK:  They do, but the transport --

DEFENDANT:  The transport doesn't have one.  They didn't brought one.  And now they trying to send me back to Livingston.  So that means I'm not going to eat tonight or

tomorrow.

THE COURT:  Okay.  So tell me this.  Why are you going to Livingston?

DEFENDANT:  I don't know.  Ask the marshals.

THE COURT:  Well, the marshals just told me you could go on the transport to Milan, and they haven't left yet.

DEFENDANT:  Okay, Judge.

THE COURT:  Help me, marshals.

MARSHAL:  I don't have the --

THE COURT:  And it's four o'clock; right?

MARSHAL:  They have to be back -- they have to leave here by 12:30 --

THE COURT:  That's not possible.  That's unreasonable.  I can't have him leave by 12:30 when he's in trial.  So who should I talk to?

MARSHAL:  The supervisor, Amanda Seeger or --

MR. FINK:  Yeah, I know who.

THE COURT:  Okay.  Make a note of that so I can talk to them, because --

MR. FINK:  Amanda Seeger, is that what you said?

THE CLERK:  What was the supervisor's name?

MR. FINK:  Amanda Seeger, S-E-E-G-E-R.

THE COURT:  When I had my other pro per, I only had to have them downstairs by 4 p.m.

MR. FINK:  Ms. Seeger was the person that I was --

THE COURT: What's your special diet, if you don't mind me asking?

DEFENDANT: Everything is not gluten on it.

THE COURT: It's non -- gluten-free?

DEFENDANT: It's gluten-free.

THE COURT: They don't have that at Livingston?

DEFENDANT: No.

THE COURT: I didn't think so, but Livingston is getting better. Okay.

DEFENDANT: But the marshals they can call Milan and say they'll find somebody to keep me here. Like they dealing with another inmate.

THE COURT: What other inmate?

DEFENDANT: They always five o'clock, six o'clock for some -- that's up to you, your Honor.

THE COURT: They don't -- they're unhappy surely to hear from me.

Okay. Let's do this. Will the marshals please note that Mr. Didani hasn't had any food. So can you guys note that?

MARSHAL: Yes, Judge.

THE COURT: Maybe you all can do something about that, maybe.

MARSHAL: This is our first hearing about it, so absolutely. We'll --

DEFENDANT:  Your Honor, they try early, but, you know --

THE COURT:  "They" who?

DEFENDANT:  Absolutely not.

THE COURT:  "They" who?

DEFENDANT:  The marshals.

THE COURT:  What marshal?

DEFENDANT:  That was back there.

THE COURT:  They're not like one person.  They're several.

DEFENDANT:  They're several of them.

THE COURT:  Okay.  So I would like to see what you could do about making sure he has a meal to eat today, okay.

MARSHAL:  Absolutely.

THE COURT:  I know that's a lot to ask, but I am asking it.

MARSHAL:  It's not an issue.

THE COURT:  Okay.  What else do we need to take up?

THE CLERK:  We need to give him a pretrial conference date, Judge.

THE COURT:  And what about pretrial?  If he's not going to be transported back to Milan, I might as well get Pretrial to talk to him.

THE CLERK:  Pretrial a date of January 28th at 2 p.m.

THE COURT:  For what?

THE CLERK:  For a pretrial conference.

THE COURT:  Okay.  January 28th.

THE CLERK:  At 2 p.m.

THE COURT:  And that's going to be a final pretrial conference, okay.  And I'm going to give you a motion cutoff, but I don't know when I'm going to want it to be.  I'll give you that date, though, okay.

And now let me ask you does the Government just want to file a response to his request for bond?

MR. BILKOVIC:  Yes.

THE COURT:  You should file a written -- or can I just conclude that this document is your also request for pretrial release?

DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  All right.  Great.  Then you file a response.  How soon can you do that?

They're going to take probably until at least -- this is what, Wednesday?  They're probably not going to give me anything until Monday.

MR. BILKOVIC:  Can we have seven days from the time we get the Pretrial Services report?

Mr. McDonald, I don't know what else he's juggling. I'm starting a trial next week.  If we can get it to the Court sooner, we will, Judge.

THE COURT:  All right.  So seven days from the final

pretrial -- from the Pretrial Services date.

Can I decide it without argument?  Is that fine with the Government?

MR. BILKOVIC:  That's fine.

THE COURT:  What about with you, Mr. Didani?

DEFENDANT:  Yes, your Honor.  Yes, ma'am.

THE COURT:  Okay.  All right.  Great.  Where do your parents live?

DEFENDANT:  Chicago, your Honor.

THE COURT:  Anybody live there with them?

DEFENDANT:  My parents -- just my parents and my nieces.

THE COURT:  Your parents and your nieces?

DEFENDANT:  Yes.

THE COURT:  How many?

DEFENDANT:  They're two nieces.

THE COURT:  How old are they?

DEFENDANT:  23 and 21.

THE COURT:  But their parents don't live there?

DEFENDANT:  No.

THE COURT:  Okay.  All right.  Can we get somebody, do you think, Ms. Saulsberry?

THE CLERK:  Yes.  I just called Pretrial.

THE COURT:  Okay.  They're going to come down and interview you downstairs.

Mr. Fink, I hate to ask you, but you need to go down there with him, okay.

DEFENDANT:  Your Honor, can I ask a few things?

THE COURT:  You what?

DEFENDANT:  Can I ask you a few things?

THE COURT:  Ask me for things?

DEFENDANT:  I wanted to bring something, because the last time we have a -- because we've been going -- I'm sorry. I know it's long, but Mr. Bilkovic said --

MR. FINK:  I'm sorry, Judge.

THE COURT:  I know.  The State Court is different, but we're not yet --

MR. FINK:  My apologies.

THE COURT:  Okay.  What do you want to ask me?

DEFENDANT:  Because he said there was mandatory 20, and under USC 21, 960 --

THE COURT:  Mandatory what, 20 years in prison?

DEFENDANT:  Yes.

THE COURT:  For this indictment?

DEFENDANT:  For this indictment.  That's why I want to make --

THE COURT:  You think it's how much?

DEFENDANT:  The mandatory -- I mean, without the quantity of the drugs, the mandatory is ten years, your Honor.

THE COURT:  Without the quantity?

DEFENDANT:  It's a mandatory ten.

MR. BILKOVIC:  I believe that's correct, and if I said 20 I misspoke.  You should have the acknowledgment of indictment.  I'll double-check to make sure those numbers are correct.

THE COURT:  Yes, please do, and if they're different let him know.

MR. BILKOVIC:  Absolutely.  And one of the things that again I want to do is -- and we'll have a Lafler hearing at one point, but present a formal Rule 11, because I think there maybe is a misconception as to how much time the Government ultimately would seek in this case, and I want to make sure that he's aware of that.  So we will make sure that we do that as well.

THE COURT:  You make sure that you serve it on him and a copy on his standby counsel.

MR. BILKOVIC:  Yes, Judge.

THE COURT:  But I don't want you to serve his standby counsel and not Mr. Didani.

MR. BILKOVIC:  No.  Everything that we file in this case we will make sure that we serve Mr. Didani and Mr. Fink.

THE COURT:  Okay.  All right.  What else do you want to know?

MR. FINK:  Can we approach real quick, Judge?  This is not about Mr. Didani, but off the record.

THE COURT:  But in a second.

MR. FINK:  Sure, sure.

THE COURT:  Let me find out about Mr. Didani, because I want to get him downstairs to talk to Pretrial.

What else do you have, sir?

DEFENDANT:  I just wanted to make clear, did Portugal ever considered to you as jurisdiction?

THE COURT:  Okay.  The jurisdiction question, you and opposing counsel can have that discussion all you want when you have your discussion on October 25th, okay.  And he will clarify whatever he's going to do with jurisdiction and everybody can decide whether or not they think I actually decided that or not, okay.

DEFENDANT:  And it's important for the Court.  Are we bringing the jurisdiction issue to the trial -- to the jury?

THE COURT:  We're not bringing any issues of law to the jury, no.

Is that fair?  Do you think there is some jurisdictional issue that has to do with --

DEFENDANT:  But who decides, your Honor?

THE COURT:  I decide that.  That's why I'm the judge.  And I have people over me who decide if I'm wrong.

Now, tell me this.  Do you think they're any jurisdictional issues that are for the jury?

MR. BILKOVIC:  No, your Honor.

THE COURT:  Do you?

MR. FINK:  You made a pretrial determination the jurisdiction under the MDLEA.  I do think one of the elements of the MDLEA requires the jury to make a factual finding that supports that jurisdiction --

THE COURT:  So it's a mixed question of law.

MR. FINK:  I believe -- Mr. Bilkovic may object.  I will help him with jury instructions obviously.  I think Mr. Bilkovic may object, but I think one of the elements of the MDLEA conspiracy requires a factual finding that supports jurisdiction.

THE COURT:  Okay.  That's fine.  Which is a mixed question of law, in fact, which means the jury would decide a factual issue that might impact jurisdiction.

MR. BILKOVIC:  Correct.

THE COURT:  Okay.  That's fine.  That's in there, I think.

MR. FINK:  It's been one of the points of contention in our relationship.

THE COURT:  It would be very helpful if you would help him with that jury instruction ahead of time so that you guys can know what the jury instruction is going to be now instead of in, you know, February 11th or February 1st when I may require that you submit them, okay.

Could you bring that up then?

MR. FINK:  I sure can.

THE COURT:  Okay.  Can you let your standby counsel propose such an instruction to you?

DEFENDANT:  Yes, your Honor.

THE COURT:  Very good.  What else?

MR. FINK:  Can we clarify that Mr. Didani, all things considered, wants me to be the standby counsel?

THE COURT:  I should have spoken to that, and that is that you all know that a criminal defendant is entitled to effective counsel, okay.  But they are not required -- I'm not required to appoint them a counsel of their choice, okay.

And, Mr. Didani, that means I'm not required to appoint you a standby counsel of your choice.  You don't even have to get along with the standby counsel, okay.  The standby counsel is there so that if you should, as I said, throw up your hands at trial or start doing something that's clear error, they could step in on your behalf.

And I think I fully can require Mr. Fink to continue as your standby counsel.  And you should know that it won't be like this at trial.  He won't be talking nearly -- hardly any at trial, okay, and especially in front of the jury, which has the right to see that you are representing yourself and that you choose to.  And I'll also note to them in my instructions to them.  But you don't have a right to have your choice of standby counsel.

And you should also know that one of the issues in standby counsel is how long does it take that person to come up to speed on all the issues, okay.  And that's why Mr. Fink is here today.  All right.

MR. FINK:  We like each other just fine personally.  It's always been a grievance about legal issues.  So I think we've addressed that.

THE COURT:  That's fine.  And I guess to some extent you have to defer to him, even if he's in error, and I think that you have to continue.  I just think if you get a new standby counsel I think we're starting from scratch.

I mean, your counsel already thinks I'm wrong on some of the legal issue so that's a good thing.  That's actually in your favor, all right.

DEFENDANT:  You know what would be in my favor, your Honor.  It would have been in my favor if we hold the --

THE COURT:  Trial November 5th.

DEFENDANT:  November 5th.  Of course, your Honor, November 5th, you know, but if we would have hold -- and I wish Mr. Fink, you know, with all due respect, you know, I have a lot of respect for him as a person.  He never consented to enter to any agreement or stipulation with the Government, because --

THE COURT:  And that's an argument you get to make another day before another judge.

DEFENDANT:  Yes.

MR. FINK:  And to be clear, you've stipulated to nothing for your trial.  You can argue every single fact in this trial whether it's true or not, and I don't want you to think you've disagreed --

THE COURT:  Now, that's a discussion you all can have together, okay.

DEFENDANT:  But --

THE COURT:  And you should know, Mr. Didani, that the Government is going to offer you some stipulations.  For instance, likely one of them is going to be we have a document that says that this particular item we recovered is a drug and it's this kind of drug; is that right?

MR. BILKOVIC:  That's correct.

THE COURT:  And that somebody tested it.  And they're going to ask if you'll stipulate to the report and probably the qualifications of the tester or the testing organization, and you have the right to say no, bring that person to court and let the jury decide if they believe they're an expert or not and if they did it right, okay.  But he has the right to say "will you stipulate to this," because I don't think your argument -- well, I don't know what your argument is, but your argument it may be it's not drugs.  And, if your argument is it's not drugs, you have the right to proceed with that.  I can't require you to stipulate.  A stipulation is an agreement,

okay.

All right.  So here's what I want to do if we have nothing else.  I'd like you to get downstairs to be able to see the marshals -- I'm sorry, the Pretrial Services people for your bond, okay.

MR. FINK:  Judge, I sincerely apologize for this.  I have three people standing at the Tiger statue outside the game waiting --

THE COURT:  I bet they do.

MR. FINK:  No.  Waiting for me to bring them tickets.

THE COURT:  I imagined it was something to do with the game.

MR. FINK:  I feel bad.  I mean, if I stay --

THE COURT:  -- the game in the first ten minutes.

MR. FINK:  If it's only a ten-minute interview, sure, but I don't know that it's going to be a ten-minute interview, Judge.  I just feel bad they're waiting on me.  I'll miss part of the game if they're waiting on me to bring the tickets.  It's on my phone.

THE COURT:  Okay.  So here's what I'll do.

Mr. Didani, can you be interviewed by Pretrial Services without Mr. Fink there?

DEFENDANT:  That's fine, your Honor.

THE COURT:  And can Mr. Fink call the Pretrial Services people on his own to find out what happened?

DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  There we go.  You don't have to go downstairs.

MR. FINK:  Thank you for your time, your Honor.

THE COURT:  Do you all have anything?

MR. BILKOVIC:  No, your Honor.

THE COURT:  Okay.  Very good.  I'll see you all the next time you're here, all right.  All right.  Thank you.  And make sure that this document gets filed on the docket, please.

MR. FINK:  I'm doing that, Judge, and giving him instructions to file.

THE COURT:  It doesn't have to be today, but --

MR. FINK:  Well, I'm going to give him instructions how to file from the clerk, too.

THE COURT:  All right.  Great.

And, marshals, please see if he can get some food.

MARSHAL:  Yes, Judge.

THE COURT:  Okay.  Thank you very much.  I appreciate it.

(The proceedings were adjourned at 3:14 p.m.)

                        _   _   _

CERTIFICATE OF COURT REPORTER


I, Sheila D. Rice, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages is a correct transcript from the record of proceedings in the above-entitled matter.


_s/Sheila D. Rice_____
Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date:  01/13/2025
Detroit, Michigan.